ORIGINAL

# EXHIBIT A

MC-275

Name _Gregory L. Brown_

Address _SATF- Corcoran_

_P.O. Box 5246_

_Corcoran, CA 93212_

CDC or ID Number _J-82241_

ENDORSED
F I L E D
San Francisco County Superior Court

APR 2 5 2007

GORDON PARK-LI, Clerk
BY: JACQUES KHOROZIAN
Deputy Clerk

_Superior Court Of The State Of California_

_City And County Of San Francisco_

(Court)

_GREGORY L. BROWN_
Petitioner

vs.

_WARDEN; SATF-CORCORAN PRISON_
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _5568_

(To be supplied by the Clerk of the Court)

_Evidentiary Hearing Requested_

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)
American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☒ A conviction      ☐ Parole

☐ A sentence      ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☐ Other *(specify):*

1. Your name: _Gregory L. Brown_

2. Where are you incarcerated? _SATF - Corcoran State Prison_

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

_Count I, Conspiracy To Commit Murder_
_Count II, Attempted Murder_

b. Penal or other code sections: _Count I 182.1, 187 ; Count II 664/187_

c. Name and location of sentencing or committing court: _Superior Court of the City and County_
_of San Francisco, Hall of Justice, 850 Bryant St., S.F., CA 94103_

d. Case number: _No. 159271_

e. Date convicted or committed: _May 25, 1995_

f. Date sentenced: _October 12, 1995_

g. Length of sentence: _56 Years to Life_

h. When do you expect to be released? _Immediately upon granting of this habeas._

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:
_Stephen Arian; P.O. Box 668; Kentfield, CA 94914_

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

---

MC-275 [Rev. July 1, 2005]      **PETITION FOR WRIT OF HABEAS CORPUS**      Page two of six

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

GREG'S Right to A FAIR TRIAL AND DUE PROCESS; AS GUARANTEED UNDER the Fifth And Fourteenth Amendments of the United States Constitution; WAS VIOLATED AS A RESULT of his conviction on less than proof beyond A REASONABLE doubt of every Element of the charged CRIMES.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who did exactly what to violate your rights at what time (when)* or place *(where)*. *(if available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

No RATIONAL TRIER of facts could have found the ESSENTIAL elements of the CRIMES CHARGED AGAINST GREG, beyond A REASONABLE doubt. On March 17, 1995, Prosecutor Floyd Andrews filed his Information in his CASE. Count I of the Information ACCUSED GREG of conspiracy to commit murder (CT 1.) And Count II ACCUSED him of Attempted murder (CT 4.). The Information Alleged that the Attempted murder was willful, deliberate, And premeditated. (CT 5.) As to the Attempted murder count, the Information Also Alleged that GREG personally inflicted great bodily injury upon Robin "Williams." (CT 5.) The Information set out 14 overt Acts in support of the conspiracy Accusation, naming GREG in only four overt Acts (Nos. 2, 4, 5 And 6.). (CT 1-4) Overt Act No. 2 ACCUSED      (SEE Continuation, Additional Page.)

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

In RE WINSHIP, 397 U.S. 358 (1970); LEAVITT V. VASQUEZ, 875 F.2d 260 (1989) (9th Cir.);

3     4

<u>Continuation Of "Ground I", Page #2</u>

1  Greg of taking a photo and giving it to Wanda "Fain";
2  No. 4 accused Greg of accompanying Fain to deliver a
3  note; No. 5 accused Greg of encouraging Fain and
4  Joseph "Diggs" to murder Robin Williams; And No. 6 accused
5  Greg and Fain of residing at 136 Blythdale. Overt Act
6  Nos. 2 and 4 are meaningless in the context of the
7  conspiracy charge because there was no evidence of any
8  agreement, between Greg and another or others
9  <u>to commit murder</u>. But, more importantly, those two
10  "Acts" do not meet the legal requirement of an
11  "overt Act." The jury made a determination that Greg
12  encouraged Fain and Diggs to murder Robin Williams
13  (Verdict, Overt Act No. 5), **but there is** not a shred of
14  admissible evidence presented at trial from which this
15  **conclusion could logically be reached.** And there was
16  **no finding of overt Act No. 6.** (Verdict, Overt Act No. 6)
17  There was no sufficient evidence of an overt Act
18  supporting the charge of conspiracy to commit murder.
19  The crime of conspiracy is defined in the California Penal
20  Code (Sec. 182, subd. (a)(1); 184) as two or more persons
21  conspiring to commit any crime, together with proof of
22  the commission of an overt Act by one or more of the
23  parties to such agreement in furtherance thereof.
24  Conspiracy is a specific intent crime. The specific
25  intent required divides logically into two elements
26  (a) the intent to agree, or conspire, and (b) the intent

4    5

<u>Continuation Of "Ground I"; Page #3</u>

1  to commit the offense which is the object of the conspiracy.
2  To sustain a conviction for conspiracy to commit murder,
3  the prosecution must show not only that the conspirators
4  intended to agree <u>but also</u> that they intended to kill
5  the victim.

6        The evidence introduced at trial, as it pertains to
7  Greg may be summarized as follows:

8        1.)  He was arrested on January 6, 1995, at
9  126 Blythdale, while in possession of a handgun and
10  crack cocaine.  Robin Williams made a statement to
11  police incriminating Greg.

12        2.)  He was present when a purportedly threatening
13  note, written by co-defendant Wanda Fain, on paper from
14  a notebook belonging to Fain, was delivered to Williams.
15  The note came with a photograph of her taken by Greg
16  five years before.

17        3.)  Greg and Williams met, and Greg agreed to
18  provide Williams unspecified remuneration if she would
19  refrain from testifying against him at an upcoming
20  preliminary hearing.  The two resumed their previously
21  friendly relationship.

22        4.)  Greg was present at 126 Blythdale on
23  February 7, until about 4:00 to 6:30 P.M. that evening.
24  Williams, Fain and Diggs left to take the bus about 7:30 P.M.
25  / / / /
26  / / / /

◈AO 72
(Rev. 8/82)

Continuation Of "Ground 1", Page #4

First, the January 6, arrest could only be considered on the issue of Greg's motive to commit the crimes alleged. (RT 347-348; 1213-1215.) Clearly, "motive" is not an essential element of either crime charged. Indeed, motive is different from intent (1 Witkin, California Criminal Law (3rd edition 1988); sec. 100, p. 118), and does not establish intent.

Second, the alleged threatening note was written by Frin on her paper. (RT 727-729, 935.) It was delivered about three weeks before the February 7, 1995 shooting of Williams. A reasonable trier of facts could infer that Greg was associated with the note, but it is not reasonable to interpret the note as evidencing an agreement between Frin and Greg to commit any crime, let alone an agreement to kill Williams. Furthermore, about a week and a half after Williams received the note, or about two weeks before February 7, 1995, Williams and Greg reconciled. (RT 520, 545-546, 557.) From that time forward, up to and including February 7, 1995, Williams visited with Greg every day or every other day. There is no evidence to suggest that these approximately seven to fourteen visits were anything but friendly. Indeed, Williams testified that Greg specifically indicated to her that he had no intention to hurt her. (RT 557.)

Third, given the evidence that Greg either lived at 126 Blythdale or was there often and Williams considered

<u>Continuation Of "Ground 1", Page #5</u>

1  him her friend, nothing can be inferred from Gregg's
2  presence at or absence from 126 Blythdale on the day
3  Williams was shot. Williams' trial testimony varied as to
4  when Gregg left on that day. (RT 547-530.) She also
5  testified that she did not remember when he left. (RT 551-
6  552.) At the March 6, 1995 preliminary examination,
7  she testified that he left early, around 4:00 P.M.
8  (RT 547-549, 551.)

9      Nowhere in the record is there any evidence from which
10  a rational inference may be made that Gregg agreed with
11  anyone to take Robin Williams' life, or to do her any harm
12  at all. There is no evidence which even arguably shows
13  that Gregg had an intent to kill Williams. There is
14  no evidence linking Gregg to any weapon associated with
15  the shooting of Williams. There is no other physical
16  evidence linking Gregg to the shooting of Williams. There is
17  no evidence of any discussions among Gregg, Fain, and
18  Diggs regarding killing Williams. There is no evidence
19  that Gregg had any connection to the trip that Fain, Diggs,
20  and Williams took to Third Street. And there is nothing
21  in the statements that Fain and Diggs gave to the police
22  that connected Gregg to the shooting of Williams.

23      The fact that Gregg knew Fain and perhaps Diggs is
24  not sufficient. Mere association is not enough to
25  establish the essential elements of either crime alleged.
26  / / / /

<u>Continuation Of "Ground 1"; Page #6</u>

1.     As shown above, there is no evidence to support
2. the essential elements of the crime of conspiracy to
3. commit murder.

4.     Even less evidence exists with respect to the finding
5. of the crime of attempted murder of Robin Williams.
6. Where, as here, the prosecution has charge the attempt
7. to be "willful, deliberate, and premeditated,"
8. it must adduce evidence from which it may be
9. rationally inferred that, " ... the would-be slayer
10. (weighed and considered) the question of killing and the
11. reason for and against such choice and, having in mind
12. the consequences, decides to kill another human being."
13. CALJIC 8.67.

14.     No such evidence exists in the record. Nor is there
15. any evidence of the specific intent element needed to
16. satisfy the attempted murder requirement. Such intent
17. must be shown at the time of the overt act by which
18. the attempt is manifested; and it cannot be inferred
19. from the commission of another crime.

20.     Another essential element of the crime of attempt
21. is the requirement of a direct but ineffectual act done
22. toward the commission of the act alleged. The act
23. must be overt and unequivocal; it must constitute the
24. beginning of the consummation of the attempted crime.
25. Preparation alone is not sufficient.

26. / / / /

AO 72
(Rev. 8/82)

Continuation Of "Ground I"; Page #7

1    Just as there is no evidence to support the elements
2   of Greg's conspiracy to commit murder conviction of
3   Robin Williams, there is no evidence to support the
4   Elements of his Attempted murder conviction of her.
5   There is no evidence to support a finding that Greg
6   had a specific intent to kill Williams. There is
7   No evidence that Greg attempted a direct but
8   ineffectual act of killing Williams. There is no evidence
9   that Greg participated in the shooting of Williams,
10  directly or indirectly. There is no evidence that Greg
11  aided and abetted an attempt to kill Williams. There is
12  no weapon or physical evidence linking Greg to the shooting
13  of Williams. There is no evidence that Greg even
14  suspected that Fain, Diggs or anyone else had any
15  criminal intent towards Williams, and certainly no
16  evidence that he shared in any criminal intent toward her.
17  Furthermore, just as the note cannot support the
18  conspiracy conviction, it cannot support the attempted
19  murder conviction. Greg's presence when Fain
20  delivered the note cannot be interpreted as providing
21  encouragement to Fain, Diggs, or anyone else to shoot
22  Williams three weeks later; And the reconciliation
23  between Williams and Greg are irreconcilable with a
24  finding that Greg advised or encouraged the attempted
25  murder of Williams. Williams and Fain reconciled also.
26  (RT.546-556.) Even putting aside the reconciliation

## Confirmation Of "Ground I", Page #3

1  of Williams with Fain and Greg, the Attempted murder of
2  Williams was not a reasonably foreseeable consequence of
3  Greg's standing on a porch while Fain delivered a note and
4  photograph to Williams.

5      Nonetheless, motive cannot supply the specific intent
6  Elements of Attempted murder. Nor can association establish
7  Either the requisite encouragement or intent to kill.
8  Nor can Greg's brief presence at 126 Blythdale on the day
9  of the shooting establish either the requisite encouragement
10  or intent to kill, particularly, in light of the evidence
11  that he either frequent or lived there.

12      A microscopic examination of the trial transcript
13  fails to reveal ANY evidence from which a reasonable
14  person could make a rational inference establishing any
15  of the elements of conspiracy to commit murder and
16  Attempted murder.

17      Greg's convictions for conspiracy to commit murder
18  and Attempted murder based on absent and/or less than
19  proof beyond a reasonable doubt of every element of
20  the accused crimes violated his right to a fair trial
21  and due process under the Fifth and Fourteenth
22  Amendments of the United States Constitution.

23      Based on the above, the court must grant habeas
24  relief to Greg and enter a judgment of Acquittal.
25  Acquittal is required because, At the close of the
26  prosecution's case-in-chief, the trial court improperly

AO 72
(Rev. 8/82)

10

11

<u>Continuation Of "Ground I"; Page #9</u>

1  denied Greg's California Penal Code sec. 1118.1 motion for
2  judgment of acquittal. (CT 48, 55; RT 1031-1037.)
3  Reversal Alone is not an Adequate remedy because A retrial
4  could then result, which would violate the state and
5  federal constitutional prohibitions against double jeopardy.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

AO 72
(Rev. 8/82)

11

12

7. **Ground 2 or Ground** _2_ (if applicable): "GROUND 2"; PAGE #1

Greg's right to a Fair Trial and Due Process, as guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, was violated when the prosecutor maliciously and intentionally introduced false and unsupported and deceitful material statements at trial.

a. Supporting facts:

It was prosecutorial misconduct and malicious prosecution for Floyd "Andrews," a formal San Francisco prosecutor, to introduce false and unsupported and deceitful material statements at trial to acquire Greg's convictions for conspiracy to commit murder and attempted murder. Prosecutor Andrews' false and unsupported material statements in his "Closing Arguments" at trial were so improper that it infected the trial with unfairness as to make Greg's convictions a denial of due process and a fair trial. In closing, Andrews told the jury that Wanda Fain wrote the note "for Gregory Brown," (RT 1349.) And "... he (Greg) can get her (Robin Williams) out to Jerrold Avenue and shoot her and leave her dead through the other two (Wanda Fain and Joseph Diggs)." (RT 1349.) Andrews further repeatedly exhorted the jury to bring in a "guilty" verdict, not based on the evidence, but "because (SEE CONTINUATION, ADDITIONAL PAGE)

Supporting cases, rules, or other authority:
Darden v. Wainwright, 477 U.S. 168 (1986); Brecht v. Abrahamson, 509 U.S. 619 (1993); Donnelly v. DeChristoforo, 416 U.S. 637 In re Winship, 397 U.S. 358 (1970); Berger v. United States, 295 U.S. 78 (1935); Miller v. Pate, 386 U.S. 1 (1967)

PETITION FOR WRIT OF HABEAS CORPUS

Continuation Of "Ground 5"; Page #2

1  they did it." (RT 1350.)  The trial record is devoid
2  of any evidence to support any of these accusations.
3  The was no evidence introduced at trial that showed
4  Fain wrote the note "for Gregory Brown." There was
5  no evidence introduced at trial that showed Greg had
6  any connection to the trip that Fain, Diggs and Williams
7  took to Jerrold Avenue.  There was no evidence
8  introduced at trial from which a rational inference may
9  be made that Greg agreed with Fain, Diggs or anyone
10  else to take Robin Williams' life, or to do her any harm
11  at all.  And nowhere in the trial record is there any
12  evidence as to who actually shot Williams.
13         As demonstrated above, not only did Andrews
14  failed to limit the **scope** of his closing arguments
15  to the evidence presented at trial but he also
16  deliberately and consciously introduced numerous false
17  and unsupported material statements which rested
18  exclusively on the issue of guilt.  Additionally,
19  Andrews' exhortations of the jury to bring in a "guilty,"
20  verdict, by any means other than the evidence, "because
21  they did it" amount to malicious prosecution and
22  several instances of prosecutorial misconduct because:
23  (1) it was contrary to the evidence presented at trial;
24  (2) it was an injection of his personal opinion or belief;
25  (3) it influenced and inflamed the jury's prejudices
26  against Greg; (4) it encouraged the jury to

<u>Continuation of "Ground 2"; Page #3</u>

1  disregard the court's instructions concerning innocence
2  and guilt; and (5) it diverted the jury's attention from
3  its duty to decide the case on the merit of the evidence
4  presented at trial.

5       But, just as equally prejudicial, it negated the
6  fact that other people could have been responsible for
7  the shooting of Robin Williams. On cross-examination,
8  Williams was questioned about various persons who might
9  bear ill will towards her. In January 1994, just a
10  year prior to her shooting, Robin Williams was convicted
11  of a residential burglary, and named three black males
12  who were also involved. (RT 573, 587-588, 641.)
13  After that burglary, Corky, the boyfriend of the woman
14  whose house she had burglarized, beat her up. (RT 583.)
15  Williams had also incurred drug debts in the past.
16  (LT 576, 580.)  However, she denied having any drug
17  debts on February 7, 1995, and did not remember ever
18  being threatened by drug dealers to whom she owed
19  money. (RT 576, 580, 582.)  She said that she knew
20  Irwin Berry at Sunnydale, but did not remember him
21  hitting her with a gun because of some debts she owed
22  him. (RT 582.)  She specifically denied owing any
23  money to a man named "Tails" from the Sunnydale area,
24  and said that she did not remember him coming up to
25  her the night before February 7, 1995 and pointing a
26  gun at her. (RT 581-582.)  However, Defnie Hayes

Continuation Of "Ground 2", Page #4

1 testified that she was talking on the telephone with a
2 friend at her home in the Sunnydale Projects on the
3 afternoon of February 6, 1995 when the friend said,
4 "Oh, my God, Tails pulled a gun on Robin." Robin
5 referred to Robin Williams. (RT 1005.) Hayes also
6 testified that sometime during the last couple of months
7 Phoebe's apartment at 56 Santos had caught on fire.
8 Williams and Phoebe were once roommates at 56 Santos.
9 (RT 1005-1006.) Over the years, Williams had gotten
10 into fights at Sunnydale. (RT 584-585.) Williams
11 admitted that she might have some enemies around
12 the city. (RT 586.)

13   Andrews' false and unsupported material statements
14 implanted in his closing arguments, whether individually
15 or collectively, so infected the trial outcome as to
16 create a genuine effect on the jury's verdict, especially
17 when considering the fact that the trial judge did not
18 instruct the jury to disregard the improper statements.
19 There is absolutely no way a rational jury could have
20 found Greer guilty of the crimes accused absent the
21 mentioned statements in Andrews' closing.

22   Prosecutor Andrews' intentional and malicious use
23 of false and deceitful material statements in his
24 "Opening Statements" at trial were so improper
25 that they infected the trial with unfairness as
26 to make Greer's resulting convictions a denial of due

Continuation Of "Ground 2"; Page #5

1   process and a fair trial. Andrews' opening statements
2   alleged, "She (Robin Williams) was shot because she made
3   a statement to the police about Gregory Brown; about
4   him selling drugs, about him having a gun. She was shot
5   to punish her for that statement and to prevent her from
6   testifying in future court appearances." (RT 314.)
7   Andrews failed to introduce any evidence at trial as to
8   why Robin Williams was shot. Andrews introduced no
9   evidence that Williams was shot because she made a
10  statement to the police "about Gregory Brown." Andrews
11  introduced no evidence that Williams was shot because her
12  statement mentioned Greg "selling drugs." Andrews
13  introduced no evidence that Williams was shot because
14  her statement mentioned Greg "having a gun." Andrews
15  introduced no evidence that Williams "was shot to
16  punish her for that statement" to the police.
17  Andrews introduced no evidence that Williams was shot
18  "to prevent her from testifying in future court
19  appearances." Furthermore, Andrews completely
20  failed to introduce any evidence at trial as to why
21  Williams was shot, and there was no trial evidence
22  as to why.
23       Moreover, Robin Williams' trial testimony totally
24  contradicted the improper statements given by Andrews in
25  his opening statements; while at the same time
26  exonerating Greg on all charges relating to her shooting.

<u>Continuation Of "Ground 2"; Page #6</u>

1  Williams testified At trial that oN JANUARY 6, she WAS
2  visiting GREG At 126 Blythdate, when the police came.
3  She saw A gun IN GREG's hand And A bag of check IN
4  the other. (RT 511.)  She made A statement to the police
5  As to what she saw. (RT 513.)  Some days later she
6  WAS At A friends house when WANDA "FAIN" delivered
7  A Note to her, that included A photo of her taken some
8  years before by GREG.  GREG WAS NEARby when the note
9  WAS delivered, standing outside on A porch. (RT 515.)
10  FAIN said GREG wanted to talk to her. (RT 517.)
11  She did Not speak to GREG because she considered the
12  Note threatening And was scared. (RT 518.) About A
13  week And A half later, she met GREG on the street
14  And they spoke.  He Asked her to stay out of sight,
15  And Not to testify At his upcoming hearing; And In
16  return he "would take care of" her As long As she
17  didn't testify. (RT 519.)  She was satisfied with
18  the conversation And returned to her regular visits to
19  126 Blythdale, going there About every other day.
20  She went there to talk to GREG And they were friends.
21  (RT 520.)  GREG Never threatened her, And she
22  believed he had No intention of hurting her. (RT 557.)
23       ANdrews WAS AWARE that Williams would testify
24  As she did, because it was relatively A recital of her
25  preliminary hearing testimony. (RT 11-16; 51-52.)
26  Nevertheless, Andrews deliberately, consciously And

<u>Continuation Of "Ground I", Page #7</u>

1. maliciously used false and deceitful material statements
2. in his opening statements to manipulate the jury.
3. This fact is highlighted by Andrews' calculated
4. (and successful) efforts to paint Greg as a heartless
5. dope dealer who has previously captured and corrupted
6. the victim, Robin Williams. Thus, for example, in his
7. opening statements Andrews said:

8.  
9. "Robin is going to tell you that she is addicted
   to cocaine, that she had been supplied
10. cocaine by Gregory Brown and other people
11. ..., that she did a lot of things to
   get her poison. She'd go to Gregory Brown
12. and get drugs there. She's traded drug
   for sex with Mr. Brown."
13.

14. (RT 315, line 28; 316, line 1-7.)   Of course, there was
15. no evidence adduced at trial to support this assertion.
16. Absent the maliciously false and deceitful statements
17. embedded in Andrews' opening statements, no rational
18. jury could have reached a guilty verdict against Greg
19. because there was simply no evidence introduced at
20. trial connecting him to the shooting of Robin Williams.
21. Indeed, the improper statements created such a
22. substantial and injurious effect on the jury's decision
23. as to render Greg's convictions unconstitutional.
24. / / / /
25. / / / /
26. / / / /

AO 72
(Rev. 8/82)

18                    19

<u>Continuation Of "Ground 2", Page #8</u>

1  Greg's right to a fair trial and due process, under
2  the Fifth and Fourteenth Amendments of the United
3  States Constitution, was violated as a result of several
4  instances of prosecutorial misconduct as set forth herein.
5  Based on the above, the Court must grant habeas
6  relief to Greg on this ground and enter a judgment
7  of acquittal because there is no evidence to support
8  a re-trial.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**AO 72**
(Rev. 8/82)

19                    20

7. Ground 2 or Ground __3__ (if applicable): *"Ground 3"; Page #1*

Gree's Right to a Fair Trial and Impartial Jury, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution was violated when jurors gave intentionally false answers during voir dire and/or covered up false statements given therein.

a. Supporting facts:

In the present case, jurors committed misconduct when they intentionally gave false answers during voir dire or covered up false statements given therein which violated Gree's right to due process, a fair trial, an unbias jury, confrontation, and a verdict based on admissible trial evidence, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

During voir dire, Mr. Fuetsch, defense counsel for co-defendant Wanda Fain, asked the jury: "Does anyone have a problem or would they have a problem with following the instructions of the Court even if the result that would be reached by following instructions of the Court were contrary to your gut reaction in a case as serious as the one that's charged here?" (RT 132, lines 3-8) The only juror who indicated he would have a problem with following the Court's instructions is juror John Elwood. (RT 132-133 (from line 3 of 132 to line 13 of 133); 142-143 (from line 11 of 142 to line 28 of 143); 158-159, line 28-13)

During voir dire, Mr. Zilversmit, defense counsel for co-defendant Joseph Diggs, asked jurors Mr. Castillo, Ms. Owens, Ms. Smith, and (SEE CONTINUATION ADDITIONAL PAGE)

b. Supporting cases, rules, or other authority:

Irwin v. Dowd, 366 U.S. 717 (1961); Brecht v. Abrahamson, 509 U.S. 619 (1993); Donnelly v. DeChristoforo, 416 U.S. 637 (1974); In re Winship, 397 U.S. 358 (1970); Carter v. Kentucky, 450 U.S. 288;

---

<u>Continuation Of "Ground 3"; Page #2</u>

1  Mr. Bowen if they heard the judge's instruction on the
2  presumption of innocence and whether they would be able to
3  vote not guilty assuming there was no evidence to the
4  contrary; each juror indicated they would. (RT 136-137.)
5  Mr. Zilversmit also asked the jury if they would be able
6  to vote not guilty if the prosecution failed to produce
7  evidence of the defendants' guilt beyond a reasonable doubt;
8  none of the jurors indicated to the contrary. (RT 140-141.)

9        During voir dire, Mr. Arian, Greg's trial defense
10 counsel, asked the jury if any of them are confused about
11 the "difference between a mere suspicion, a creating of a
12 suspicion and creating evidence that convinces beyond
13 a reasonable doubt"; none of the jurors indicated
14 confusion. (RT 147.)

15       As demonstrated in the concerning declarations of juror
16 John Elwood, juror Karen Pemberton, and Maggie Richard,
17 Greg's trial defense investigator, the jury failed to answer
18 questions honestly during voir dire regarding whether or
19 not they would follow the court's instructions.

20
21  ――――――――――――――
22       1 Following the verdicts, all the defendants, including
23  Greg, filed motions for new trial, alleging among other
24  things, jury misconduct during deliberation. However,
25  this Ground, as well as all other Grounds set forth in these
26  papers, was not raised in the motions for new trial by
   defense counsels nor on direct appeal.

AO 72
(Rev. 8/82)

21

22

<u>Continuation Of "Ground 3"; Page #3</u>

1   Juror Karen Pemberton, in her declaration given to
2   counsel for co-defendant Joseph Diggs states among other
3   things:

4   During deliberations, a juror had a bus
5   schedule with them. We looked at the
6   schedule and we talked about how long
7   the bus ride took, when they (Robin, Linnet
8   & Joseph) got on the bus, and how long it
9   took to get where they were going...

10   When we went into the jury after arguments,
11   some people were saying "they don't have
12   a case." I originally believed they were
13   talking about the prosecution. But later,
14   I realized that more than half of the
15   jurors were talking about how the defense
16   had not proven their case.

14   (CT 453-454.) The clear impact of this discussion
15   between jurors is that they did not apply the court's
16   instruction on the burden of proof in a criminal case.
17   (CALJIC Nos. 2.61, 2.90, 2.91; CT 334, 340-341; RT 1219,
18   1222-1223. Also, see, RT 93-94.) Juror Karen P. also
19   advised Maggie Richards, Giles's investigator, that "a
20   couple" of jurors commented on Giles's failure to testify
21   in his own defense being an indication of his guilt. (See
22   Maggie Richards' sworn declaration at, CT 473-474.)
23       The instructions placing the burden of proof on the
24   prosecution are grounded in the Due Process Clause of the
25   Fourteenth Amendment of the United States Constitution
26   and play a vital role in the American scheme of criminal

<u>Continuation Of "Ground 3"; Page #4</u>

1  procedure. The jurors clearly disobeyed the court's
2  instructions regarding burden of proof when, according to
3  the declaration of juror Karen P. more than half the
4  jurors said, during deliberations, that the defense had
5  not proven their case. There is nothing in the record
6  to suggest that the credibility of Karen P.'s declaration
7  on this issue was questioned, and it certainly was not
8  countered. There is no case law or other authority that
9  Greg is aware of that states that the declaration of a
10  single juror cannot establish misconduct, that offending
11  jurors must be identified by name, or that all twelve
12  jurors must disobey court instructions in order to
13  establish misconduct. Indeed, one juror is enough.
14      The instruction that no inference is to be drawn
15  from a defendant's failure to testify is grounded in
16  the Fifth and Fourteenth Amendments of the United States
17  Constitution. The jury was instructed as follows:
18  "A defendant in a criminal trial has a constitutional
19  right not to testify. You must not draw any
20  inference from the fact that a defendant does not
21  testify. Further, you must neither discuss this matter
22  nor permit it to enter into your deliberation in any
23  way." (CALJIC 2.60; CT 333; RT 1219.) The jurors
24  misconduct in disobeying this instruction was inherently
25  and substantially likely to have influenced and biased the
26  ////

<u>Continuation Of "Ground 3"; Page #5</u>

1  involved jurors so as to prejudice Greg.

2      There are hardly two matters more basic to a fair

3  jury trial than the principles embodied in the

4  instructions referred to above.

5      Juror John Elwood, in his declaration given to

6  counsel for co-defendant Joseph Diggs states under oath

7  Among other things:

8      During our deliberations we prepared a time

9  line... for the evening of the incident. We

10  were particularly concerned with the period

11  between 7:30 pm and 8:35 pm on the night

12  of the shooting. To help reconstruct what

13  happened during that period, we consulted

    bus schedules that Jurors Alvin Bernstein and

    Monnell Beukmann brought in on the second

14  day of deliberations. These schedules provided

    us information about the intervals between

15  buses and the frequency with which buses

16  came; this information along with court

17  testimony and statements helped us to fill

18  in our time line from 7:30 pm until 8:35 pm

    on the night of the shooting...

19      There was also discussion about access to guns

20  which was in reference to defendant Greg

21  Brown's prior arrest.

22      There were also discussions about defendant

23  Greg Brown being a drug dealer and his

24  propensity for violence and drugs and that

25  kind of lifestyle. This was mostly in

    reference to defendant Brown's state of mind.

26

<u>Continuation Of "Ground 3"; Page #6</u>

Some jurors Also discussed that as a drug
dealer, Brown's State of mind may be twisted,
And power hungry. Some jurors Also discussed
that as a drug dealer, Brown might feel that
there would be No consequences to his actions
if he killed Robin Williams. The jurors who
brought up discussions of def. Brown's
lifestyle were reminded by other jurors that
this line of discussion was speculation and
could not be considered in deliberations.

Someone Also made reference to the fact that
if you do crack cocaine, it does not mean
you lose your memory.

(CT 451-452.) This statement taken on its face is clearly
juror bias of the worst sort in and of itself. Nevertheless,
juror Jordan Owens corroberated the fact that jury did in fact
disregarded and disobeyed the court's instructions And
considered the seizure of a gun And drugs from defendant
Gregory Brown as evidence of his guilt in the charged crimes.
(Declaration of Maggie Richards At, CT 473-474)

Early in the prosecution case, the trial court gave
the following limiting instruction to the jury regarding the
evidence seized during the January 6, 1995 Arrest of Greg.
The court Admonished:

[T]he evidence or testimony that's being received
At this point regarding the gun and cocaine
seized At 12161 Blythdale on January 26th [sic]
1995, in the presence of Mr. Brown is being
offered only to show motive for Mr. Brown to

25    26

&AO 72
(Rev. 8/82)

_Continuation Of "Ground 3"; Page #7_

1  from Ms. Williams. You may not consider this
2  evidence for any other purpose at this time.

3  (RT 347-348.) After the completion of the presentation of all
4  of the evidence, the court gave the jury the following
5  instructions:

6  Evidence was introduced of an arrest on
7  January 6, 1995 of defendant Gregory Brown
8  and seizure of guns and clays from the premises
   of 126 Blythdale. This evidence was admitted and
9  may be considered by you only for the purpose of
   showing a possible motive for the commission of the
10 crimes charged. You're to consider this evidence
   only for the purpose of determining whether such
11 motive exists, and for no other purpose. Such
12 evidence, if believed, was not received and may
   not be considered by you to prove that defendant
13 Gregory Brown is a person of bad character or
   that he has a disposition to commit crimes. Such
14 evidence was received and may considered by you
15 only for the limited purpose of determining if
   it tends to show a motive for the commission
16 of the crimes charged. For the limited purpose
   for which you may consider such evidence, you
17 must weigh it in the same manner you do all
   other evidence in this case. You're not permitted
18 to consider such evidence for any other purpose.

19
20 Evidence that a gun was seized on January 6th,
   1995, may not be considered by you to infer or
21 prove that any of the defendants had a gun on
   February 7th, 1995, when Robin Williams was shot.
22

23 Certain evidence was admitted for a limited purpose.
24 At the time this testimony was admitted you were
   admonished it could not be considered by you for
25 for any purpose other than the limited purpose for
   which it was admitted. Do not consider such evidence
26 for any purpose, except the limited purpose for
   which it was admitted.

26          57

<u>Continuation Of "Ground 3"; Page #8</u>

1  (RT 1213-1215.)   These instructions were also provided to the
2  jury in written form during their deliberations. (CT. 306,
3  318-320, 323.)

4      Jurors clearly disregarded and disobeyed these
5  instructions. Far from limiting their consideration of the
6  evidence of the gun and cocaine to the issue whether Greg had
7  a motive to harm Williams, jurors discussed that the
8  January 6, 1995 gun and cocaine evidence showed that Greg
9  had "access to guns," was "a drug dealer," had a
10  "propensity for violence and drugs," had a "twisted and
11  power hungry state of mind," and felt that "there would
12  be no consequences to his actions if he killed Robin
13  Williams." The fact that some jurors reminded other
14  jurors not to consider this line of discussion does not
15  indicate whether any or all of the improper discussion
16  ceased, and there is no indication that the reminder was
17  given by the jury foreman or otherwise carried special
18  authority. And the reminder could not erase the previous
19  improper discussion. The record is without any
20  contradictory declarations on this issue. Nor is there
21  any indication in the record that the prosecutor or the
22  trial court questioned the credibility of juror John
23  Elwood's declaration on this subject.
24  / / / /
25  / / / /
26  / / / /

Continuation Of "Ground 3"; Page #9

1    The declaration of GREG's trial defense investigator,

2  Maggie Richards, states, among other things:

3      On May 30, 1995, I spoke with juror KAREN

4      Pemberton by telephone. At that time, she

5      told me she heard "a couple" jurors discussing

6      the fact that defendant Gregory Brown did not

      testify in his own defense, and that this was

7      an indication of guilt.

8      On May 30, 1995, I spoke with juror Alvin Bernstein

9      by telephone. He told me that in jury deliberations

      . . . jurors did consult maps and bus schedules.

10     On May 30, 1995, I spoke with juror Jordan T.

11     Owens by telephone. She told me that the jury

12     considered as evidence of one of defendants being

      shot the victim that there were guns in Gregory

13     Brown's past, and that he was a drug dealer.

14  (CT 473-474.)

15    The sworn declarations of jurors John Elwood and

16  Karen Pemberton and that of investigator Maggie Richards,

17  demonstrate that the jurors consulted bus schedules and/or

18  maps during deliberations. The record shows that neither

19  were admitted into evidence at trial. It is juror misconduct

20  to consider and discuss "evidence" other than that which

21  was received at trial, whether a juror acted intentionally

22  or inadvertently in being exposed to the outside source

23  of information.

    The jurors were also specifically instructed:

24

25      You must decide all questions of fact in this

      case from the evidence received in this trial

26      and not from any other source . . .

<u>Continuation Of "Ground 3"; Page #10</u>

1   You must not make any independent
2   investigation of the facts ... nor consider
3   nor discuss facts as to which there's no
    evidence.

4   (CALJIC 1.03; CT 313; RT 1210.)   Clearly, the jurors use
5   of the bus schedules constituted misconduct.

6        Timing was an important issue in this case. The
7   prosecution theory was that Fair, Diggs and Williams left
8   126 Blythdale at around 7:30 p.m., walked to the bus stop,
9   waited for the bus, rode the bus for twenty to twenty five
10  minutes, and walked a block and a half, before co-defendants
11  Fair and Diggs shot Williams. The wounded Williams was first
12  discovered around 8:30 p.m. There is no evidence that Fair or
13  Diggs were anywhere in sight at that time. Given all of this,
14  plus the co-defendants denial of any involvement in Williams'
15  shooting, the expert witness evidence regarding Williams' memory
16  problems, and the defense theories that third parties were
17  responsible, the jury plainly had a question as to whether
18  all that Williams described could have happened within
19  the one hour time period. Thus, they obviously felt a need
20  to fill in important gaps in the prosecution's case time line,
21  and used the bus schedules to do so. Inasmuch as Greg's
22  culpability as a conspirator rested on the jury's
23  evaluations of the actions of Fair's and Diggs and on the
24  credibility and reliability of Williams' testimony, the
25  jury's consultation of the bus schedules to bolster the
26  prosecution's case was prejudicial to Greg.

Continuation Of "Ground 3"; Page #11

1   The sworn declaration of juror John Elwood makes clear
2  that a juror injected his own outside expertise into deliberations.
3  The comment of a juror that if you do crack cocaine it does not
4  mean you lose your memory is also misconduct. The relationship
5  between crack cocaine use and memory loss is not a subject of
6  commonplace knowledge. Moreover, the juror comment is not
7  a reasonable interpretation of expert witness psychiatrist
8  Eugene Schoenfeld trial testimony. (RT 932-935.) The juror
9  who made the comment regarding cocaine and memory was,
10 clearly relying on first hand experience, observation, or study.
11 As such, his comment injected his outside expertise into the
12 deliberations, which constituted misconduct.
13   Here, the evidence is so very slim against Greer, non-
14 Existent by most standards, that a very minimal amount of
15 Error can have a substantial weight in affecting the verdict.
16 All that ties Greer to the shooting of Robin Williams is, the
17 January 6 arrest, and his connection to the delivery of a
18 purportedly threatening note. Other than his presence earlier
19 in the day, there is nothing connecting Greer to the events
20 leading up to Williams' shooting. Absent the varieties of jury
21 misconduct in this case, no trier of facts could have
22 found Greer guilty of the crimes charged.
23   As stated herein, the defense counsels explicitly asked
24 the jury material questions during voir dire which the
25 jury intentionally failed to respond honestly to; specifically,
26 the jury concealed their unwillingness to (1) follow the court's

Continuation Of "Ground 3"; Page #12

1    instructions; (2) give the defendants, particularly Green, the
2    presumption of innocence; (3) vote not guilty if the
3    prosecution failed to produce evidence of the defendants' guilt
4    beyond a reasonable doubt; And (4) ascertain the
5    "difference between A mere suspicion, a creating of a
6    suspicion And creating evidence that convinces beyond a
7    reasonable doubt." (RT 132; 136-137; 140-141; 147. Also,
8    see, this Ground at pages 1 & 2.)

9        The jury's failure to respond honestly to the defense
10   counsels' questions during voir dire violated Green right to a
11   fair trial, an impartial jury, due process, confrontation,
12   And a verdict based on admissible trial evidence under the
13   Fifth, Sixth And Fourteenth Amendments of the United
14   States Constitution; And was the direct cause of the
15   violation set forth in Ground 1.

16       Based on the above, the Court must grant habeas
17   relief to Green on this ground along with any other
18   relief the Court deems fair and just.

19

20

21

22

23

24

25

26

7. Ground 2 or Ground __4__ (if applicable): "Ground 4", Page #1

· Greg's right to Effective Assistance of Trial Counsel, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, was violated when counsel failed to: challenge overt acts; object to false and unsupported material statements at trial; and use preemptory challenge to excuse a bias juror.

a. Supporting facts:

Trial counsel's failure to make an obvious challenge of overt acts constitutes ineffective trial representation.

Trial counsel failed to challenge the validity and the legality of the overt acts in his motion to dismiss (Calif. Penal Code Sec. 995 motion.). (CT 70, 152; RT 27.) To support a crime of conspiracy, the prosecution must prove the commission of an overt act by one or more of the parties engaged in the agreed upon conspiracy. In this case, only four overt acts in support of the conspiracy was related to Greg. (Nos. 2, 4, 5, and 6.). Overt Act No. 2 alleged that Greg took a photo and gave it to Ursula Fain; No. 4 alleged that Greg accompanied Fain to deliver a note; No. 5 alleged that Greg encouraged Fain and Joseph Diggs to murder Robin Williams; and No. 6 alleged that Greg and Fain resided at 126 Blythdale. (CT 1-4.) As stated in "Ground 1" and supported by the record, there was no finding of overt act No. 6; no evidence to support No. 5; and Nos. 2 and 4 fail because (1) there is no evidence of an agreement (SEE Continuation, Additional Page)

b. Supporting cases, rules, or other authority:

Strickland V. Washington, 466 U.S. 668 (1984); Brecht V. Abrahamson, 507 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974);

32

33

## Continuation Of "Ground 4"; Page #2

1  between Greer and ANYONE to commit murder and (2) they
2  do not meet the legal requirement of an overt Act.
3  In light of the fact that Greer pled not guilty to the
4  crimes accused (CT 9-11.), any reasonably effective
5  counsel would have moved to challenge all evidence against
6  his client in which the prosecution relies upon to obtain a
7  conviction. It is reasonable to assume that had counsel
8  challenged the overt Acts, the prosecution would have
9  been forced to produce sufficient evidence to support each
10 Act or run the risk of having one or more Acts dismissed.
11 As shown herein, the mentioned overt Acts were either not
12 Acts in and of themselves or unsupported or lacked
13 finding. Therefore, had counsel challenge the overt Acts
14 it is more than likely that one or more or all of the Acts
15 would have been dismissed which would have further weaken
16 the prosecution's case or resulted in the entire case against
17 Greer being dismissed, because, the essence of a conspiracy
18 lies within the commission of an overt Act.

19      Here, the prosecution's case against Greer is non-existent
20 by most standards, therefore, A minimal of error such as
21 the failure to challenge the overt Acts contributed to and
22 proximately caused the subjection of Greer to an UNFAIR TRIAL,
23 A bias jury, prosecutorial misconduct, and a conviction on
24 less than proof beyond A reasonable doubt. Counsel's failure
25 to challenge the overt Acts in question amount to
26 defective and ineffective representation.

Continuation Of "Ground 4"; Page #3

1    Trial counsel's failure to make meritorious objections to
2    false and unsupported material statements at trial constitutes
3    ineffective trial representation.

4        As stated in "Ground 2" and supported by the record,
5    in closing arguments, the prosecutor told the jury that
6    (Wynola Fain wrote the note "for Gregory Brown," (RT 1349.)
7    And "... he (Greg) can get her (Robin Williams) out to
8    Jerrold Avenue and shoot her and leave her dead through
9    the other two (Fain and Joseph Diggs)." (RT 1349.)
10   The prosecutor further repeatedly exhorted the jury to bring
11   in a "guilty" verdict, not based on the evidence, but
12   "because they did it." (RT 1350.) There was not a
13   scintilla of evidence presented at trial that supports
14   any of those false material statements. Any reasonably
15   effective counsel would have fervently objected to each
16   and every one of those improper statements, particularly,
17   in light of the fact that closing arguments are limited
18   to the issue in the case and the evidence that has been
19   presented.    Counsel's non-objections to the false and
20   unsupported material statements allowed the prosecutor
21   to: (1) argue facts that are not supported by the
22   evidence in the record; (2) inject his personal beliefs
23   and opinions; (3) influence and inflame the jury's
24   prejudices against Greg; (4) encourage the jury to
25   disregard the court's instruction regarding innocence
26   and guilt; and (5) divert the jury's attention from

34

## Continuation Of "Ground 4"; Page #4

1  its duty to decide the case on the merit of the evidence
2  presented at trial. Moreover, counsel's non-objections gave
3  credence to the prosecutor's baseless opening statements.
4      Had counsel objected to the improper statements,
5  the objections would have undoubtedly resulted in the
6  judge ordering the jury to disregard the statements which
7  would have put the jury on notice that they are not
8  allowed to consider the improper statements, and that alone
9  could have changed the outcome of the trial. However,
10 counsel's failure to object to the false and unsupported
11 material statements resulted in and contributed to and
12 proximately caused Gree's convictions for the crimes
13 accused and subjected him to an unfair trial, a bias jury,
14 prosecutorial misconduct, and a conviction on less than
15 proof beyond a reasonable doubt. Counsel's non-objections
16 to the statements in question amount to defective and
17 ineffective representation.
18     Trial counsel's failure to use preemptory challenge to
19 excuse a potential bias juror from the jury panel constitutes
20 ineffective trial representation.
21     Here, during voir dire, juror John Elwood was
22 questioned and answered as follows:
23     Mr. Fuetsch (co-defendant Wanda Fain's defense counsel):
24     "Does anyone have a problem or would they have
25 a problem with following the instructions of the Court even
26 if the result that would be reached by following the

Continuation Of "Ground 4"; Page #5

1 | Instructions of the Court were contrary to your gut
2 | reaction in a case as serious as the that's charged here?"
3 |     Prospective Juror: "I think I would have a problem
4 | with it."
5 |     Mr. Fuetsch: ". . . could you explain what you mean
6 | by you would have a problem with that?"
7 |     Prospective Juror: "I believe there's a higher
8 | authority than legal authority that is like moral authority,
9 | and to follow like a set of rules rather than more of a
10 | moral thing, I think I would be hardpressed to follow the
11 | set of rules that are outlined by law."
12 |     ". . . but I think if you misconstrue the constitution
13 | or broaden its actual authority, then I think that
14 | could be potentially wrong."
15 | (RT 132-133.)
16 |     Mr. Arian (Greep's trial counsel):
17 |     "Mr. Elwood, I heard you say something about
18 | broadening the authority of the constitution. Do you recall
19 | that comment?"
20 |     Prospective Juror: "I do."
21 |     Mr. Arian: "I wonder if you could say any more
22 | about that. I didn't get your complete thought."
23 |     Prospective Juror: "My thought is a lot of, let's
24 | say, somebody's on trial, the jurors sit through the
25 | entire trial, they have a gut feeling that these defendants
26 | are, let's say, guilty, but a lot of circumstantial

<u>Continuation Of "Ground 4"; Page #6</u>

1  evidence has been brought in and it's been found -- or a
2  legal issue has been brought up, a minor legal issue that
3  speaks to their innocence. You're supposed to think
4  they're innocent even though they're guilty, because it's
5  a legal argument and it takes precedence over how you feel."
6      Mr. Arian: " you're saying that as a juror your gut
7  reaction is very important and you're going to pay a lot
8  of attention to that?"
9      Prospective Juror: " If you've listened to all the
10  facts and you say, yes, they are innocent or guilty, but
11  some legal precedence makes you dismiss that, then I
12  have a big problem with that."
13      Mr. Arian: "You might not be able to do that?".
14      Prospective Juror: " No, I would not."
15      Mr. Arian: " Would that hold if the judge at the
16  close of the case instructed you that you were to consider
17  this evidence in a certain way and the instructions of the
18  judge went counter to the feelings you just described."
19      Prospective Juror: "I really don't know sitting
20  here right now."
21      Mr. Arian: " Would you have trouble with it?"
22      Prospective Juror : " I would have major problems."
23  (RT 142- 143.)
24      The Court: " At this point does any party wish
25  to enter a challenge for cause?
26  ////

37       38

Continuation Of "Ground 4"; Page #7

1   But before you do that, Mr. Elwood, I was little
2   unclear about your statements.
3   Let me just read this question to you again:
4   It [sic] important that I have your assurance that you
5   will without reservation follow my instructions and
6   rulings on the law and will apply that law to the case.
7   To put it differently, whether you approve or disapprove
8   of my instructions, it is your solemn duty to accept as
9   correct my statements of the law. You may not
10  substitute your own idea of what you think the law
11  ought to be.
12  Would you be able to follow the law as given
13  by me in this case?"
14  Prospective Juror: "I would, but I may have a
15  problem with that, internal conflict."
16  (RT 158-159.)
17  As demonstrated, juror Elwood's responses during
18  voir dire were evasive and misleading and concealed his
19  unwillingness to follow the court's instructions. Any
20  reasonably effective counsel would have used a preemptory
21  challenge to excuse juror Elwood from the jury panel as a
22  result of his explicit or implicit allegiance to his "gut"
23  feelings opposed to the law and instructions given by
24  the court. Moreover, Elwood's declaration illustrates
25  an abundance of juror misconduct (CT 451-452.);
26  therefore, it is reasonable to assume that Elwood's

AO 72
(Rev. 8/82)

38          39

<u>Continuation Of "Ground 4"; Page #8</u>

1   reliance on his gut feelings during deliberations, rather than
2   the Court's instructions, was influential in the jury's
3   decision to find Greg guilty of the crimes charged,
4   particularly since the verdicts were contrary to law.
5   Counsel's failure to excuse potential bias Elwood from the
6   jury panel contributed to and proximately caused Greg's
7   deprivation of a fair trial and impartial jury.
8       Greg's right to effective assistance of trial counsel
9   as guaranteed by the Fifth, Sixth and Fourteenth
10  Amendments of the United States Constitution was violated
11  when counsel failed to (1) challenge the overt acts;
12  (2) object to false and unsupported material statements
13  at trial; And (3) use preemptory challenge to excuse the
14  bias juror John Elwood from the jury panel.
15      Based on the above, the Court must grant habeas
16  relief to Greg on this ground Along with any other
17  relief the Court deems fair and just.
18
19
20
21
22
23
24
25
26

. Ground ~~2~~ or Ground ___5___ (if applicable): " *Ground 5* "; *Page #1*

· *Greg's right to Effective Assistance of Appellate Counsel, As guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, was violated when Counsel deliberately failed to discover And include NON-frivolous issues into the Appellant's brief.*

a. Supporting facts:

*It was defective And ineffective Representation of Appellate counsel when Counsel failed to Raise on Appeal the following NON-frivolous issues : (1) Greg's Convictions Are based on less than proof beyond A reasonable doubt of every Element of the charged Crimes As fully set forth herein At Ground One; (2) the prosecutor Committed several instances of prosecutorial misconduct As fully set forth herein At Ground Two; (3) the jury failed to Respond honestly to the defense Counsel's questions during voir dire As fully set forth herein At Ground Three; And (4) trial counsel was ineffective when he failed to challenge the overt Acts in support of the Conspiracy charge; failed to object to the false And unsupported And deceitful material statements presented At trial by the prosecutor; And failed to use preemptory challenge to excuse juror John Elwood, As fully set forth herein At Ground Four. None of these issues Are frivolous. (SEE Continuation, Additional Page)*

. Supporting cases, rules, or other authority:
*Smith V. Robbins, 538 U.S. 259 (2000); Beecht V. Abrahamson, 507 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974)*

PETITION FOR WRIT OF HABEAS CORPUS

<u>Continuation of "Ground 5"; Page #2</u>

1  Any reasonably effective appellate counsel would have
2  raised each of the mentioned issues on direct appeal
3  to acquire the reversal of the lower court's judgment.
4      Appellate counsel raised the following claims on
5  appeal: insufficient evidence to prove conspiracy to
6  commit murder; insufficient evidence to prove
7  attempted murder; jury misconduct; remand for
8  resentencing under People V. Superior Court; and
9  joinder in co-defendants' arguments. Had
10  counsel incorporated the mentioned non-frivolous
11  issues into the appellate brief, the issues would have
12  provided evidentiary support for the claims raised
13  therein and contributed to the perseverance of a
14  successful appeal. However, appellate counsel's
15  failure to raise the issues in question deprived Greg
16  of a prosperous and triumphant appeal and the
17  right to effective representation of counsel on appeal
18  in violation of his Fifth, Sixth and Fourteenth
19  Amendments of the United States Constitution.
20      Based on the above, the Court must grant habeas
21  relief to Greg on this ground and any other relief
22  the Court deems fair and just.
23
24
25
26

AO 72
(Rev. 8/82)

41                    45

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.  If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

*Court of Appeal of the State of Calif., First Appellate District, Division Four*

b. Result *Affirmed*                    c. Date of decision: *January 28, 1998*

d. Case number or citation of opinion, if known: *No. A072126*

e. Issues raised: (1) *Insufficient evidence to prove conspiracy to commit murder;*

*(2) Insufficient evidence to prove Attempted murder; (3) Jury Misconduct; (4) Remand*

*for Resentencing under People v. Superior Court; and (5) Joinder in co-defendant*

*Arguments.*

f. Were you represented by counsel on appeal?  ☒ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

*Victor Blumenkrante; P.O. Box 9586; Berkeley, CA 94709*

9. Did you seek review in the California Supreme Court?  ☒ Yes  ☐ No.  If yes, give the following information:

a. Result *Denied*                    b. Date of decision: *April 29, 1998*

c. Case number or citation of opinion, if known: *S068320*

d. Issues raised: (1) *Same As Above*

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

*The Issues Raised herein Are based on matters outside the record on Appeal.*

*Trial And Appellate counsels were ineffective in failing to raise these issues.*

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

*N/A*

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.

Attach documents that show you have exhausted your administrative remedies.

MC-275 (Rev. July 1, 2005)              **PETITION FOR WRIT OF HABEAS CORPUS**              Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b.  (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.) _The issues raised herein are based on matters outside the record on appeal, and Greg lacked basic education and all legal knowledge, until now, to pursue the issues herein. Moreover, Greg has been suffering from major depression and mental illnesses as a result of his wrongful convictions and imprisonment._

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
_N/A_

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: ~~3/6/07~~ 4/16/07                              ▶ _Gregory F. Brown_
                                                          (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page six of six

43

44

Declaration of Service

CASE NAME: GREGORY L. BROWN V. WARDEN, SATF - CORCORAN PRISON

CASE NO.: _____

I declare: April 16, 2007
On March 16, 2007, I served the attached:
Gregg's Petition For Writ Of Habeas Corpus by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the prison mail collection system at CSATF-Corcoran, in California, addressed as follows:

Clerk, Superior Court of the City and County
of San Francisco
Hall of Justice
850 Bryant St.
San Francisco, CA 94103

District Attorney's Office of San Francisco
Hall of Justice
850 Bryant St., Room 300
San Francisco, CA 94103

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/16/07
          3/6/07

Gregory L. Brown
GREGORY L. BROWN
Petitioner

45

**EXHIBIT** *B*

1

2          SUPERIOR COURT OF THE STATE OF CALIFORNIA
           FOR THE CITY AND COUNTY OF SAN FRANCISCO
3

4                      Department No. 22

5
     IN THE MATTER OF THE APPLICATION  )
6    OF                                )
                                       )   WRIT NO. 5568
7                                      )
     GREGORY L. BROWN                  )   ORDER      **ENDORSED**
                                       )             **F I L E D**
8                                      )          San Francisco County Superior Court
          Petitioner,                  )
9                                      )          MAY 3 0 2007
     FOR A WRIT OF HABEAS CORPUS       )
10   _____)       **GORDON PARK-LI, Clerk**
                                           BY: ____CARLOS BARRAZA____
                                                          Deputy Clerk

11       On April 25, 2007 this Court received a Petition for Writ of
12  Habeas Corpus from petitioner Gregory L. Brown ("Petitioner").   On
    May 25, 1995, Petitioner was convicted of conspiring to commit
13  murder and of attempted murder.  On January 28, 1998, the First
    District Court of Appeal affirmed the judgment with sentencing
14  modifications.  On April 29, 1998, the California Supreme Court
    denied review.  Petitioner is serving 56 years to life at Corcoran
15  State Prison.

16       Petitioner seeks habeas relief on four grounds.  He claims
    that the verdict was not supported by sufficient evidence and that
17  the prosecutor "maliciously and intentionally introduced false and
    unsupported and deceitful material statements at trial."  He also
18  claims that jurors committed misconduct and that his trial and
    appellate counsel provided ineffective assistance of counsel.
19

20       Petitioner was convicted almost 12 years ago and the Court of
    Appeal affirmed his conviction over nine years ago.  Under well-
21  established California law, a petition should be filed as promptly
    as the circumstances allow.  As a result, the petitioner must
22  explain in detail and "justify any substantial delay in presenting
    a claim."  (*In re Clark* (1993) 5 Cal.4th 750, 765); *In re Swain*
23  (1949) 34 Cal.2d 300, 302.)  Where there has been significant delay
    in seeking habeas relief, the petitioner must describe
24  circumstances sufficient to justify or explain the delay.  To avoid
    the bar of untimeliness, the petitioner has the burden of
25  establishing: (1) the absence of substantial delay; (2) good cause

_____
                              1

                                                    47

1   for the delay; or (3) that the claim falls within an exception to
2   the bar of untimeliness. (*In re Robbins* (1998) 18 Cal.4th 770,
    781; *see also Clark, supra,* 5 Cal.4th at 775 ["[i]f a petitioner
3   had reason to suspect that a basis for habeas corpus relief was
    available, but did nothing to promptly confirm those suspicions,
4   that failure must be justified"].)

5        As an initial matter, Petitioner's insufficient evidence
    and juror misconduct claims are barred because they were raised
6   - and rejected - on appeal. Because these issues were
    "previously raised and rejected on direct appeal, and because
7   the [P]etitioner does not allege sufficient justification for
    the issues['] renewal on habeas corpus," the issues are
8   "procedurally barred from being raised again." (*Harris, supra,*
    5 Cal.4th at 825; *see also In re Sakarias* (2005) 35 Cal.4th 140,
9   145.)

10       Petitioner's ineffective assistance of trial and appellate
    counsel claims fail for two reasons. First, he has failed to
11  justify the delay in bringing these claims. Instead of alleging
    facts to demonstrate good cause for the delay, Petitioner claims
12  that he "lacked basic education and all legal knowledge, until now"
    and that he was somehow prevented from seeking relief because he
13  has "been suffering from major depression and mental illness."
14  These contentions have no merit. Petitioner does not allege when
    he began suffering "major depression and mental illness," nor does
15  he allege how these conditions prevented him from seeking writ
    relief. Moreover, Petitioner does not explain how his alleged lack
16  of "legal knowledge" prevented him from consulting his appellate
    attorney about a possible claim for ineffective assistance of trial
17  counsel, or from contacting an attorney to inquire into the quality
18  of representation provided by his appellate counsel.

19       Even assuming Petitioner's ineffective assistance of
    counsel claims are not time-barred, these claims fail because
20  Petitioner has not provided any documentation to support his
    claims that his trial and appellate counsel provided ineffective
21  assistance. It is well settled that a petition for writ of
    habeas corpus should: (1) state fully and with particularity
22  the facts upon which relief is sought; and (2) include copies of
    reasonably available documentary evidence supporting the claim,
23  including pertinent portions of trial transcripts and affidavits
    or declarations. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)
24  Conclusory allegations made without any explanation of their
    basis do not warrant relief. (*People v. Karis* (1988) 46 Cal.3d
25  612, 656; *see also In re Swain* (1949) 34 Cal.2d 300, 303-304.)

48

1  Petitioner's failure to attach any supporting documentation to
   his petition prevents this Court from conducting a meaningful
2  review of his ineffective assistance of counsel claims.

3       "To establish ineffective assistance of counsel . . . a
4  defendant must show that counsel's representation fell below an
   objective standard of reasonableness under prevailing
5  professional norms, and that counsel's deficient performance was
   prejudicial, i.e., that a reasonable probability exists that,
6  but for counsel's failings, the result would have been more
   favorable to the defendant." (*Strickland v. Washington* (1984)
7  466 U.S. 668, 687-688; *People v. Waidla* (2000) 22 Cal.4th 690,
   718.)  Even assuming Petitioner's claims about his attorneys'
8  conduct at trial and during his appeal are accurate, his claims
   fail because he has not demonstrated that his counsels'
9  performance "fell below an objective standard of reasonableness"
   and that there is a reasonable probability that, but for
10 counsel's alleged errors, "the result of the proceeding would
   have been different."  (*People v. Ledesma* (1987) 43 Cal.3d 171,
11 218.)  "When a defendant challenges a conviction, the question
   is whether there is a reasonable probability that, absent the
12 errors, the factfinder would have had a reasonable doubt
   respecting guilt."  (*Ledesma, supra*, 43 Cal.3d at 218, citing
13 *Strickland, supra*, 466 U.S. at 693-94].)

14
        For the foregoing reasons, Petitioner's writ of habeas corpus
15 is DENIED.

16
   5/25/07
17 Date                              Judge of the Superior Court

18

19

20

21

22

23

24

25

3

*4f*

# EXHIBIT C

Name _GREGORY L. BROWN_

Address _SATF-CORCORAN_

_P.O. Box 5246_

_CORCORAN, CA 93212_

MC-275

**A 118248**

**FILED**

CDC or ID Number _____

_Court Of Appeal Of The State Of California_

JUN 2 9 2007

Court of Appeal - First App. Dist.

DIANA HERBERT

_First Appellate District, Division Four_

(Court)

DEPUTY

_Gregory L. Brown_

Petitioner

vs.

_Warden, SATF-Corcoran Prison_

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No. _____

*(To be supplied by the Clerk of the Court)*

_Evidentiary Hearing Requested_

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

51

This petition concerns:

☒ A conviction        ☐ Parole

☐ A sentence          ☐ Credits

☐ Jail or prison conditions   ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name: *Gregory L. Brown*

2. Where are you incarcerated? *SATF - Corcoran State Prison*

3. Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

*Count I, Conspiracy To Commit Murder*

*Count II, Attempted Murder*

b. Penal or other code sections: *Count I 182.1, 187 ; Count II 664/187*

c. Name and location of sentencing or committing court: *Superior Court of the City and County of San Francisco, Hall of Justice, 850 Bryant St., S.F., CA 94103*

d. Case number: *No. 159271*

e. Date convicted or committed: *May 25, 1995*

f. Date sentenced: *October 12, 1995*

g. Length of sentence: *56 Years to Life*

h. When do you expect to be released? *Immediately upon granting of this habeas*.

i. Were you represented by counsel in the trial court? ☒ Yes.  ☐ No. If yes, state the attorney's name and address:

*Stephen Arian; P.O. Box 665; Kentfield, CA 94914*

_____

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

GREG's right to a FAIR Trial and Due Process, as guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, was violated as a result of his conviction on less than proof beyond a reasonable doubt of every element of the charged crimes.

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

No RATIONAL trier of facts could have found the essential elements of the crimes charged against GREG, beyond a reasonable doubt. On March 17, 1995, Prosecutor Floyd Andrews filed his Information in this case. Count I of the Information accused Greg of conspiracy to commit murder (CT 1) and Count II accused him of Attempted murder (CT 4). The Information alleged that the Attempted murder was willful, deliberate, and premeditated. (CT 5.) As to the Attempted murder count, the Information also alleged that Greg personally inflicted great bodily injury upon Robin "Williams." (CT 5.) The Information set out 14 overt acts in support of the conspiracy accusation, naming Greg in only four overt acts (Nos. 2, 4, 5 and 6.). (CT 1-4) Overt Act No. 2 accused          (See Continuation, Additional Page.)

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

In re Winship, 397 U.S. 358 (1970); Leavitt V. Vasquez, 875 F.2d 260 (1989) (9th Cir.);

## Continuation Of "Ground I", Page #2

1  Grees of taking a photo and giving it to Wanda "Fain";
2  No. 4 accused Grees of accompanying Fain to deliver a
3  note; No. 5 accused Grees of encouraging Fain and
4  Joseph "Diggs" to murder Robin Williams; and No. 6 accused
5  Grees and Fain of residing at 126 Blythdale. Overt Act
6  Nos. 2 and 4 are meaningless in the context of the
7  conspiracy charge because there was no evidence of any
8  agreement, between Grees and another or others
9  <u>to commit murder</u>. But, more importantly, those two
10 "acts" do not meet the legal requirement of an
11 "overt act." The jury made a determination that Grees
12 encouraged Fain and Diggs to murder Robin Williams
13 (Verdict, Overt Act No. 5), **but** there **is not a shred of**
14 **admissible evidence presented at trial from which this**
15 **conclusion could logically be reached.** And there was
16 **no finding of overt act No. 6.** (Verdict, Overt Act No. 6.)
17 There was no sufficient evidence of an overt act
18 supporting the charge of conspiracy to commit murder.
19 The crime of conspiracy is defined in the California Penal
20 Code (Sec. 182, subd. (a)(1), 184) as two or more persons
21 conspiring to commit any crime, together with proof of
22 the commission of an overt act by one or more of the
23 parties to such agreement in furtherance thereof.
24 Conspiracy is a specific intent crime. The specific
25 intent required divides logically into two elements
26 (a) the intent to agree, or conspire, and (b) the intent

_Continuation Of "Ground 1", Page #3_

1  to commit the offense which is the object of the conspiracy.
2  To sustain a conviction for conspiracy to commit murder,
3  the prosecution must show not only that the conspirators
4  intended to agree <u>but also</u> that they intended to kill
5  the victim.

6      The evidence introduced at trial, as it pertains to
7  Greg may be summarized as follows:

8      1.) He was arrested on January 6, 1995, at
9  126 Blythdale, while in possession of a handgun and
10  crack cocaine. Robin Williams made a statement to
11  police incriminating Greg.

12      2.) He was present when a purportedly threatening
13  note, written by co-defendant Wanda Fain, on paper from
14  a notebook belonging to Fain, was delivered to Williams.
15  The note came with a photograph of her taken by Greg
16  five years before.

17      3.) Greg and Williams met, and Greg agreed to
18  provide Williams unspecified remuneration if she would
19  refrain from testifying against him at an upcoming
20  preliminary hearing. The two resumed their previously
21  friendly relationship.

22      4.) Greg was present at 126 Blythdale on
23  February 7, until about 4:00 to 6:30 P.M. that evening.
24  Williams, Fain and Diggs left to take the bus about 7:30 P.M.

25  ////
26  ////

## Continuation Of "Ground I"; Page #4

First, the January 6, arrest could only be considered on the issue of Greg's _motive_ to commit the crimes alleged. (RT 347-348; 1213-1215.) Clearly, "motive" is not an essential element of either crime charged. Indeed, motive is different from intent (1 Witkin, California Criminal Law (3rd edition 1988); sec. 100; p. 118), and does not establish intent.

Second, the alleged threatening note was written by Fain on her paper. (RT 727-729, 935.) It was delivered about three weeks before the February 7, 1995 shooting of Williams. A reasonable trier of facts could infer that Greg was associated with the note; but it is not reasonable to interpret the note as evidencing an agreement between Fain and Greg to commit any crime, let alone an agreement to kill Williams. Furthermore, about a week and a half after Williams received the note, or about two weeks before February 7, 1995, Williams and Greg reconciled. (RT 520, 545-546, 557.) From that time forward, up to and including February 7, 1995, Williams visited with Greg every day or every other day. There is no evidence to suggest that these approximately seven to fourteen visits were anything but friendly. Indeed, Williams testified that Greg specifically indicated to her that he had no intention to hurt her. (RT 557.)

Third, given the evidence that Greg either lived at 126 Blythdale or was there often and Williams considered

sAO 72
(Rev. 8/82)

## Continuation Of "Ground 1", Page #5

1  him her friend, Nothing can be inferred from Greer's
2  presence at or absence from 126 Blythdale on the day
3  Williams was shot. Williams' trial testimony varied as to
4  when Greer left on that day. (RT 347-530.) She also
5  testified that she did not remember when he left. (RT 551-
6  552.) At the March 6, 1995 preliminary examination,
7  she testified that he left early, around 4:00 P.M.
8  (RT 547-549, 551.)

9      Nowhere in the record is there any evidence from which
10  a rational inference may be made that Greer agreed with
11  ANYONE to take Robin Williams' life, or to do her any harm
12  at all. There is no evidence which even arguably shows
13  that Greer had an intent to kill Williams. There is
14  no evidence linking Greer to any weapon associated with
15  the shooting of Williams. There is no other physical
16  evidence linking Greer to the shooting of Williams. There is
17  no evidence of any discussions among Greer, Fain, and
18  Diggs regarding killing Williams. There is no evidence
19  that Greer had any connection to the trip that Fain, Diggs,
20  and Williams took to Third Street. And there is nothing
21  in the statements that Fain and Diggs gave to the police
22  that connected Greer to the shooting of Williams.

23      The fact that Greer knew Fain and perhaps Diggs is
24  not sufficient. Mere association is not enough to
25  establish the essential elements of either crime alleged.
26  / / / /

*AO 72
(Rev. 8/82)

<u>Continuation Of "Ground 1"; Page #6</u>

1    As shown above, there is no evidence to support
2  the essential elements of the crime of conspiracy to
3  commit murder.

4    Even less evidence exists with respect to the finding
5  of the crime of attempted murder of Robin Williams.
6  Where, as here, the prosecution has charge the attempt
7  to be "willful, deliberate, and premeditated,"
8  it must adduce evidence from which it may be
9  rationally inferred that, " ... the would-be slayer
10  (weighed and considered) the question of killing and the
11  reason for and against such choice and, having in mind
12  the consequences, decides to kill another human being."
13  CALJIC 8.67.

14    No such evidence exists in the record. Nor is there
15  any evidence of the specific intent element needed to
16  satisfy the attempted murder requirement. Such intent
17  must be shown at the time of the overt act by which
18  the attempt is manifested; and it cannot be inferred
19  from the commission of another crime.

20    Another essential element of the crime of attempt
21  is the requirement of a direct but ineffectual act done
22  toward the commission of the act alleged. The act
23  must be overt and unequivocal; it must constitute the
24  beginning of the consummation of the attempted crime.
25  Preparation alone is not sufficient.

26  / / / /

⌐AO 72
(Rev. 8/82)

Continuation Of "Ground I"; Page #7

Just as there is no evidence to support the elements
of Greg's conspiracy to commit murder conviction of
Robin Williams, there is no evidence to support the
elements of his attempted murder conviction of her.
There is no evidence to support a finding that Greg
had a specific intent to kill Williams. There is
no evidence that Greg attempted a direct but
ineffectual act of killing Williams. There is no evidence
that Greg participated in the shooting of Williams,
directly or indirectly. There is no evidence that Greg
aided and abetted an attempt to kill Williams. There is
no weapon or physical evidence linking Greg to the shooting
of Williams. There is no evidence that Greg even
suspected that Fain, Diggs or anyone else had any
criminal intent towards Williams, and certainly no
evidence that he shared in any criminal intent toward her.
Furthermore, just as the note cannot support the
conspiracy conviction, it cannot support the attempted
murder conviction. Greg's presence when Fain
delivered the note cannot be interpreted as providing
encouragement to Fain, Diggs, or anyone else to shoot
Williams three weeks later; and the reconciliation
between Williams and Greg are irreconcilable with a
finding that Greg advised or encouraged the attempted
murder of Williams. Williams and Fain reconciled also.
(RT 546-556.) Even putting aside the reconciliation

Continuation Of "Ground 1"; Page #8

1  of Williams with Fain and Greg, the Attempted murder of
2  Williams was not a reasonably foreseeable consequence of
3  Greg's standing on a porch while Fain delivered a note and
4  photograph to Williams.

5      Nonetheless, motive cannot supply the specific intent
6  Elements of Attempted murder. Nor can association establish
7  either the requisite encouragement or intent to kill.
8  Nor can Greg's brief presence at 126 Blythdale on the day
9  of the shooting Establish either the requisite encouragement
10 or intent to kill, particularly, in light of the evidence
11 that he either frequent or lived there.

12     A microscopic examination of the trial transcript
13 fails to reveal ANY evidence from which a reasonable
14 person could make a rational inference establishing any
15 of the elements of conspiracy to commit murder and
16 attempted murder.

17     Greg's convictions for conspiracy to commit murder
18 and attempted murder based on absent and/or less than
19 proof beyond a reasonable doubt of every element of
20 the accused crimes violated his right to a fair trial
21 and due process under the Fifth and Fourteenth
22 Amendments of the United States Constitution.

23     Based on the above, the court must grant habeas
24 relief to Greg and enter a judgment of acquittal.
25 Acquittal is required because, At the close of the
26 prosecution's case-in-chief, the trial court improperly

_Continuation Of "Ground I"; Page #9_

1  denied Greg's (California Penal Code sec. 1118.1 motion for
2  judgment of acquittal. (CT 48, 55; RT 1031-1037.)
3  Reversal Alone is not an adequate remedy because A retrial
4  could then result, which would violate the state and
5  federal constitutional prohibitions against double jeopardy.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

7. **Ground 2 or Ground** _2_ (if applicable): "GROUND 2", PAGE #1

. GREG's right to a FAIR TRIAL AND DUE PROCESS, AS GUARANTEED under the Fifth AND Fourteenth Amendments of the United States Constitution, WAS violated when the prosecutor maliciously AND intentionally introduced false AND unsupported AND deceitful material statements AT trial.

a. Supporting facts:

It WAS prosecutorial misconduct AND malicious prosecution for Floyd "Andrews," A formal SAN FRANCISCO prosecutor, to introduce false AND unsupported AND deceitful material statements AT trial to acquire GREG's convictions for conspiracy to commit murder AND attempted murder. Prosecutor Andrews' false AND unsupported material statements in his "Closing Arguments" AT trial WERE SO improper that it infected the trial with unfairness AS to make GREG's convictions A denial of due process AND a fair trial. In closing, Andrews told the jury that WANDA FAIR wrote the note "for GREGORY BROWN," (RT 1349.) AND "... he (GREG) CAN get her (Robin Williams) out to Terrell Avenue AND shoot her AND leave her dead through the other two (WANDA FAIR AND Joseph Diggs)." (RT 1349.) Andrews further repeatedly exhorted the jury to bring in A "guilty" verdict, not based on the evidence, but "BECAUSE (SEE Continuation, Additional Page)

Supporting cases, rules, or other authority:
DARDEN V. WAINWRIGHT, 477 U.S. 168 (1986); BRECHT V. ABRAHAMSEN, 509 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 In re Winship, 397 U.S. 358 (1970); BERGER V. United States, 295 U.S. 78 (1935); Miller V. Pate, 386 U.S. 1 (1967)

12

62

<u>Continuation Of "Ground 5"; Page #3</u>

1 they did it." (RT 1350.)   The trial record is devoid
2 of any evidence to support any of these accusations.
3 The was no evidence introduced at trial that showed
4 Fain wrote the note "for Gregory Brown." There was
5 no evidence introduced at trial that showed Greg had
6 any connection to the trip that Fain, Diggs and Williams
7 took to Jerrold Avenue. There was no evidence
8 introduced at trial from which a rational inference may
9 be made that Greg agreed with <u>Fain, Diggs or anyone</u>
10 <u>else</u> to take Robin Williams' life, or to do her any harm
11 at all.   And nowhere in the trial record is there any
12 evidence as to <u>who</u> actually shot Williams.

13      As demonstrated above, not only did Andreus
14 failed to limit the **scope** of his closing arguments
15 to the evidence presented at trial but he also
16 deliberately and consciously introduced numerous false
17 and unsupported material statements which rested
18 exclusively on the issue of guilt.   Additionally,
19 Andreus' exhortations of the jury to bring in a "guilty"
20 verdict, by any means other than the evidence, "because
21 they did it" amount to malicious prosecution and
22 several instances of prosecutorial misconduct because:
23 (1) it was contrary to the evidence presented at trial;
24 (2) it was an injection of his personal opinion or belief;
25 (3) it influenced and inflamed the jury's prejudices
26 against Greg; (4) it encouraged the jury to

Continuation Of "Ground 2": Page #3

1  disregard the court's instructions concerning innocence
2  and guilt; and (5) it diverted the jury's attention from
3  its duty to decide the case on the merit of the evidence
4  presented at trial.

5      But, just as equally prejudicial, it negated the
6  fact that other people could have been responsible for
7  the shooting of Robin Williams. On cross-examination,
8  Williams was questioned about various persons who might
9  bear ill will towards her. In January 1994, just a
10  year prior to her shooting, Robin Williams was convicted
11  of a residential burglary, and named three black males
12  who were also involved. (RT 573, 587-588, 641.)
13  After that burglary, Corky, the boyfriend of the woman
14  whose house she had burglarized, beat her up. (RT 583.)
15  Williams had also incurred drug debts in the past.
16  (RT 576, 580.)  However, she denied having any drug
17  debts on February 7, 1995, and did not remember ever
18  being threatened by drug dealers to whom she owed
19  money. (RT 576, 580, 582.)  She said that she knew
20  Irwin Berry at Sunnydale, but did not remember him
21  hitting her with a gun because of some debts she owed
22  him. (RT 582.)  She specifically denied owing any
23  money to a man named "Tails" from the Sunnydale Area,
24  and said that she did not remember him coming up to
25  her the night before February 7, 1995 and pointing a
26  gun at her. (RT 581-582.)  However, Defnie Hayes

Continuation Of "Ground 2"; Page #4

1   testified that she was talking on the telephone with a
2   friend at her home in the Sunnydale Projects on the
3   afternoon of February 6, 1995 when the friend said,
4   "Oh, my God, Tails pulled a gun on Robin." Robin
5   referred to Robin Williams. (RT 1005.) Hayes also
6   testified that sometime during the last couple of months
7   Phoebe's apartment at 56 Santos had caught on fire.
8   Williams and Phoebe were once roommates at 56 Santos.
9   (RT 1005-1006.) Over the years, Williams had gotten
10  into fights at Sunnydale. (RT 584-585.) Williams
11  admitted that she might have some enemies around
12  the city. (RT 586.)
13       Andrews' false and unsupported material statements
14  implanted in his closing arguments, whether individually
15  or collectively, so infected the trial outcome as to
16  create a genuine effect on the jury's verdict, especially
17  when considering the fact that the trial judge did not
18  instruct the jury to disregard the improper statements.
19  There is absolutely no way a rational jury could have
20  found Greg guilty of the crimes accused absent the
21  mentioned statements in Andrews' closing.
22       Prosecutor Andrews' intentional and malicious use
23  of false and deceitful material statements in his
24  "Opening Statements" at trial were so improper
25  that they infected the trial with unfairness as
26  to make Greg's resulting convictions a denial of due

15

65

_Continuation Of "Ground 2"; Page #5_

1  PROCESS AND A fair trial. Andrews' opening statements
2  alleged, "She (Robin Williams) was shot because she made
3  a statement to the police about Gregory Brown, about
4  him selling drugs, about him having a gun. She was shot
5  to punish her for that statement and to prevent her from
6  testifying in future court appearances." (RT 314.)
7  Andrews failed to introduce any evidence at trial as to
8  why Robin Williams was shot. Andrews introduced no
9  evidence that Williams was shot because she made a
10  statement to the police "about Gregory Brown." Andrews
11  introduced no evidence that Williams was shot because her
12  statement mentioned Greg "selling drugs." Andrews
13  introduced no evidence that Williams was shot because
14  her statement mentioned Greg "having a gun." Andrews
15  introduced no evidence that Williams "was shot to
16  punish her for that statement" to the police.
17  Andrews introduced no evidence that Williams was shot
18  "to prevent her from testifying in future court
19  appearances." Furthermore, Andrews completely
20  failed to introduce any evidence at trial as to _why_
21  Williams was shot, and there was no trial evidence
22  as to why.
23       Moreover, Robin Williams' trial testimony totally
24  contradicted the improper statements given by Andrews in
25  his opening statements, while at the same time
26  exonerating Greg on all charges relating to her shooting.

<u>Continuation Of "Ground 2"; Page #6</u>

1  Williams testified at trial that on January 6, she was
2  visiting Greg at 126 Blythdale, when the police came.
3  She saw a gun in Greg's hand and a bag of crack in
4  the other. (RT 511.)  She made a statement to the police
5  as to what she saw. (RT 513.)  Some days later she
6  was at a friends house when Wanda "Fain" delivered
7  a note to her, that included a photo of her taken some
8  years before by Greg.  Greg was nearby when the note
9  was delivered, standing outside on a porch. (RT 515.)
10  Fain said Greg wanted to talk to her. (RT 517.)
11  She did not speak to Greg because she considered the
12  note threatening and was scared. (RT 518.)  About a
13  week and a half later, she met Greg on the street
14  and they spoke.  He asked her to stay out of sight,
15  and not to testify at his upcoming hearing; and in
16  return he "would take care of" her as long as she
17  didn't testify. (RT 519.)  She was satisfied with
18  the conversation and returned to her regular visits to
19  126 Blythdale, going there about every other day.
20  She went there to talk to Greg and they were friends.
21  (RT 520.)  Greg never threatened her, and she
22  believed he had no intention of hurting her. (RT 557.)
23      Andrews was aware that Williams would testify
24  as she did, because it was relatively a recital of her
25  preliminary hearing testimony. (RT 11-16; 51-52.)
26  Nevertheless, Andrews deliberately, consciously and

17                    67

<u>Continuation Of "Ground 3"; Page #7</u>

1  maliciously used false and deceitful material statements
2  in his opening statements to manipulate the jury.
3  This fact is highlighted by Andrews' calculated
4  (and successful) efforts to paint Greg as a heartless
5  dope dealer who has previously captured and corrupted
6  the victim, Robin Williams. Thus, for example, in his
7  opening statements Andrews said:

8
9        "Robin is going to tell you that she is addicted
10       to cocaine, that she had been supplied
         cocaine by Gregory Brown and other people
11       ...., that she did a lot of things to
         get her poison. She'd go to Gregory Brown
12       and get drugs there. She's traded drug
         for sex with Mr. Brown."
13

14  (RT 315, line 28; 316, line 1-7.)   Of course, there was
15  no evidence adduced at trial to support this assertion.
16  Absent the maliciously false and deceitful statements
17  embedded in Andrews' opening statements, no rational
18  jury could have reached a guilty verdict against Greg
19  because there was simply no evidence introduced at
20  trial connecting him to the shooting of Robin Williams.
21  Indeed, the improper statements created such a
22  substantial and injurious effect on the jury's decision
23  as to render Greg's convictions unconstitutional.
24  / / / /
25  / / / /
26  / / / /

AO 72
(Rev. 8/82)

<u>Continuation Of "Ground 2"; Page #8</u>

1    Greg's right to a fair trial and due process, under
2  the Fifth and Fourteenth Amendments of the United
3  States Constitution, was violated as a result of several
4  instances of prosecutorial misconduct as set forth herein.
5        Based on the above, the Court must grant habeas
6  relief to Greg on this ground and enter a judgment
7  of acquittal because there is no evidence to support
8  a re-trial.

SAO 72
(Rev. 8/82)

7. Ground 2 or Ground __3__ (if applicable): "Ground 3", Page #1

Greg's right to a Fair Trial and Impartial Jury, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution was violated when jurors gave intentionally false answers during voir dire and/or covered up false statements given therein.

a. Supporting facts:

In the present case, jurors committed misconduct when they intentionally gave false answers during voir dire or covered up false statements given therein which violated Greg's right to due process, a fair trial, an unbias jury, confrontation, and a verdict based on admissible trial evidence, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

During voir dire, Mr. Fuetsch, defense counsel for co-defendant Wanda Fain, asked the jury: "Does anyone have a problem or would they have a problem with following the instructions of the Court even if the result that would be reached by following instructions of the Court were contrary to your gut reaction in a case as serious as the one that's charged here?" (RT 132, lines 3-8). The only juror who indicated he would have a problem with following the Court's instructions is juror John Elwood. (RT 132-133 (from line 3 of 132 to line 13 of 133); 142-143 (from line 11 of 142 to line 28 of 143); 158-159, line 28-13).

During voir dire, Mr. Zilversmit, defense counsel for co-defendant Joseph Diggs, asked jurors Mr. Castillo, Ms. Owens, Ms. Smith, and (See Continuation Additional Page)

b. Supporting cases, rules, or other authority:

Irwin V. Dowd, 366 U.S. 717 (1961); Brecht V. Abrahamson, 509 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974); In re Winship, 397 U.S. 358 (1970); Carter V. Kentucky, 450 U.S. 288;

20

20

## Continuation Of "Ground 3"; Page #2

1   Mr. Bowen if they heard the judge's instruction on the
2   presumption of innocence and whether they would be able to
3   vote not guilty assuming there was no evidence to the
4   contrary; each juror indicated they would. (RT 136-137.)
5   Mr. Ziversait also asked the jury if they would be able
6   to vote not guilty if the prosecution failed to produce
7   evidence of the defendants' guilt beyond a reasonable doubt;
8   none of the jurors indicated to the contrary. (RT 140-141.)

9       During voir dire, Mr. Arian, Greg's trial defense
10   counsel, asked the jury if any of them are confused about
11   the "difference between a mere suspicion, a creating of a
12   suspicion and creating evidence that convinces beyond
13   a reasonable doubt"; none of the jurors indicated
14   confusion. (RT 147.)

15       As demonstrated in the concerning declarations of juror
16   John Elwood, juror Karen Pemberton, and Wayne Richard,
17   Greg's trial defense investigator, the jury failed to answer
18   questions honestly during voir dire regarding whether or
19   not they would follow the court's instructions.

20

21   _____

22     1   Following the verdicts, all the defendants, including
23   Greg, filed motions for new trial, alleging among other
24   things, jury misconduct during deliberation. However,
25   this Ground, as well as all other Grounds set forth in these
      papers, was not raised in the motions for new trial by
26   defense counsels nor on direct appeal.

AO 72
(Rev. 8/82)

<u>Continuation Of "Ground 3"; Page #3</u>

1    Juror Karen Pemberton, in her declaration given to
2    counsel for co-defendant Joseph Diggs states among other
3    things:

4        During, deliberations, a juror had a bus
5        schedule with them. We looked at the
         schedule and we talked about how long
6        the bus ride took, when they (Robin, Inmate
         & Joseph) got on the bus, and how long it
7        took to get where they were going...

8        When we went into the jury after arguments,
9        some people were saying "they don't have
         a case." I originally believed they were
10       talking about the prosecution. But later,
11       I realized that more than half of the
         jurors were talking about how the defense
12       had not proven their case.

13

14   (CT 453-454.)   The clear impact of this discussion
15   between jurors is that they did not apply the court's
16   instruction on the burden of proof in a criminal case.
17   (CALJIC Nos. 2.61, 2.90, 2.91; CT 334, 340-341; RT 1219,
18   1222-1223. Also, see, RT 93-94.)   Juror Karen P. also
19   advised Maggie Richards, Green's Investigator, that "a
20   couple" of jurors commented on Green's failure to testify
21   in his own defense being an indication of his guilt. (See
22   Maggie Richards' sworn declaration at, CT 473-474.)
23        The instructions placing the burden of proof on the
24   prosecution are grounded in the Due Process Clause of the
25   Fourteenth Amendment of the United States Constitution
26   and play a vital role in the American scheme of criminal

_Continuation Of "Ground 3"; Page #4_

1 procedure. The jurors clearly disobeyed the court's
2 instructions regarding burden of proof when, according to
3 the declaration of juror Karen P. more than half the
4 jurors said, during deliberations, that the defense had
5 not proven their case. There is nothing in the record
6 to suggest that the credibility of Karen P.'s declaration
7 on this issue was questioned, and it certainly was not
8 countered. There is no case law or other authority that
9 Greg is aware of that states that the declaration of a
10 single juror cannot establish misconduct, that offending
11 jurors must be identified by name, or that all twelve
12 jurors must disobey court instructions in order to
13 establish misconduct. Indeed, one juror is enough.
14      The instruction that no inference is to be drawn
15 from a defendant's failure to testify is grounded in
16 the Fifth and Fourteenth Amendments of the United States
17 Constitution. The jury was instructed as follows:
18 "A defendant in a criminal trial has a constitutional
19 right not to testify. You must not draw any
20 inference from the fact that a defendant does not
21 testify. Further, you must neither discuss this matter
22 nor permit it to enter into your deliberations in any
23 way." (CALJIC 2.60; CT 333; RT 1219.) The jurors
24 misconduct in disobeying this instruction was inherently
25 and substantially likely to have influenced and biased the
26 ////

<u>Continuation Of "Ground 3"; Page #5</u>

1   involved jurors so as to prejudice Greg.

2   There are hardly two matters more basic to a fair

3   jury trial than the principles embodied in the

4   instructions referred to above.

5   Juror John Elwood, in his declaration given to

6   counsel for co-defendant Joseph Diggs states under oath,

7   among other things:

8       During our deliberations we prepared a time

9       line... for the evening of the incident. We

        were particularly concerned with the period

10      between 7:30 pm and 8:35 pm on the night

11      of the shooting. To help reconstruct what

        happened during that period, we consulted

12      two schedules that jurors Alvin Bernstein and

13      Monnell Beurmann brought in on the second

        day of deliberations. These schedules provided

14      us information about the intervals between

15      buses and the frequency with which buses

16      came; this information along with court

        testimony and statements helped us to fill

17      in our time line from 7:30 pm until 8:35 pm

18      on the night of the shooting...

19      There was also discussion about access to guns

20      which was in reference to defendant Greg

21      Brown's prior arrest.

22      There were also discussions about defendant

23      Greg Brown being a drug dealer and his

        propensity for violence and drugs and that

24      kind of lifestyle. This was mostly in

25      reference to defendant Brown's state of mind.

26

24

<u>Continuation Of "Ground 3"; Page #6</u>

Some jurors Also discussed that as a drug
dealer, Brown's State of mind may be twisted
And power hungry. Some jurors Also discussed
that as a drug dealer, Brown might feel that
there would be No consequences to his actions
if he killed Robin Williams. The jurors who
brought up discussions of def. Brown's
lifestyle were reminded by other jurors that
this line of discussion was speculation and
could Not be considered in deliberations.

Someone Also made reference to the fact that
if you do crack cocaine, It does Not mean
you lose your memory.

(CT 451-452.) This statement taken on its face is clearly
juror bias of the worst sort in and of itself. Nonetheless,
juror Jordan Owens corroborated the fact that jury did in fact
disregarded and disobeyed the court's instructions And
considered the seizure of a gun and drugs from defendant
Gregory Brown As evidence of his guilt in the charged crimes.
(Declaration of Maggie Richards At, CT 473-474)

        Early in the prosecution case, the trial court gave
the following limiting instruction to the jury regarding the
evidence seized during the January 6, 1995 arrest of Greg.
The court admonished:

        [T]he evidence or testimony that's being received
        At this point regarding the gun And cocaine
        seized At 126 Blythdale on January 26th [sic]
        1995, in the presence of Mr. Brown is being
        offered only to show motive for Mr. Brown to

25                          75

<u>Continuation Of "Ground 3"; Page #7</u>

from Ms. Williams. You may not consider this
evidence for any other purpose at this time.

(RT 347-348.) After the completion of the presentation of all
of the evidence, the court gave the jury the following
instructions:

Evidence was introduced of an arrest on
January 6, 1995 of defendant Gregory Brown
and seizure of guns and drugs from the premises
of 126 Blythdale. This evidence was admitted and
may be considered by you only for the purpose of
showing a possible motive for the commission of the
crimes charged. You're to consider this evidence
only for the purpose of determining whether such
motive exists and for no other purpose. Such
evidence, if believed, was not received and may
not be considered by you to prove that defendant
Gregory Brown is a person of bad character or
that he has a disposition to commit crimes. Such
evidence was received and may considered by you
only for the limited purpose of determining if
it tends to show a motive for the commission
of the crimes charged. For the limited purpose
for which you may consider such evidence, you
must weigh it in the same manner you do all
other evidence in this case. You're not permitted
to consider such evidence for any other purpose.

Evidence that a gun was seized on January 6th,
1995, may not be considered by you to infer or
prove that any of the defendants had a gun on
February 7th, 1995, when Robin Williams was shot.

Certain evidence was admitted for a limited purpose.
At the time this testimony was admitted you were
admonished it could not be considered by you for
for any purpose other than the limited purpose for
which it was admitted. Do not consider such evidence
for any purpose, except the limited purpose for
which it was admitted.

AO 72
(Rev. 8/82)

## Continuation Of "Ground 3"; Page #8

1  (RT 1213-1215.)   These instructions were also provided to the
2  jury in written form during their deliberations. (CT 306,
3  318-320, 323.)

4        Jurors clearly disregarded and disobeyed these
5  instructions. Far from limiting their consideration of the
6  evidence of the gun and cocaine to the issue whether Greer had
7  a motive to harm Williams, juror discussed that the
8  January 6, 1995 gun and cocaine evidence showed that Greer
9  had "access to guns," was "a drug dealer," had a
10 "propensity for violence and drugs," had a "twisted and
11 power hungry state of mind," and felt that "there would
12 be no consequences to his actions if he killed Robin
13 Williams." The fact that some jurors reminded other
14 jurors not to consider this line of discussion does not
15 indicate whether any or all of the improper discussion
16 ceased, and there is no indication that the reminder was
17 given by the jury foreman or otherwise carried special
18 authority. And the reminder could not erase the previous
19 improper discussion. The record is without any
20 contradictory declarations on this issue. Nor is there
21 any indication in the record that the prosecutor or the
22 trial court questioned the credibility of juror John
23 Elwood's declaration on this subject.

24  / / / /
25  / / / /
26  / / / /

Continuation Of "Ground 3"; Page #9

The declaration of Greg's trial defense investigator, Maggie Richards, states, among other things:

On May 30, 1995, I spoke with juror Karen Pemberton by telephone. At that time, she told me she heard "a couple" jurors discussing the fact that defendant Gregory Brown did not testify in his own defense, and that this was an indication of guilt.

On May 30, 1995, I spoke with juror Alvin Bernstein by telephone. He told me that in jury deliberations . . . jurors did consult maps and bus schedules.

On May 30, 1995, I spoke with juror Jordan T. Owens by telephone. She told me that the jury considered as evidence of one of defendant's being shot the victim that there were guns in Gregory Brown's past, and that he was a drug dealer.

(CT 473-474.)

The sworn declarations of jurors John Elwood and Karen Pemberton and that of investigator Maggie Richards, demonstrate that the jurors consulted bus schedules and/or maps during deliberations. The record shows that neither were admitted into evidence at trial. It is juror misconduct to consider and discuss "evidence" other than that which was received at trial, whether a juror acted intentionally or inadvertently in being exposed to the outside source of information.

The jurors were also specifically instructed:

You must decide all questions of fact in this case from the evidence received in this trial and not from any other source . . .

28

78

<u>Continuation Of "Ground 3"; Page #10</u>

1   You must not make any independent
2   investigation of the facts ... nor consider
3   nor discuss facts as to which there's no
    evidence.

4   (CALJIC 1.03; CT 313; RT 1210.)   Clearly, the jurors use
5   of the bus schedules constituted misconduct.

6        Timing was an important issue in this case.  The
7   prosecution theory was that Fain, Diggs and Williams left
8   126 Blythdale at around 7:30 p.m., walked to the bus stop,
9   waited for the bus, rode the bus for twenty to twenty five
10  minutes, and walked a block and a half, before co-defendants
11  Fain and Diggs shot Williams.  The wounded Williams was first
12  discovered around 8:30 p.m.  There is no evidence that Fain or
13  Diggs were anywhere in sight at that time.  Given all of this,
14  plus the co-defendants denial of any involvement in Williams'
15  shooting, the expert witness evidence regarding Williams' memory
16  problems, and the defense theories that third parties were
17  responsible, the jury plainly had a question as to whether
18  all that Williams described could have happened within
19  the one hour time period.  Thus, they obviously felt a need
20  to fill in important gaps in the prosecution case time line,
21  and used the bus schedules to do so.  Inasmuch as Greg's
22  culpability as a conspirator rested on the jury's
23  evaluations of the actions of Fain's and Diggs and on the
24  credibility and reliability of Williams' testimony, the
25  jury's consultation of the bus schedules to bolster the
26  prosecution's case was prejudicial to Greg.

AO 72
(Rev. 8/82)

29

<u>Continuation Of "Ground 3"; Page #11</u>

1   The sworn declaration of juror John Elwood makes clear
2   that a juror injected his own outside expertise into deliberations.
3   The comment of a juror that if you do crack cocaine it does not
4   mean you lose your memory is also misconduct. The relationship
5   between crack cocaine use and memory loss is not a subject of
6   commonplace knowledge. Moreover, the juror comment is not
7   a reasonable interpretation of expert witness psychiatrist
8   Eugene Schoenfeld trial testimony. (RT 932-935.) The juror
9   who made the comment regarding cocaine and memory was,
10  clearly relying on first hand experience, observation, or study.
11  As such, his comment injected his outside expertise into the
12  deliberations, which constituted misconduct.

13      Here, the evidence is so very slim against Greg, non-
14  existent by most standard, that a very minimal amount of
15  error can have a substantial weight in affecting the verdict.
16  All that ties Greg to the shooting of Robin Williams is, the
17  January 6 arrest, and his connection to the delivery of a
18  purportedly threatening note. Other than his presence earlier
19  in the day, there is <u>nothing</u> connecting Greg to the events
20  leading up to Williams' shooting. Absent the varieties of jury
21  misconduct in this case, no trier of facts could have
22  found Greg guilty of the crimes charged.

23      As stated herein, the defense counsels explicitly asked
24  the jury material questions during voir dire which the
25  jury intentionally failed to respond honestly to; specifically,
26  the jury concealed their unwillingness to (1) follow the court's

<u>Continuation Of "Ground 3"; Page #12</u>

1   instructions; (2) give the defendants, particularly Gree, the

2   presumption of innocence; (3) vote not guilty if the

3   prosecution failed to produce evidence of the defendants' guilt

4   beyond a reasonable doubt; and (4) ascertain the

5   "difference between a mere suspicion, a creating of a

6   suspicion and creating evidence that convinces beyond a

7   reasonable doubt." (RT 132; 136-137; 140-141; 147. Also,

8   see, this Ground at pages 1 & 2.)

9        The jury's failure to respond honestly to the defense

10  counsels' questions during voir dire violated Gree right to a

11  fair trial, an impartial jury, due process, confrontation,

12  and a verdict based on admissible trial evidence under the

13  Fifth, Sixth and Fourteenth Amendments of the United

14  States Constitution; and was the direct cause of the

15  violation set forth in Ground 1.

16       Based on the above, the Court must grant habeas

17  relief to Gree on this ground along with any other

18  relief the Court deems fair and just.

19

20

21

22

23

24

25

26

7. Ground 2 or Ground __4__ (if applicable): "Ground 4", Page #1

Greg's right to Effective Assistance of Trial Counsel, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, was violated when counsel failed to: challenge overt acts; object to false and unsupported material statements at trial; and use preemptory challenge to excuse a bias juror.

a. Supporting facts:

Trial counsel's failure to make an obvious challenge of overt acts constitutes ineffective trial representation.

Trial counsel failed to challenge the validity and the legality of the overt acts in his motion to dismiss (Calif. Penal Code Sec. 995 motion). (CT 70, 152; RT 37.) To support a crime of conspiracy, the prosecution must prove the commission of an overt act by one or more of the parties engaged in the agreed upon conspiracy. In this case, only four overt acts in support of the conspiracy was related to Greg. (Nos. 2, 4, 5, and 6). Overt Act No. 2 alleged that Greg took a photo and gave it to Wanda Fain; No. 4 alleged that Greg accompanied Fain to deliver a note; No. 5 alleged that Greg encouraged Fain and Joseph Diggs to murder Robin Williams; and No. 6 alleged that Greg and Fain resided at 126 Blythdale. (CT 1-4.) As stated in "Ground 1" and supported by the record, there was no finding of overt act No. 6; no evidence to support No. 5; and Nos. 2 and 4 fail because (1) there is no evidence of an agreement (SEE Continuation, Additional Page)

b. Supporting cases, rules, or other authority:

Strickland V. Washington, 466 U.S. 668 (1984); Brecht V. Abrahamson, 507 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974);

32

82

<u>Continuation Of "Ground 4"; Page #2</u>

1  between Greer and anyone to commit murder And (2) they
2  do not meet the legal requirement of an overt act.
3  In light of the fact that Greer pled not guilty to the
4  crimes accused (CT 9-11), any reasonably effective
5  counsel would have moved to challenge all evidence against
6  his client in which the prosecution relies upon to obtain a
7  conviction. It is reasonable to assume that had counsel
8  challenged the overt acts, the prosecution would have
9  been forced to produce sufficient evidence to support each
10  act or run the risk of having one or more acts dismissed.
11  As shown herein, the mentioned overt acts were either not
12  acts in and of themselves or unsupported or lacked
13  finding. Therefore, had counsel challenge the overt acts
14  it is more than likely that one or more or all of the acts
15  would have been dismissed which would have further weaken
16  the prosecution's case or resulted in the entire case against
17  Greer being dismissed, because, the essence of a conspiracy
18  lies within the commission of an overt act.
19      Here, the prosecution's case against Greer is non-existent
20  by most standards, therefore, a minimal of error such as
21  the failure to challenge the overt acts contributed to and
22  proximately caused the subjection of Greer to an unfair trial,
23  a bias jury, prosecutorial misconduct, and a conviction on
24  less than proof beyond a reasonable doubt. Counsel's failure
25  to challenge the overt acts in question amount to
26  defective and ineffective representation.

AO 72
(Rev. 8/82)

33

Continuation Of "Ground 4"; Page #3

1   Trial counsel's failure to make meritorious objections to
2   false and unsupported material statements at trial constitutes
3   ineffective trial representation:

4       As stated in "Ground 2" and supported by the record,
5   in closing arguments, the prosecutor told the jury that
6   Wanda Fain wrote the note "for Gregory Brown," (RT 1349.)
7   And "... he (Greg) can get her (Robin Williams) out to
8   Texwood Avenue and shoot her and leave her dead through
9   the other two (Fain and Joseph Diggs)." (RT 1349.)
10  The prosecutor further repeatedly exhorted the jury to bring
11  in a "guilty" verdict, not based on the evidence, but
12  "because they did it." (RT 1350.) There was not a
13  scintilla of evidence presented at trial that supports
14  any of those false material statements. Any reasonably
15  effective counsel would have fervently objected to each
16  and every one of those improper statements, particularly,
17  in light of the fact that closing arguments are limited
18  to the issue in the case and the evidence that has been
19  presented.    Counsel's non-objections to the false and
20  unsupported material statements allowed the prosecutor
21  to: (1) argue facts that are not supported by the
22  evidence in the record; (2) inject his personal beliefs
23  and opinions; (3) influence and inflame the jury's
24  prejudices against Greg; (4) encourage the jury to
25  disregard the court's instruction regarding innocence
26  and guilt; and (5) divert the jury's attention from

## _Continuation Of "Ground 4"; Page #4_

1  its duty to decide the case on the merit of the evidence
2  presented at trial. Moreover, counsel's non-objections gave
3  credence to the prosecutor's baseless opening statements.

4       Had counsel objected to the improper statements,
5  the objections would have undoubtedly resulted in the
6  judge ordering the jury to disregard the statements which
7  would have put the jury on notice that they are not
8  allowed to consider the improper statements, and that alone
9  could have changed the outcome of the trial. However,
10 counsel's failure to object to the false and unsupported
11 material statements resulted in and contributed to and
12 proximately caused Greer's convictions for the crimes
13 accused and subjected him to an unfair trial, a bias jury,
14 PROSECUTORIAL misconduct, and a conviction on less than
15 proof beyond a reasonable doubt. Counsel's non-objections
16 to the statements in question amount to defective and
17 ineffective representation.

18      Trial counsel's failure to use preemptory challenge to
19 excuse a potential bias juror from the jury panel constitutes
20 ineffective trial representation.

21      Here, during voir dire, juror John Elwood was
22 questioned and answered as follows:

23      Mr. Fuotsch (co-defendant Wanda Fain's defense counsel):

24      "Does anyone have a problem or would they have
25 a problem with following the instructions of the Court even
26 if the result that would be reached by following the

## Continuation Of "Ground 4"; Page #5

1  Instructions of the Court were contrary to your gut
2  reaction in a case as serious as the that's charged here?"
3        Prospective Juror: "I think I would have a problem
4  with it."
5        Mr. Fuetsch: ". . . could you explain what you mean
6  by you would have a problem with that?"
7        Prospective Juror: "I believe there's a higher
8  authority than legal authority that is like moral authority,
9  and to follow like a set of rules rather than more of a
10 moral thing, I think I would be hardpressed to follow the
11 set of rules that are outlined by law."
12       ". . . but I think if you misconstrue the constitution
13 or broaden its actual authority, then I think that
14 could be potentially wrong."
15 (RT 132-133.)
16       Mr. Arian (Greer's trial counsel):
17       "Mr. Elwood, I heard you say something about
18 broadening the authority of the constitution. Do you recall
19 that comment?"
20       Prospective Juror: "I do."
21       Mr. Arian: "I wonder if you could say any more
22 about that. I didn't get your complete thought."
23       Prospective Juror: "My thought is a lot of, let's
24 say, somebody's on trial, the jurors sit through the
25 entire trial, they have a gut feeling that these defendants
26 are, let's say, guilty, but a lot of circumstantial

## Continuation Of "Ground 4", Page #6

1  EVIDENCE has been brought in And It's been found -- or A
2  legal issue has been brought up, A minor legal issue that
3  speaks to their innocence. You're supposed to think
4  they're innocent even though they're guilty, because It's
5  A legal argument and It takes precedence over how you feel."

6      Mr. Arian: " you're saying that As A juror your gut
7  reaction is very important And you're going to pay a lot
8  of Attention to that?"

9      Prospective Juror: " If you've listened to all the
10 facts And you say, yes, they Are innocent or guilty, but
11 some legal precedence makes you dismiss that, then I
12 have a big problem with that."

13     Mr. Arian: "You might not be able to do that?".
14     Prospective Juror: " No, I would not."

15     Mr. Arian: " Would that hold if the judge At the
16 close of the case instructed you that you were to consider
17 this evidence in a certain way And the instructions of the
18 judge went counter to the feelings you just described."

19     Prospective Juror: " I really don't know sitting
20 here right now."

21     Mr. Arian: "Would you have trouble with it?"
22     Prospective Juror: " I would have major problems."

23 (RT 142- 143.)

24     The Court: " At this point does Any party wish
25 to enter A challenge for cause?

26 / / / /

Continuation Of "Ground 4", Page #7

1  But before you do that, Mr. Elwood, I was little
2  unclear about your statements.

3  Let me just read this question to you again!
4  "It [sic] important that I have your assurance that you
5  will without reservation follow my instructions and
6  rulings on the law and will apply that law to the case.
7  To put it differently, whether you approve or disapprove
8  of my instructions, it is your solemn duty to accept as
9  correct my statements of the law. You may not
10  substitute your own idea of what you think the law
11  ought to be.

12  Would you be able to follow the law as given
13  by me in this case?"

14  Prospective Juror: "I would, but I may have a
15  problem with that, internal conflict."

16  (RT 158-159.)

17  As demonstrated, juror Elwood's responses during
18  voir dire were evasive and misleading and concealed his
19  unwillingness to follow the court's instructions. Any
20  reasonably effective counsel would have used a preemptory
21  challenge to excuse juror Elwood from the jury panel as a
22  result of his explicit or implicit allegiance to his "gut"
23  feelings opposed to the law and instructions given by
24  the court. Moreover, Elwood's declaration illustrates
25  an abundance of juror misconduct (CT 451-452),
26  therefore, it is reasonable to assume that Elwood's

## Continuation Of "Ground 4"; Page #8

1  Reliance on his gut feelings during deliberations, rather
2  than the Court's instructions, was influential in the jury's
3  decision to find Greg guilty of the crimes charged,
4  particularly since the verdicts were contrary to law.
5  Counsel's failure to excuse potential bias Elwood from
6  the jury panel contributed to and proximately caused
7  Greg's deprivation of a fair trial and impartial jury.
8      Greg's right to effective assistance of trial counsel
9  as guaranteed by the Fifth, Sixth and Fourteenth
10  Amendments of the United States Constitution was violated
11  when counsel failed to (1) challenge the overt acts;
12  (2) object to false and unsupported material statements
13  at trial; and (3) use preemptory challenge to
14  excuse the bias juror John Elwood from the jury panel.
15      (Attachment No. I affixed hereto is exact copies
16  of the court and the reporter's transcripts
17  referred to in this ground.)
18      Based on the above, the Court must grant
19  habeas relief to Greg on this ground along with
20  any other relief the Court deems fair and just.
21
22
23
24
25
26

Ground 2 or Ground __5__ (if applicable): "Ground 5"; Page #1

GREG's Right to Effective Assistance of Appellate Counsel, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, was violated when counsel deliberately failed to discover and include non-frivolous issues into the Appellant's brief.

a. Supporting facts:

It was defective and ineffective representation of appellate counsel when counsel failed to raise on appeal the following non-frivolous issues: (1) GREG's convictions are based on less than proof beyond a reasonable doubt of every element of the charged crimes as fully set forth herein at Ground One; (2) the prosecutor committed several instances of prosecutorial misconduct as fully set forth herein at Ground Two; (3) the jury failed to respond honestly to the defense counsel's questions during voir dire as fully set forth herein at Ground Three; and (4) trial counsel was ineffective when he failed to challenge the overt acts in support of the conspiracy charge; failed to object to the false and unsupported and deceitful material statements presented at trial by the prosecutor; and failed to use preemptory challenge to excuse juror John Elwood, as fully set forth herein at Ground Four. None of these issues are frivolous. (SEE Continuation, Additional Page)

Supporting cases, rules, or other authority:
Smith V. Robbins, 528 U.S. 259 (2000); Brecht V. Abrahamson, 507 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974)

PETITION FOR WRIT OF HABEAS CORPUS

<u>Continuation of "Ground 5"; Page #2</u>

1   Any reasonably effective Appellate counsel would have
2   raised each of the mentioned issues on direct Appeal
3   to acquire the reversal of the lower court's judgment.
4       Appellate counsel raised the following claims on
5   Appeal: insufficient evidence to prove conspiracy to
6   commit murder; insufficient evidence to prove
7   attempted murder; jury misconduct; remand for
8   resentencing under People V. Superior Court; and
9   joinder in co-defendants' arguments. Had
10  counsel incorporated the mentioned non-frivolous
11  issues into the Appellate brief, the issues would have
12  provided evidentiary support for the claims raised
13  therein and contributed to the perseverance of a
14  successful Appeal. However, Appellate counsel's
15  failure to raise the issues in question deprived Greg
16  of a prosperous and triumphant Appeal and the
17  right to effective representation of counsel on Appeal
18  in violation of his Fifth, Sixth and Fourteenth
19  Amendments of the United States Constitution.
20      Based on the above, the Court must grant habeas
21  relief to Greg on this ground and any other relief
22  the Court deems fair and just.
23
24
25
26

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_Court of Appeal of the State of Calif., First Appellate District, Division Four_

b. Result _Affirmed_                    c. Date of decision: _January 28, 1998_

d. Case number or citation of opinion, if known: _No. A072126_

e. Issues raised: (1) _Insufficient evidence to prove conspiracy to commit murder;_

_(2) Insufficient evidence to prove attempted murder; (3) Jury Misconduct; (4) Remand_

_for resentencing under People V. Superior Court; And (5) Joinder in co-defendant_
_arguments._

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_Victor Blumenkrantz; P.O. Box 9586; Berkeley, CA 94709_

9. Did you seek review in the California Supreme Court? ☒ Yes ☐ No. If yes, give the following information:

a. Result _Denied_                    b. Date of decision: _April 29, 1998_

c. Case number or citation of opinion, if known: _S068320_

d. Issues raised: (1) _Same As Above_

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_The Issues Raised herein are based on matters outside the record on appeal._
_Trial and appellate counsels were ineffective in failing to raise these issues._

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_N/A_

b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
Attach documents that show you have exhausted your administrative remedies.

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☒ Yes. If yes, continue with number 13.   ☐ No. If no, skip to number 15.

13. a. (1) Name of court *Superior Court of San Francisco*

(2) Nature of proceeding (for example, "habeas corpus petition"): *Habeas Corpus Petition*

(3) Issues raised: (a) *(SEE: Attachment No. 2 Affixed hereto.)*

(b) _____

(4) Result *(Attach order or explain why unavailable):* *Denied; SEE Attachment No. 3*

(5) Date of decision: *May 30, 2007*

b. (1) Name of court: *Court of Appeal of the State of California*

(2) Nature of proceeding: *Habeas Corpus Petition*

(3) Issues raised: (a) *(SEE: Attachment No. 2 Affixed hereto.)*

(b) _____

(4) Result *(Attach order or explain why unavailable):* *Denied; SEE Attachment No. 4*

(5) Date of decision: *July 5, 2007*

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result: *N/A*

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) *(SEE: Attachment No. 2 Affixed hereto.)*

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court: *The petition was denied by the Superior Court of San Francisco. And by the Court of Appeal of the State of California.*

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true. *Under penalty of perjury I also declare that the Attachments are what I declare them to be.*

Date: *8/1/07   6/23/07*   *Gregory L. Brown*
(SIGNATURE OF PETITIONER)

## Declaration of Service

CASE NAME: Gregory L. Brown    V.   Warden, SATF-Corcoran Prison

CASE No. : _____

I declare:

On June 23, 2007, I served the attached: Greg's Petition For Writ Of Habeas Corpus by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the prison mail collection system at CSATF-Corcoran, in California, addressed as follows:

1.) First District Court of Appeal
    350 Mc Allister
    San Francisco, CA  94102-3600

2.) Office of the Attorney General
    455 Golden Gate Ave., Ste. 11000
    San Francisco, CA 94102-3364

I declare under penalty of perjury that the foregoing is true and correct.

Date: 6/23/07

Gregory L. Brown
GREGORY L. BROWN

94

95

Gregory L. Brown
J-82241
P.O. Box 5246
Corcoran, CA 93212

Greg's
Copy

**FILED**

JUN 29 2007

Court of Appeal - First App. Dist.
By DIANA HERBERT

DEPUTY

Court Of Appeal Of The State Of California
First Appellate District, Division Four

A118248

Gregory L. Brown,
        Appellant,

        V.

Warden, SATF-Corcoran Prison,

No. _____

Greg's Supporting Documents
For The Petition For
Writ Of Habeas Corpus
Served On June 23,
2007

Gregory L. Brown declares that:

1.) I am the appellant in the above entitled-action.

2.) The documents attached hereto are supporting documents for the petition for writ of habeas corpus served on this court on June 23, 2007. Furthermore,

/ / / /
/ / / /
/ / / /

AO 72
(Rev. 8/82)

I of 2

96

UNDER penalty of perjury I declare that the affixed
supporting documents are exact copies of what I
declare them to be as set forth in the said petition.

GREGORY L. BROWN, the appellant, declare under
penalty of perjury that the foregoing is true and
correct.

Date: 6/23/07

Respectfully submitted,
Gregory L. Brown
GREGORY L. BROWN,
Appellant

2 of 2

AO 72
(Rev. 8/82)

# ATTACHMENT 1

F I L E D

San Francisco County Superior Court

MAR 1 7 1995

ALAN CARLSON, Clerk
BY: _Alan G. A. Pierce_
Deputy Clerk

001

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | NO. 159271 |
| Plaintiff, | |
| vs. | F. ANDREWS |
| GREGORY BROWN, WANDA FAIN and JOSEPH DIGGS, | INFORMATION |
| Defendants | |

COUNT I:

GREGORY BROWN, WANDA FAIN and JOSEPH DIGGS

are accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit: VIOLATION OF SECTION 182.1 OF THE CALIFORNIA PENAL CODE committed as follows: The said defendants on or about the 7th day of January, 1995 to the 7th day of February, 1995, both dates inclusive, at the City and County of San Francisco, State of California, did wilfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of MURDER, in violation of Section 187 of the Penal Code, a felony; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the County of San Francisco:

OVERT ACTS

OVERT ACT NUMBER 1

It is alleged in the City and County of San Francisco, on or about the 7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did write a note containing threats against Robin Williams.

People v. Gregory Brown, et al.                          SC 159271

Page 2


OVERT ACT NUMBER 2

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did
put the note in an envelope with a photograph of Robin Williams which
was taken by defendant Gregory Brown and which was given to Fain by
defendant Gregory Brown.


OVERT ACT NUMBER 3

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did
deliver the threatening note and photograph to Robin Williams.


OVERT ACT NUMBER 4

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Gregory Brown
did accompany defendant Wanda Fain to deliver the threatening note to
Robin Williams.


OVERT ACT NUMBER 5

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Gregory Brown
did encourage defendants Wanda Fain and Joseph Diggs to murder Robin
Williams.


OVERT ACT NUMBER 6

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Gregory Brown, Wanda Fain
and Joseph Diggs did reside at the same address of 126 Blythdale
Street in San Francisco.


OVERT ACT NUMBER 7

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendant Wanda Fain did provide
cocaine base, also called "crack" cocaine, to Robin Williams.

G 03

People v. Gregory Brown, et al.                    SC 159271

Page 3


OVERT ACT NUMBER 8

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendant Wanda Fain did encourage
Robin Williams to go to Jerrold Street with defendants Wanda Fain and
Joseph Diggs.


OVERT ACT NUMBER 9

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did get on the Number 15 bus with Robin Williams.


OVERT ACT NUMBER 10

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did exit the bus with Robin Williams at 3rd and McKinnon Streets in
San Francisco.


OVERT ACT NUMBER 11

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did take Robin Williams with them to Jerrold Street with the intention
of murdering Robin Williams.


OVERT ACT NUMBER 12

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did walk on Jerrold Street approaching Quint Street with Robin
Williams.


OVERT ACT NUMBER 13

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that while walking with Robin Williams
defendants Wanda Fain and Joseph Diggs did shoot Robin Williams in the
back of the head with a 9mm semi-automatic pistol.

604

People v. Gregory Brown, et al.                    SC 159271

Page 4


OVERT ACT NUMBER 14

It is alleged in the City and County of San Francisco, on or about the 7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs did shoot at Robin Williams again while she was lying on the ground.


USE OF FIREARM ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5(a) [As to defendant JOSEPH DIGGS only]:

It is further alleged that in the commission and attempted commission of the above offense, the said defendant, JOSEPH DIGGS, personally used a firearm, to wit, a 9 mm semi-automatic pistol, within the meaning of Penal Code Section 12022.5(a) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(8).


ARMED WITH A FIREARM ALLEGATION PURSUANT TO PENAL CODE SECTION 12022(a)(1)[As to defendants GREGORY BROWN and WANDA FAIN only]:

It is further alleged that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm, to wit, a 9 mm semi-automatic pistol, said arming not being an element of the above offense, within the meaning of Penal Code Section 12022(a)(1).


ALLEGATION OF FELONY COMMITTED WHILE ON BAIL AND ON OWN RECOGNIZANCE PURSUANT TO PENAL CODE SECTION 12022.1[As to defendant GREGORY BROWN only]:

It is further alleged that the defendant, GREGORY BROWN, committed the above offense while he was released from custody in a felony offense, on bail and on his own recognizance, within the meaning of Penal Code Section 12022.1.


COUNT II:

The said defendants GREGORY BROWN, WANDA FAIN AND JOSEPH DIGGS, are further accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit:  VIOLATION OF SECTION 664/187 OF THE CALIFORNIA PENAL CODE committed as follows:  The said defendant on or about the 7th day of February, 1995, at the City and County of San Francisco, State of California, did wilfully, unlawfully, and with malice aforethought attempt to murder ROBIN WILLIAMS, a human being.

102

| | | |
|---|---|---|
| **SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES** | | 009 |

People of the State of California vs. GREGORY L. BROWN     ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 159271-01 | | ☐ Present | S. ARIAN | ☒ Present |
| | **Clerk** JOSIE C. ROQUE | | **Judge** DAVID A. GARCIA | |

**Reporter**

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Defendant has retained ARIAN/S, Esq.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 1 | PC | 182.1/F | | 01563370 | NG |
| 2 | PC | 664.187/F | | 01563370 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

010

| People of the State of California vs. | WANDA LOUISE FAIN | | ☒ Present |
|---|---|---|---|

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 159271-02 | . | ☐ Present | F. FUETSCH | ☒ Present |
| | Clerk | | Judge | |
| | JOSIE C. ROQUE | | DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Court has appointed FUETSCH/F, Public Defender.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 2 | PC | 664.187/F | 1 | 01559424 | NG |
| 3 | PC | 245(A).2/F | | 01559424 | NG |
| 1 | PC | 182.1/F | | 01559424 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

*104*

| SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO | CISCO - MINUTES | 011 |
|---|---|---|

| People of the State of California vs. | JOSEPH | DIGGS | | ☒ Present |
|---|---|---|---|---|

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 159271-03 | F. ANDREWS | ☐ Present | MARC SILVERSMIT | ☒ Present |
| | **Clerk** JOSIE C. ROQUE | | **Judge** DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Court has appointed SILVERSMIT/MARC, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 2 | PC | 664.187/F | 1 | 01559442 | NG |
| 3 | PC | 245(A).2/F | | 01559442 | NG |
| 4 | PC | 12021A1/F | | 01559442 | NG |
| 1 | PC | 182.1/F | | 01559442 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

105

| Dept. | S22 | Date | 03/20/95 | Page | 1 |
|---|---|---|---|---|---|

Attest: JOSIE C. ROQUE          Deputy Clerk

F I L E D 070
San Francisco County Superior Court

MAR 24 1995

ALAN CARLSON, Clerk
BY: _____
Deputy Clerk

STEPHEN ARIAN, Attorney at Law
State Bar No. 38939
Pier 33 South, #200
San Francisco, CA 94111
(415) 434-1550

Attorney for Defendant GREGORY L. BROWN

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | No. 159271- 01 |
| ) | |
| Plaintiff, ) | NOTICE OF MOTION FOR |
| ) | DISMISSAL OF COUNTS I |
| vs. ) | AND II OF THE INFORM- |
| ) | ATION UNDER SECTION 995 |
| GREGORY L. BROWN, ) | OF THE PENAL CODE |
| WANDA FAIN, and JOSEPH DIGGS, ) | |
| ) | Date: April 7, 1995 |
| Defendants. ) | Time: 9:00 A.M. |
| | Dept: 23 |

To the District Attorney of the City and County of San
Francisco and to FLOYD ANDREWS, Deputy District Attorney:

PLEASE TAKE NOTICE that on the 7 day of April 1995, at
9:00 A.M. or as soon thereafter as the matter may be heard in
Department 23 of the above entitled court, defendant GREGORY
L. BROWN, through counsel will move the court for dismissal of
Count I and II of the indictment herein as it relates to said
defendant GREGORY L. BROWN, and to strike the enhancement
allegations as they relate to said GREGORY L. BROWN, all under
Section 995 of the California State Penal Code.

This motion is made on the grounds that there is no
competent evidence to show probable cause to hold defendant

BROWN 2/995                    1                    106

152

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO

PEOPLE OF THE STATE OF CALIFORNIA VS.     ACTION NO. ___159271___

                                          ___F. Andrews___
                                          ASSISTANT D.A.        PRESENT

___GREGORY L. BROWN___    _-1___          ___S. Arian___
DEFENDANT             PRESENT             DEFENSE COUNSEL       PRESENT

___WANDA LOUISE FAIN___   _-2___          ___F. Fuetsch  PD___
DEFENDANT             PRESENT             DEFENSE COUNSEL       PRESENT

___JOSEPH DIGGS___        _-3___          ___M. Silversmit___
DEFENDANT             PRESENT             DEFENSE COUNSEL       PRESENT

=====================================================================

CAUSE ON CALENDAR  Mo. 995 PC (all); Mo. handwriting exemplar (Diggs)
Mo. discovery (Diggs); Motion for joinder in motions (Fain, Brown)

9:15 A.M.
The Court grants motion for joinder.
The Court grants the motion for discovery in part.
The Court grants the motion for handwriting exemplar.

9:30 A.M.  The Court orders the matter continued to 1:30 P.M. for
hearing on 995 PC motion.
2:50 P.M.

Hearing resumes.  The Court grants the 995 PC motion as to defendant BROWN
(Great Bodily Injury Allegation only).  The 995 PC motion is denied in all
other respects.

Defendants are given standing to participate in the 1538.5 PC hearing in case
#159194  (Gregory Brown)  Copy of proceedings had in that matter are attached
and incorporated herein by reference.

DEPT. _27_  DATE April 5, 1995  PAGE_____

ATTEST:_____DEPUTY CLERK

CRM-04 (8/89)

107

451

1  MARC J. ZILVERSMIT, ESQ.
   RIORDAN & ROSENTHAL
2  Attorney At Law
   523 Octavia Street
3  San Francisco, CA 94102
   Telephone: (415) 431-3472
4
   Attorney for Defendant JOSEPH DIGGS
5

6              SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                  FOR THE COUNTY OF SAN FRANCISCO

8
   THE PEOPLE OF THE STATE OF CALIFORNIA  )  No. 159271
9                                          )
                        Plaintiff,         )
10                                         )  DECLARATION OF
                    vs.                    )  JUROR JOHN ELWOOD
11                                         )
   JOSEPH DIGGS,                           )
12                                         )
                        Defendant.         )
13  _____)

14      I, John Elwood, declare under penalty of perjury that:

15      I was a juror in the case of People v. Joseph Diggs, Wanda

16  Fain, and Gregory Brown, No. 159271.

17      During our deliberations we prepared a time line from

18  January 6 to February 10 and made a time line for the evening of

19  the incident. We were particularly concerned with the period

20  between 7:30 pm and 8:35 pm on the night of the shooting. To

21  help reconstruct what happened during that period, we consulted

22  bus schedules that Jurors Alvin Bernstein and Monell Beurmann

23  brought in on the second day of deliberations. These schedules

24  provided us information about the intervals between buses and the

25  frequency with which buses came; this information, helped us fill

26  in our time line from 7:30 pm until 8:35 pm on the night of the shooting

27  Declaration of John Elwood
28  Page 1

108

1    We also discussed a number of other things in our          `452`

2    deliberations.  We discussed the inconsistencies between

3    defendant Wanda Fain's statement and defendant Joseph Diggs'

4    statement.  We discussed how these inconsistencies demonstrated

5    that at least one of them was lying.

6       There was also discussion about access to guns which was in

7    reference to defendant Greg Brown's prior arrest.

8       There were also discussions about defendant Greg Brown being

9    a drug dealer and his propensity for violence and drugs and that

10   kind of lifestyle.  This was mostly in reference to defendant

11   Brown's state of mind.  Some jurors discussed that as a drug

12   dealer, Brown's state of mind may be twisted and power hungry.

13   Some jurors also discussed that as a drug dealer, Brown might

14   feel that there would be no consequences to his actions if he    *lifesty*

15   killed Robin Williams. *The jurors who brought up discussions of def. Brown's lifesty*

     *were reminded by other jurors that this line of dertroothus was speculation & could ns*

16   Someone also made reference to the fact (that if you do crack *be consi*
                                              *discussed*
17   cocaine, it does not mean you lose your memory.                *M delbser*
                                                                    *J4*

18      Some jurors also discussed defendant Joseph Diggs' medical

19   condition, specifically his tremor.  Juror Jordan Owens stated

20   that this might explain how Diggs could have shot at Robin

21   Williams and missed.

22      Executed this __5__ day of __JULY__, 1995 in San Francisco,

23   California.

24

25                                        JOHN ELWOOD
                                          Declarant

26

27

28   Declaration of John Elwood
     Page 2

                              *"A"*                          *109*

1    record that Mr. Brown personally did it?

2         MR. ANDREWS:  I don't believe that with the conspiracy

3    count I have to prove personal great bodily injury.

4         THE COURT:  Well, you read it.  It says:

5              "It is further alleged in the commission of

6         the above offense said defendant, with the

7         intent to inflict such injury, personally

8         inflicted great bodily injury on Robin Williams."

     If you look at page 6 of the Information.

     MR. ANDREWS:  If it's plead that way, it is incorrect.

     The matter is submitted.

:    THE COURT:  All right.  Is the matter submitted?

3    MR. ARIAN:  Submitted, your Honor.

4    THE COURT:  All right.  The Court will grant the 995

5    Motion as to the great bodily injury allegation as to Mr.

16   Brown.  The other counts, the 995 motion is denied.

17        Let's go to the motion to suppress now.

18        All right.  We will get started with it now.  All right.

19   Call your first witness.

20        MR. ANDREWS:  Thank you, your Honor.

21        I will call Officer Walsh to the stand.

22        I will ask that Officer Jefferson be designated as my

23   investigating officer.

24        THE COURT:  All right.

25        MR. ARIAN:  Your Honor, may I ask for an order excluding

26   all witnesses?

27        THE COURT:  Yes.  All witnesses will be ordered excluded

28   from the courtroom.  You are not to discuss the testimony

1    instructions as it relates to how you are to conduct

2    yourself.  The process is as important as the product.

3                 Does anyone have a problem or would they

4    have a problem with following the instructions of the

5    Court even if the result that would be reached by

6    following the instructions of the Court were contrary to

7    your gut reaction in a case as serious as the one that's

8    charged here?

9                 PROSPECTIVE JUROR:  I think I would have a

10   problem with it.

11                MR. FUETSCH:  Do you feel as though --

12   well, actually could you explain what you mean by you

13   would have a problem with that?

14                PROSPECTIVE JUROR:  I believe there's a

15   higher authority than legal authority that is like moral

16   authority, and to follow like a set of rules rather than

17   more of a moral thing, I think I would be hardpressed to

18   follow the set of rules that are outlined by law.

19                MR. FUETSCH:  Let me ask you a pointed

20   question.  If, for example, and I'm not saying it's going

21   to happen, if, for example, in the middle of the night

22   the police came to your home and forced their way in and

23   just searched your house and in your home discovered

24   bombs, machine guns, bottom making material, whatever

25   they discovered is illegal.  And the prosecution sought

26   to prosecute you for the crime of possessing that

27   material or that item.  There are laws, of course, that

28   allow you as an individual through your attorney or

1    individually to challenge the admissibility of such

2    evidence, and the basis or reason for the law that allows

3    you to challenge such evidence is the law of the

4    constitution.  That is, while we may not condone your

5    conduct in possessing that, we nevertheless must hold the

6    authorities to a very high standard.  In the case I've

7    described, that evidence wouldn't be admissible against

8    you to convict you.

9                   Do you think that's wrong?

10                  PROSPECTIVE JUROR:  No.  In that particular

11   case I don't think that's wrong, but I think if you

12   misconstrue the constitution or broaden its actual

13   authority, then I think that could be potentially wrong.

14                  MR. FUETSCH:  But in the illustration I've

15   given you --

16                  PROSPECTIVE JUROR:  That's fine, I wouldn't

17   have any problem with that.

18                  MR. FUETSCH:  One individual, and I think

19   actually it was you again, indicated that you had been

20   attacked some years ago by someone, correct?

21                  PROSPECTIVE JUROR:  That's correct.

22                  MR. FUETSCH:  And you suffered a concussion

23   as a result of that?

24                  PROSPECTIVE JUROR:  A mild concussion.

25                  MR. FUETSCH:  Has anybody else here

26   suffered a severe injury, say in, for example, an

27   automobile accident or been attacked, anything wherein

28   they've lost consciousness as a result of that injury.

1     All of us have ways of looking at things that control the

2     way we lead our lives.  We may think of that as a bias,

3     but it's there.  In this rather imperfect process we try

4     to get at that a little bit, and I'm sure you'll all

5     agree this is an imperfect process.

6              In that connection, and I don't want

7     anyone, as Mr. Zilversmit said, to think that any of us

8     are picking on you.  We're really not, but when we hear

9     things we feel the necessity within the time alotted to

10    us to explore it.

11             Mr. Elwood, I heard you say something about

12    broadening the authority of the constitution.  Do you

13    recall that comment?

14             PROSPECTIVE JUROR:  I do.

15             MR. ARIAN:  I wonder if you could say any

16    more about that.  I didn't get your complete thought.

17             PROSPECTIVE JUROR:  My thought is a lot of,

18    let's say, somebody's on trial, the jurors sit through

19    the entire trial, they have a gut feeling that these

20    defendants are, let's say, guilty, but a lot of

21    circumstantial evidence has been brought in and it's been

22    found -- or a legal issue has been brought up, a minor

23    legal issue that speaks to their innocence.  You're

24    supposed to think they're innocent even though they're

25    guilty, because it's a legal argument and it takes

26    precedence over how you feel.  You're suppose to follow

27    that rather than now you feel, and you're supposed to

28    say, yes, in fact, they're innocent when you feel they're

143

guilty.

MR. ARIAN:  As I hear what you're telling me, and please correct me, you're saying that as a juror your gut reaction is very important and you're going to pay a lot of attention to that?

PROSPECTIVE JUROR:  No, you pay attention to the facts, but I'm saying that the facts don't necessarily jibe with, let's say, some legal arguments that take precedence over the facts.  If you've listened to all the facts and you say, yes, they are innocent or guilty, but some legal precedence makes you dismiss that, then I have a big problem with that.

MR. ARIAN:  You might not be able to do that?

PROSPECTIVE JUROR:  No, I would not.

MR. ARIAN:  Would that hold if the judge at the close of the case instructed you that you were to consider this evidence in a certain way and the instructions of the judge went counter to the feelings you just described, would you be forced to go with your feelings or the higher moral law you found, or would you feel compelled to follow the instructions of the Court with respect to that specific issue that was presented?

PROSPECTIVE JUROR:  I really don't know sitting here right now.

MR. ARIAN:  Would you have trouble with it?

PROSPECTIVE JUROR:  I would have major problems.

1                    MR. ANDREWS:  Was that a trial here on the

2         third floor of the building?

3                    PROSPECTIVE JUROR:  Uh-huh.

4                    MR. ANDREWS:  Was that by any chance in

5         front of the same judge?

6                    PROSPECTIVE JUROR:  No, it was not.

7                    MR. ANDREWS:  Was there a feeling on your

8         part that it was as a result of a lack -- something

9         lacking on the part of the police department?

10                    PROSPECTIVE JUROR:  No.

11                    MR. ANDREWS:  How about the District

12        Attorney?

13                    PROSPECTIVE JUROR:  No.

14                    MR. ANDREWS:  When you say there was not

15        enough evidence, was there an identification issue.

16                    MR. ZILVERSMIT:  I'll object.  He's seeking

17        to find out how this juror voted on that.

18                    MR. ANDREWS:  I didn't ask that.

19                    THE COURT:  Sustained.

20                    MR. ANDREWS:  Did you -- you don't have any

21        problem with serving as a juror today on a similar kind

22        of case?

23                    PROSPECTIVE JUROR:  No.

24                    MR. ANDREWS:  Thank you, Your Honor, I have

25        nothing further.

26                    THE COURT:  At this point does any party

27        wish to enter a challenge for cause?

28                    But before you do that, Mr. Elwood, I was

1    little unclear about your statements.

2              Let me just read this question to you

3    again:  It important that I have your assurance that you

4    will without reservation follow my instructions and

5    rulings on the law and will apply that law to the case.

6    To put it differently, whether you approve or disapprove

7    of my instructions, it is your solemn duty to accept as

8    correct my statements of the law.  You may not substitute

9    your own idea of what you think the law ought to be.

10             Would you be able to follow the law as

11   given by me in this case?

12             PROSPECTIVE JUROR:  I would, but I may have

13   a problem with that, internal conflict.

14             THE COURT:  I understand that.  Okay.

15             Any party wish to exercise a challenge for

16   cause?  Please approach sidebar with the court reporter.

17             [Following bench conference not reported:]

18             MR. ZILVERSMIT:  I have three challenges

19   for cause, Judge.  Wiley, Elwood and Lee.

20             Taking those, Mr. Lee because he obviously

21   doesn't comprehend sufficient language to participate as

22   a juror.

23             MR. ANDREWS:  Are we doing --

24             THE COURT:  Cause.

25             MR. ANDREWS:  -- the whole 24 or just

26   people in the box?

27             THE COURT:  All 24.

28             MR. ZILVERSMIT:  So Mr. Lee because of

116.

1   The defense talk about, and it's all smoke

2   and mirrors, he talks about all these other people who

3   could want to kill her; it's the 240 pound guy, the 190

4   pound guy, all these people.

5   And yet how does this work?  How do you we

6   get those people on Jerrold Avenue to shoot her in the

7   head?  It does not happen.  How else do you figure it?

8   Robin is wandering down the street and --

9   finish the sentence somehow.  You can't.  The only thing

10   that works, the only thing that fits the physical

11   evidence, the testimony of the witnesses, the taped

12   statements, testimony from the experts, the only thing

13   that works is that she's on Jerrold Avenue because she's

14   following Joseph Diggs and Wanda Fain.

15   The only theory that fits about the note,

16   Wanda is not writing this because she's mad, she's

17   writing this for Gregory Brown.  They're all in the same

18   house.  Gregory has got a problem, he's got a court case

19   coming up.  But he knows how to deal with this problem.

20   Because he's got a gullible little girl, and he can get

21   her out to Jerrold Avenue and shoot her and leave her for

22   dead through the other two, and that's it.  That would be

23   easier.  That will be clean.  If they had done the wrong

24   right and killed her, you wouldn't be here today because

25   we wouldn't have any clue.

26   And that's all I have to say.  I want you

27   to look carefully at what you've heard, what you saw.  If

28   somebody said something on that stand, just because we're

117

1    in court, we're in a formal setting, everybody says

2    "please" and "thank you," does not mean you should

3    believe anything you hear here that you wouldn't believe

4    outside those doors?

5             Use your common sense.  You certainly

6    shouldn't believe anything you've heard here unless it

7    fits the evidence you've heard.

8             Based on that I'm asking you to find the

9    defendants guilty of attempted murder of Robin Williams.

10   Because they did it.

11            Conspiracy to commit murder.

12            Assault with a deadly weapon.

13            Possession of a firearm by an ex-felon.

14            Because they did it, for no other reason.

15   They did it, and that's why you're here today.

16            Thank you, Your Honor.

17            THE COURT:  Thank you, Mr. Andrews.

18            At this point, ladies and gentlemen, it's

19   quarter to 5.  I have about ten minutes worth of

20   instructions to read you, the concluding instructions,

21   then I want to go over the verdict forms with you which

22   is going to take some time.

23            Rather than do that today we're going to

24   reconvene tommorow at 10.  I will then finish the

25   instructions, go over the jury forms, and we'll be

26   finished.

27            I know one of you has a problem tomorrow,

28   and hopefully you can change the appointment either later

# ATTACHMENT 2

Response to Question #13a of this petition:

(3) ISSUES RAISED: 1.) GREG's conviction was based on less than proof beyond a reasonable doubt of every element of the charged crime; 2.) Prosecutorial misconduct: the prosecutor introduced false and unsupport and deceitful material statements at trial; 3.) Jury misconduct: juror gave intentional false answers during voir dire; 4.) Ineffective assistance of trial counsel; and 5.) Ineffective assistance of appellate counsel.

Response to Question #15 of this petition:

"Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition." Ineffective assistance of trial and appellate counsels. The issues raised herein are on matters outside the record on appeal, and GREG lacked basic education and all legal knowledge, until now, to pursue the issues herein. Moreover, GREG has been suffering from major depression and mental illnesses since and as a result of his wrongful convictions and imprisonment.

ATTACHMENT 3

121

1

2      SUPERIOR COURT OF THE STATE OF CALIFORNIA
            FOR THE CITY AND COUNTY OF SAN FRANCISCO
3

4                      Department No. 22

5
       IN THE MATTER OF THE APPLICATION  )
6      OF                                )
                                         )   WRIT NO. 5568
7      GREGORY L. BROWN                   )
                                         )   ORDER      ENDORSED
8                                        )            F I L E D
           Petitioner,                   )        San Francisco County Superior Court
9                                        )
       FOR A WRIT OF HABEAS CORPUS       )          MAY 3 0 2007
10                                       )        GORDON PARK-LI, Clerk
       _____ )   BY: ___ CARLOS BARRAZA
                                                          Deputy Clerk

11          On April 25, 2007 this Court received a Petition for Writ of
12     Habeas Corpus from petitioner Gregory L. Brown ("Petitioner").  On
       May 25, 1995, Petitioner was convicted of conspiring to commit
13     murder and of attempted murder.  On January 28, 1998, the First
       District Court of Appeal affirmed the judgment with sentencing
14     modifications.  On April 29, 1998, the California Supreme Court
       denied review.  Petitioner is serving 56 years to life at Corcoran
15     State Prison.

16          Petitioner seeks habeas relief on four grounds.  He claims
       that the verdict was not supported by sufficient evidence and that
17     the prosecutor "maliciously and intentionally introduced false and
       unsupported and deceitful material statements at trial."  He also
18     claims that jurors committed misconduct and that his trial and
       appellate counsel provided ineffective assistance of counsel.
19

20          Petitioner was convicted almost 12 years ago and the Court of
       Appeal affirmed his conviction over nine years ago.  Under well-
21     established California law, a petition should be filed as promptly
       as the circumstances allow.  As a result, the petitioner must
22     explain in detail and "justify any substantial delay in presenting
       a claim."  (In re Clark (1993) 5 Cal.4th 750, 765); In re Swain
23     (1949) 34 Cal.2d 300, 302.)  Where there has been significant delay
       in seeking habeas relief, the petitioner must describe
24     circumstances sufficient to justify or explain the delay.  To avoid
       the bar of untimeliness, the petitioner has the burden of
25     establishing: (1) the absence of substantial delay; (2) good cause

                                    1

                                                              133

1    for the delay; or (3) that the claim falls within an exception to
     the bar of untimeliness.  (*In re Robbins* (1998) 18 Cal.4th 770,
2    781; *see also Clark, supra*, 5 Cal.4th at 775 ["[i]f a petitioner
     had reason to suspect that a basis for habeas corpus relief was
3    available, but did nothing to promptly confirm those suspicions,
     that failure must be justified"].)
4

5        As an initial matter, Petitioner's insufficient evidence
     and juror misconduct claims are barred because they were raised
6    - and rejected - on appeal.  Because these issues were
     "previously raised and rejected on direct appeal, and because
7    the [P]etitioner does not allege sufficient justification for
     the issues['] renewal on habeas corpus," the issues are
8    "procedurally barred from being raised again."  (*Harris, supra*,
     5 Cal.4th at 825; *see also In re Sakarias* (2005) 35 Cal.4th 140,
9    145.)

10       Petitioner's ineffective assistance of trial and appellate
     counsel claims fail for two reasons.  First, he has failed to
11   justify the delay in bringing these claims.  Instead of alleging
     facts to demonstrate good cause for the delay, Petitioner claims
12   that he "lacked basic education and all legal knowledge, until now"
     and that he was somehow prevented from seeking relief because he
13   has "been suffering from major depression and mental illness."
     These contentions have no merit.  Petitioner does not allege when
14   he began suffering "major depression and mental illness," nor does
     he allege how these conditions prevented him from seeking writ
15   relief.  Moreover, Petitioner does not explain how his alleged lack
     of "legal knowledge" prevented him from consulting his appellate
16   attorney about a possible claim for ineffective assistance of trial
     counsel, or from contacting an attorney to inquire into the quality
17   of representation provided by his appellate counsel.
18

19       Even assuming Petitioner's ineffective assistance of
     counsel claims are not time-barred, these claims fail because
20   Petitioner has not provided any documentation to support his
     claims that his trial and appellate counsel provided ineffective
21   assistance.  It is well settled that a petition for writ of
     habeas corpus should:  (1) state fully and with particularity
22   the facts upon which relief is sought; and (2) include copies of
     reasonably available documentary evidence supporting the claim,
23   including pertinent portions of trial transcripts and affidavits
     or declarations.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)
24   Conclusory allegations made without any explanation of their
     basis do not warrant relief.  (*People v. Karis* (1988) 46 Cal.3d
25   612, 656; *see also In re Swain* (1949) 34 Cal.2d 300, 303-304.)

/33

1   Petitioner's failure to attach any supporting documentation to
    his petition prevents this Court from conducting a meaningful
2   review of his ineffective assistance of counsel claims.

3        "To establish ineffective assistance of counsel . . . a
    defendant must show that counsel's representation fell below an
4   objective standard of reasonableness under prevailing
    professional norms, and that counsel's deficient performance was
5   prejudicial, i.e., that a reasonable probability exists that,
    but for counsel's failings, the result would have been more
6   favorable to the defendant." (*Strickland v. Washington* (1984)
    466 U.S. 668, 687-688; *People v. Waidla* (2000) 22 Cal.4th 690,
7   718.)  Even assuming Petitioner's claims about his attorneys'
    conduct at trial and during his appeal are accurate, his claims
8   fail because he has not demonstrated that his counsels'
    performance "fell below an objective standard of reasonableness"
9   and that there is a reasonable probability that, but for
    counsel's alleged errors, "the result of the proceeding would
10  have been different." (*People v. Ledesma* (1987) 43 Cal.3d 171,
    218.)  "When a defendant challenges a conviction, the question
11  is whether there is a reasonable probability that, absent the
    errors, the factfinder would have had a reasonable doubt
12  respecting guilt." (*Ledesma, supra,* 43 Cal.3d at 218, citing
    *Strickland, supra,* 466 U.S. at 693-94].)
13

14       For the foregoing reasons, Petitioner's writ of habeas corpus
15  is DENIED.

16  5/25/07
17  Date                              Judge of the Superior Court

18

19

20

21

22

23

24

25

3

# EXHIBIT D

125



COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

**FILED**

JUL - 5 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
by _____
DEPUTY

| | |
|---|---|
| In re GREGORY L. BROWN,<br>on Habeas Corpus. | A118248<br><br>(San Francisco County<br>Super. Ct. No. 5568) |

BY THE COURT:

    The petition for writ of habeas corpus is denied. Petitioner has not demonstrated good cause for a delay of over 9 years in seeking habeas relief, nor has he shown his petition should be considered under one of the exceptions to the requirement that habeas relief be timely sought. (See *In re Robbins* (1998) 18 Cal.4th 770, 780-781.) Further, some of the claims asserted in the petition are barred because they were raised and rejected on appeal. (*In re Waltreus* (1965) 62 Cal.2d 218, 225.)

    (Ruvolo, P.J., and Rivera, J., joined in the decision.)

JUL - 5 2007

**RUVOLO, P.J.**

Date: _____  _____ P.J.

ORIGINAL

**EXHIBIT E**

*127*

MC–275

Name _GREGORY L. BROWN_

Address _SATF - CORCORAN_

_P.O. Box 5246_

_CORCORAN, CA_

CDC or ID Number _J-82241_

**SUPREME COURT**
**FILED**

AUG 1 0 2007

**Frederick K. Ohlrich, Clerk**

DEPUTY

_CALIFORNIA SUPREME COURT_
(Court)

_GREGORY L. BROWN_
Petitioner

vs.

_WARDEN, SATF-CORCORAN PRISON_
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. **S155258**

(To be supplied by the Clerk of the Court)

_EVIDENTIARY HEARING REQUESTED_

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

_128_

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

This petition concerns:

☒ A conviction      ☐ Parole

☐ A sentence      ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name: _Gregory L. Brown_

2. Where are you incarcerated? _SATF - Corcoran State Prison_

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

_Count I, Conspiracy To Commit Murder_
_Count II, Attempted Murder_

b. Penal or other code sections: _Count I 182.1, 187; Count II 664/187_

c. Name and location of sentencing or committing court: _Superior Court of the City And County_
_of San Francisco, Hall of Justice, 850 Bryant St., S.F., CA 94103_

d. Case number: _No. 159271_

e. Date convicted or committed: _May 25, 1995_

f. Date sentenced: _October 12, 1995_

g. Length of sentence: _56 Years to Life_

h. When do you expect to be released? _Immediately upon granting of this habeas._

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:
_Stephen Arian; P.O. Box 668; Kentfield, CA 94914_

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

2

129

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Gregg's right to a Fair Trial and Due Process, as guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, was violated as a result of his conviction on less than proof beyond a reasonable doubt of every element of the charged crimes.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

No rational trier of facts could have found the essential elements of the crimes charged against Gregg, beyond a reasonable doubt. On March 17, 1995, Prosecutor Floyd Andrews filed his Information in this case. Count I of the Information accused Gregg of conspiracy to commit murder (CT 1) and Count II accused him of Attempted murder (CT 4). The Information alleged that the Attempted murder was willful, deliberate, and premeditated. (CT 5.) As to the Attempted murder count, the Information also alleged that Gregg personally inflicted great bodily injury upon Robin "Williams." (CT 5.) The Information set out 14 overt acts in support of the conspiracy accusation, naming Gregg in only four overt acts (Nos. 2, 4, 5 and 6.). (CT 1-4) Overt Act No. 2 accused         (See Continuation, Additional Page.)

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

In re Winship, 397 U.S. 358 (1970); Leavitt V. Vasquez, 875 F.2d 260 (1989) (9th Cir.);

<u>Continuation Of "Ground 1", Page #2</u>

1  Greg of taking a photo and giving it to Wanda "Fain";
2  No. 4 accused Greg of accompanying Fain to deliver a
3  Note; No. 5 accused Greg of encouraging Fain and
4  Joseph "Diggs" to murder Robin Williams; And No. 6 accused
5  Greg and Fain of residing at 126 Blythdale.   Overt act
6  Nos. 2 and 4 are meaningless in the context of the
7  conspiracy charge because there was no evidence of any
8  agreement, between Greg and another or others
9  <u>to commit murder</u>.   But, more importantly, those two
10 "Acts" do not meet the legal requirement of an
11 "Overt Act."   The jury made a determination that Greg
12 encouraged Fain and Diggs to murder Robin Williams
13 (Verdict, Overt Act No. 5), **but there is not a shred of**
14 **Admissible evidence presented at trial from which this**
15 **conclusion could logically be reached.** And there was
16 **no finding of overt act No. 6.** (Verdict, Overt Act No. 6.)
17 There was no sufficient evidence of an overt act
18 supporting the charge of conspiracy to commit murder.
19 The crime of conspiracy is defined in the California Penal
20 Code (Sec. 182, subd. (a)(1), 184) as two or more persons
21 conspiring to commit any crime, together with proof of
22 the commission of an overt act by one or more of the
23 parties to such agreement in furtherance thereof.
24 Conspiracy is a specific intent crime.   The specific
25 intent required divides logically into two elements
26 (a) the intent to agree, or conspire, and (b) the intent

<u>Continuation Of "Ground I", Page #3</u>

1   to commit the offense which is the object of the conspiracy.
2   To sustain a conviction for conspiracy to commit murder,
3   the prosecution must show not only that the conspirators
4   intended to agree <u>but also</u> that they intended to kill
5   the victim.

6       The evidence introduced at trial, as it pertains to
7   Greg may be summarized as follows:

8       1.) He was arrested on January 6, 1995, at
9   126 Blythdale, while in possession of a handgun and
10  crack cocaine. Robin Williams made a statement to
11  police incriminating Greg.

12      2.) He was present when a purportedly threatening
13  note, written by co-defendant Wanda Fain, on paper from
14  a notebook belonging to Fain, was delivered to Williams.
15  The note came with a photograph of her taken by Greg
16  five years before.

17      3.) Greg and Williams met, and Greg agreed to
18  provide Williams unspecified remuneration if she would
19  refrain from testifying against him at an upcoming
20  preliminary hearing. The two resumed their previously
21  friendly relationship.

22      4.) Greg was present at 126 Blythdale on
23  February 7, until about 4:00 to 6:30 P.M. that evening.
24  Williams, Fain and Diggs left to take the bus about 7:30 P.M.
25  / / / /
26  / / / /

<u>Continuation Of "Ground 1", Page #4</u>

First, the January 6, arrest could only be considered on the issue of Greg's motive to commit the crimes alleged. (RT 347-348; 1213-1215.) Clearly, "motive" is not an essential element of either crime charged. Indeed, motive is different from intent (1 Witkin, California Criminal Law (3rd edition 1988); sec. 100, p. 118), and does not establish intent.

Second, the alleged threatening note was written by Frin on her paper. (RT 727-729, 935.) It was delivered about three weeks before the February 7, 1995 shooting of Williams. A reasonable trier of facts could infer that Greg was associated with the note, but it is not reasonable to interpret the note as evidencing an agreement between Frin and Greg to commit any crime, let alone an agreement to kill Williams. Furthermore, about a week and a half after Williams received the note, or about two weeks before February 7, 1995, Williams and Greg reconciled. (RT 520, 545-546, 557.) From that time forward, up to and including February 7, 1995, Williams visited with Greg every day or every other day. There is no evidence to suggest that these approximately seven to fourteen visits were anything but friendly. Indeed, Williams testified that Greg specifically indicated to her that he had no intention to hurt her. (RT 557.)

Third, given the evidence that Greg either lived at 126 Blythdale or was there often and Williams considered

133

Continuation Of "Ground 1", Page #5

1  him her friend, nothing can be inferred from Greg's
2  presence at or absence from 126 Blythdale on the day
3  Williams was shot. Williams' trial testimony varied as to
4  when Greg left on that day. (RT 547-530.) She also
5  testified that she did not remember when he left. (RT 551-
6  552.) At the March 6, 1995 preliminary examination,
7  she testified that he left early, around 4:00 P.M.
8  (RT 547-549, 551.)

9      Nowhere in the record is there any evidence from which
10  a rational inference may be made that Greg agreed with
11  ANYONE to take Robin Williams' life, or to do her any harm
12  at all. There is no evidence which even arguably shows
13  that Greg had an intent to kill Williams. There is
14  no evidence linking Greg to any weapon associated with
15  the shooting of Williams. There is no other physical
16  evidence linking Greg to the shooting of Williams. There is
17  no evidence of any discussions among Greg, Fain, and
18  Diggs regarding killing Williams. There is no evidence
19  that Greg had any connection to the trip that Fain, Diggs,
20  and Williams took to Third Street. And there is nothing
21  in the statements that Fain and Diggs gave to the police
22  that connected Greg to the shooting of Williams.

23      The fact that Greg knew Fain and perhaps Diggs is
24  not sufficient. Mere association is not enough to
25  establish the essential elements of either crime alleged.
26  / / / /

<u>Continuation Of "Ground 1"; Page #6</u>

1    As shown above, there is no evidence to support
2 the essential elements of the crime of conspiracy to
3 commit murder.

4    Even less evidence exists with respect to the finding
5 of the crime of Attempted murder of Robin Williams.
6 Where, As here, the prosecution has charge the Attempt
7 to be "willful, deliberate, And premeditated,"
8 it must adduce evidence from which it may be
9 Rationally inferred that, " . . . the would-be slayer
10 (weighed And considered) the question of killing And the
11 Reason for And Against such choice And, having in mind
12 the consequences, decides to kill Another human being."
13 CALJIC 8.67.

14    No such evidence exists in the Record. Nor is there
15 Any evidence of the specific intent element needed to
16 satisfy the Attempted murder requirement. Such intent
17 must be shown at the time of the overt act by which
18 the Attempt is manifested; And it cannot be inferred
19 from the commission of Another crime.

20    Another essential element of the crime of Attempt
21 is the requirement of a direct but ineffectual act done
22 toward the commission of the act Alleged. The act
23 must be overt And unequivocal; it must constitute the
24 beginning of the consummation of the Attempted crime.
25 Preparation Alone is not sufficient.

26 / / / /

Continuation Of "Ground I"; Page #7

1    Just as there is no evidence to support the elements
2    of Greer's conspiracy to commit murder conviction of
3    Robin Williams, there is no evidence to support the
4    elements of his attempted murder conviction of her.
5    There is no evidence to support a finding that Greer
6    had a specific intent to kill Williams. There is
7    no evidence that Greer attempted a direct but
8    ineffectual act of killing Williams. There is no evidence
9    that Greer participated in the shooting of Williams,
10   directly or indirectly. There is no evidence that Greer
11   aided and abetted an attempt to kill Williams. There is
12   no weapon or physical evidence linking Greer to the shooting
13   of Williams. There is no evidence that Greer even
14   suspected that Fain, Diggs or anyone else had any
15   criminal intent towards Williams, and certainly no
16   evidence that he shared in any criminal intent toward her.
17   Furthermore, just as the note cannot support the
18   conspiracy conviction, it cannot support the attempted
19   murder conviction. Greer's presence when Fain
20   delivered the note cannot be interpreted as providing
21   encouragement to Fain, Diggs, or anyone else to shoot
22   Williams three weeks later; and the reconciliation
23   between Williams and Greer are irreconcilable with a
24   finding that Greer advised or encouraged the attempted
25   murder of Williams. Williams and Fain reconciled also.
26   (RT 546-556.) Even putting aside the reconciliation

℠AO 72
(Rev. 8/82)

9                          136

Continuation Of "Ground I", Page #8

1  of Williams with Fain and Greg, the Attempted murder of
2  Williams was not a reasonably foreseeable consequence of
3  Greg's standing on a porch while Fain delivered a note and
4  photograph to Williams.

5       Nonetheless, motive cannot supply the specific intent
6  Elements of Attempted murder. Nor can association establish
7  Either the requisite encouragement or intent to kill.
8  Nor can Greg's brief presence at 126 Blythdale on the day
9  of the shooting establish either the requisite encouragement
10 or intent to kill, particularly, in light of the evidence
11 that he either frequent or lived there.

12      A microscopic examination of the trial transcript
13 fails to reveal ANY evidence from which a reasonable
14 person could make a rational inference establishing ANY
15 of the elements of conspiracy to commit murder and
16 Attempted murder.

17      Greg's convictions for conspiracy to commit murder
18 and Attempted murder based on Absent and/or less than
19 proof beyond a reasonable doubt of every element of
20 the accused crimes violated his right to a fair trial
21 and due process under the Fifth and Fourteenth
22 Amendments of the United States Constitution.

23      Based on the above, the court must grant habeas
24 relief to Greg and enter a judgment of Acquittal.
25 Acquittal is required because, at the close of the
26 prosecution's case-in-chief, the trial court improperly

<u>Continuation Of "Ground I"; Page #9</u>

1  denied Greg's California Penal Code sec. 1118.1 motion for
2  judgment of acquittal. (CT 48, 55; RT 1031-1037.)
3  Reversal alone is not an adequate remedy because a retrial
4  could then result, which would violate the state and
5  federal constitutional prohibitions against double jeopardy.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

7. Ground 2 or Ground __2__ (if applicable): "GROUND 2". PAGE #1

Greg's right to a Fair Trial and Due Process, as guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, was violated when the prosecutor maliciously and intentionally introduced false and unsupported and deceitful material statements at trial.

a. Supporting facts:

It was prosecutorial misconduct and malicious prosecution for Floyd "Andrews," a formal San Francisco prosecutor, to introduce false and unsupported and deceitful material statements at trial to acquire Greg's convictions for conspiracy to commit murder and attempted murder.

Prosecutor Andrews' false and unsupported material statements in his "Closing Arguments" at trial were so improper that it infected the trial with unfairness as to make Greg's convictions a denial of due process and a fair trial. In closing, Andrews told the jury that Wanda Fair wrote the note "for Gregory Brown," (RT 1349.) And "... he (Greg) can get her (Robin Williams) out to Jerrold Avenue and shoot her and leave her dead through the other two (Wanda Fair and Joseph Diggs)." (RT 1349.) Andrews further repeatedly exhorted the jury to bring in a "guilty" verdict, not based on the evidence, but "because (SEE Continuation, Additional Page)

Supporting cases, rules, or other authority:
Darden V. Wainwright, 477 U.S. 168 (1986); Brecht V. Abrahamson, 509 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 In re Winship, 397 U.S. 358 (1970); Berger V. United States, 295 U.S. 78 (1935); Miller V. Pate, 386 U.S. 1 (1967)

Continuation Of "Ground 5"; Page #3

1  they did it." (RT 1350.)  The trial record is devoid
2  of any evidence to support any of these accusations.
3  There was no evidence introduced at trial that showed
4  Fain wrote the note "for Gregory Brown." There was
5  no evidence introduced at trial that showed Greg had
6  any connection to the trip that Fain, Diggs and Williams
7  took to Jewold Avenue. There was no evidence
8  introduced at trial from which a rational inference may
9  be made that Greg agreed with Fain, Diggs or anyone
10 else to take Robin Williams' life, or to do her any harm
11 at all. And nowhere in the trial record is there any
12 evidence as to who actually shot Williams.
13    As demonstrated above, not only did Andrews
14 failed to limit the scope of his closing arguments
15 to the evidence presented at trial but he also
16 deliberately and consciously introduced numerous false
17 and unsupported material statements which rested
18 exclusively on the issue of guilt. Additionally,
19 Andrews' exhortations of the jury to bring in a "guilty"
20 verdict, by any means other than the evidence, "because
21 they did it" amount to malicious prosecution and
22 several instances of prosecutorial misconduct because:
23 (1) it was contrary to the evidence presented at trial;
24 (2) it was an injection of his personal opinion or belief;
25 (3) it influenced and inflamed the jury's prejudices
26 against Greg; (4) it encouraged the jury to

Continuation Of "Ground 2"; Page #3

1  disregard the court's instructions concerning innocence
2  and guilt; and (5) it diverted the jury's attention from
3  its duty to decide the case on the merit of the evidence
4  presented at trial.

5       But, just as equally prejudicial, it negated the
6  fact that other people could have been responsible for
7  the shooting of Robin Williams.   On cross-examination,
8  Williams was questioned about various persons who might
9  bear ill will towards her.   In January 1994, just a
10  year prior to her shooting, Robin Williams was convicted
11  of a residential burglary, and named three black males
12  who were also involved.   (RT 573, 587-588, 641.)
13  After that burglary, Corky, the boyfriend of the woman
14  whose house she had burglarized, beat her up. (RT 583.)
15  Williams had also incurred drug debts in the past.
16  (RT 576, 580.)   However, she denied having any drug
17  debts on February 7, 1995, and did not remember ever
18  being threatened by drug dealers to whom she owed
19  money. (RT 576, 580, 582.)   She said that she knew
20  Irwin Berry at Sunnydale, but did not remember him
21  hitting her with a gun because of some debts she owed
22  him. (RT 582.)   She specifically denied owing any
23  money to a man named "Tails" from the Sunnydale area,
24  and said that she did not remember him coming up to
25  her the night before February 7, 1995 and pointing a
26  gun at her.  (RT 581-582.)   However, Dafnie Hayes

Continuation Of "Ground 2": Page #4

1  testified that she was talking on the telephone with a
2  friend at her home in the Sunnydale Projects on the
3  afternoon of February 6, 1995 when the friend said,
4  "Oh, my God, Tails pulled a gun on Robin." Robin
5  referred to Robin Williams. (RT 1005.) Hayes also
6  testified that sometime during the last couple of months
7  Phoebe's apartment at 56 Santos had caught on fire.
8  Williams and Phoebe were once roommates at 56 Santos.
9  (RT 1005-1006.) Over the years, Williams had gotten
10 into fights at Sunnydale. (RT 584-585.) Williams
11 admitted that she might have some enemies around
12 the city. (RT 586.)

13     Andrews' false and unsupported material statements
14 implanted in his closing arguments, whether individually
15 or collectively, so infected the trial outcome as to
16 create a genuine effect on the jury's verdict, especially
17 when considering the fact that the trial judge did not
18 instruct the jury to disregard the improper statements.
19 There is absolutely no way a rational jury could have
20 found Greg guilty of the crimes accused absent the
21 mentioned statements in Andrews' closing.

22     Prosecutor Andrews' intentional and malicious use
23 of false and deceitful material statements in his
24 "Opening Statements" at trial were so improper
25 that they infected the trial with unfairness as
26 to make Greg's resulting convictions a denial of due

AO 72
(Rev. 8/82)

15                    142

<u>Continuation Of "Ground 2"; Page #5</u>

1 process and a fair trial. Andrews' opening statements
2 alleged, "She (Robin Williams) was shot because she made
3 a statement to the police about Gregory Brown, about
4 him selling drugs, about him having a gun. She was shot
5 to punish her for that statement and to prevent her from
6 testifying in future court appearances." (RT 314.)
7 Andrews failed to introduce any evidence at trial as to
8 why Robin Williams was shot. Andrews introduced no
9 evidence that Williams was shot because she made a
10 statement to the police "about Gregory Brown." Andrews
11 introduced no evidence that Williams was shot because her
12 statement mentioned Greg "selling drugs." Andrews
13 introduced no evidence that Williams was shot because
14 her statement mentioned Greg "having a gun." Andrews
15 introduced no evidence that Williams "was shot to
16 punish her for that statement" to the police.
17 Andrews introduced no evidence that Williams was shot
18 "to prevent her from testifying in future court
19 appearances." Furthermore, Andrews completely
20 failed to introduce any evidence at trial as to <u>why</u>
21 Williams was shot, and there was no trial evidence
22 as to why.
23    Moreover, Robin Williams' trial testimony totally
24 contradicted the improper statements given by Andrews in
25 his opening statements, while at the same time
26 exonerating Greg on all charges relating to her shooting.

16                    143

<u>Continuation Of "Ground 2"; Page #6</u>

1   Williams testified at trial that on January 6, she was
2   visiting Greg at 126 Blythdale, when the police came.
3   She saw a gun in Greg's hand and a bag of crack in
4   the other. (RT 511.) She made a statement to the police
5   as to what she saw. (RT 513.) Some days later she
6   was at a friends house when Wanda "Fain" delivered
7   a note to her, that included a photo of her taken some
8   years before by Greg. Greg was nearby when the note
9   was delivered, standing outside on a porch. (RT 515.)
10  Fain said Greg wanted to talk to her. (RT 517.)
11  She did not speak to Greg because she considered the
12  note threatening and was scared. (RT 518.) About a
13  week and a half later, she met Greg on the street
14  and they spoke. He asked her to stay out of sight,
15  and not to testify at his upcoming hearing; and in
16  return he "would take care of" her as long as she
17  didn't testify. (RT 519.) She was satisfied with
18  the conversation and returned to her regular visits to
19  126 Blythdale, going there about every other day.
20  She went there to talk to Greg and they were friends.
21  (RT 520.) Greg never threatened her, and she
22  believed he had no intention of hurting her. (RT 557.)
23       Andrews was aware that Williams would testify
24  as she did, because it was relatively a recital of her
25  preliminary hearing testimony. (RT 11-16; 51-52.)
26  Nevertheless, Andrews deliberately, consciously and

<u>Continuation Of "Ground 3"; Page #7</u>

1  maliciously used false and deceitful material statements
2  in his opening statements to manipulate the jury.
3  This fact is highlighted by Andrews' calculated
4  (and successful) efforts to paint Greg as a heartless
5  dope dealer who has previously captured and corrupted
6  the victim, Robin Williams. Thus, for example, in his
7  opening statements Andrews said:

8     "Robin is going to tell you that she is addicted
9      to cocaine, that she had been supplied
       cocaine by Gregory Brown and other people
10     ...., That she did a lot of things to
       get her poison. She'd go to Gregory Brown
11     and get drugs there. She's traded drug
12     for sex with Mr. Brown."
13

14  (RT 315, line 28; 316, line 1-7.)  Of course, there was
15  no evidence adduced at trial to support this assertion.
16  Absent the maliciously false and deceitful statements
17  embedded in Andrews' opening statements, no rational
18  jury could have reached a guilty verdict against Greg
19  because there was simply no evidence introduced at
20  trial connecting him to the shooting of Robin Williams.
21  Indeed, the improper statements created such a
22  substantial and injurious effect on the jury's decision
23  as to render Greg's convictions unconstitutional.
24  ////
25  ////
26  ////

AO 72
(Rev. 8/82)

18                                    145

<u>Continuation Of "Ground 2"; Page #8</u>

1    Greg's right to a fair trial and due process, under
2    the Fifth and Fourteenth Amendments of the United
3    States Constitution, was violated as a result of several
4    instances of prosecutorial misconduct as set forth herein.
5        Based on the above, the Court must grant habeas
6    relief to Greg on this ground and enter a judgment
7    of acquittal because there is no evidence to support
8    a re-trial.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

AO 72
(Rev. 8/82)

19                          146

7. Ground 2 or Ground __3__ (if applicable): "GROUND 3", PAGE #1

GREG's RIGHT to A FAIR TRIAL AND IMPARTIAL JURY, AS GUARANTEED under the Fifth, Sixth AND FOURTEENTH Amendments of the United States Constitution WAS Violated when jurors gave intentionally false ANSWERS during VOIR dire AND/OR COVERED up false statements given therein.

a. Supporting facts:

In the PRESENT CASE, jurors committed misconduct when they intentionally gave false ANSWERS during vior dire OR COVERED up false statements given therein which violated GREG's Right to due process, A fair trial, AN UNbias jury, confrontation, AND A verdict based on Admissible trial evidence, AS GUARANTEED by the Fifth, Sixth AND FOURTEENTH Amendments to the United States Constitution.

During VOIR dire, MR. FUETSCH, defense counsel for co-defendant WANDA FAIN, ASKED the jury: "DOES ANYONE HAVE A problem OR would they have A problem with following the instructions of the Court even if the RESULT that would be reached by following instructions of the Court were contrary to your gut reaction in A CASE AS SERIOUS AS the one that's charged here?" (RT 132, lines 3-8.) The only juror who indicated he would have A problem with following the Court's instructions is juror John Elwood. (RT 132-133 (from line 3 of 132 to line 13 of 133); 142-143 (from line 11 of 142 to line 28 of 143); 158-159 (line 28-13)) During voir dire, MR. ZilVersmitz, defense counsel for co-defendant Joseph Diggs, ASKED jurors MR. Castillo, Ms. Owens, Ms. Smith, AND (SEE CONTINUATION Additional PAGE)

b. Supporting cases, rules, or other authority:

IRWIN V. DOWD, 366 U.S. 717 (1961); BRECHT V. ABRAHAMSON, 509 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974); IN RE WINSHIP, 397 U.S. 358 (1970); CARTER V. KENTUCKY, 450 U.S. 288;

20

147

Continuation Of "Ground 3"; Page 2

1  Mr. Bower if they heard the judge's instruction on the
2  presumption of innocence and whether they would be able to
3  vote not guilty assuming there was no evidence to the
4  contrary; each juror indicated they would. (RT 136-137.)
5  Mr. Ziversint also asked the jury if they would be able
6  to vote not guilty if the prosecution failed to produce
7  evidence of the defendants' guilt beyond a reasonable doubt;
8  none of the jurors indicated to the contrary. (RT 140-141.)
9      During voir dire, Mr. Arian, Greg's trial defense
10  counsel, asked the jury if any of them are confused about
11  the "difference between a mere suspicion, a creating of a
12  suspicion and creating evidence that convinces beyond
13  a reasonable doubt"; none of the jurors indicated
14  confusion. (RT 147.)
15      As demonstrated in the swearing declarations of juror
16  John Elwood, juror Karen Pemberton, and Wayne Richard,
17  Greg's trial defense investigator, the jury failed to answer
18  questions honestly during voir dire regarding whether or
19  not they would follow the court's instructions.
20
21
22  <u>1</u>  Following the verdicts, all the defendants, including
23  Greg, filed motions for new trial, alleging among other
24  things, jury misconduct during deliberation. However,
25  this Ground, as well as all other Grounds set forth in these
26  papers, was not raised in the motions for new trial by
    defense counsels nor on direct appeal.

21                    148

<u>Continuation Of "Ground 3"; Page #3</u>

1     Juror Karen Pemberton, in her declaration given to
2 counsel for co-defendant Joseph Diggs states among other
3 things:

4     During deliberations, a juror had a bus
    schedule with them. We looked at the
5     schedule and we talked about how long
    the bus ride took, when they (Robin, Wanda
6     & Joseph) got on the bus, and how long it
    took to get where they were going...
7

8     When we went into the jury after arguments,
9     some people were saying "they don't have
    a case." I originally believed they were
10     talking about the prosecution. But later,
11     I realized that more than half of the
    jurors were talking about how the defense
12     had not proven their case.

13

14 (CT 453-454.) The clear import of this discussion
15 between jurors is that they did not apply the court's
16 instruction on the burden of proof in a criminal case.
17 (CALJIC Nos. 2.61, 2.90, 2.91; CT 334, 340-341; RT 1219,
18 1222-1223. Also, see, RT 93-94.) Juror Karen P. also
19 advised Maggie Richards, Gee's investigator, that "a
20 couple" of jurors commented on Gee's failure to testify
21 in his own defense being an indication of his guilt. (See
22 Maggie Richards' sworn declaration at, CT 473-474.)
23     The instructions placing the burden of proof on the
24 prosecution are grounded in the Due Process Clause of the
25 Fourteenth Amendment of the United States Constitution
26 and play a vital role in the American scheme of criminal

<u>Continuation Of "Ground 3"; Page #4</u>

1  procedure. The jurors clearly disobeyed the court's
2  instructions regarding burden of proof when, according to
3  the declaration of juror Karen P. more than half the
4  jurors said, during deliberations, that the defense had
5  not proven their case. There is nothing in the record
6  to suggest that the credibility of Karen P.'s declaration
7  on this issue was questioned, and it certainly was not
8  countered. There is no case law or other authority that
9  Greg is aware of that states that the declaration of a
10  single juror cannot establish misconduct, that offending
11  jurors must be identified by name, or that all twelve
12  jurors must disobey court instructions in order to
13  establish misconduct. Indeed, one juror is enough.
14      The instruction that no inference is to be drawn
15  from a defendant's failure to testify is grounded in
16  the Fifth and Fourteenth Amendments of the United States
17  Constitution. The jury was instructed as follows:
18  "A defendant in a criminal trial has a constitutional
19  right not to testify. You must not draw any
20  inference from the fact that a defendant does not
21  testify. Further, you must neither discuss this matter
22  nor permit it to enter into your deliberation in any
23  way." (CALJIC 2.60; CT 333; RT 1219.) The jurors
24  misconduct in disobeying this instruction was inherently
25  and substantially likely to have influenced and biased the
26  ////

Continuation Of "Ground 3"; Page #5

1  involved jurors so as to prejudice Greg.
2      There are hardly two matters more basic to a fair
3  jury trial than the principles embodied in the
4  instructions referred to above.
5      Juror John Elwood, in his declaration given to
6  counsel for co-defendant Joseph Diggs states under oath
7  among other things:

8      During our deliberations we prepared a time
9      line . . . for the evening of the incident. We
10     were particularly concerned with the period
11     between 7:30 pm and 8:35 pm on the night
12     of the shooting. To help reconstruct what
13     happened during that period, we consulted
14     bus schedules that jurors Alvin Bernstein and
15     Monnell Beukmann brought in on the second
16     day of deliberations. These schedules provided
17     us information about the intervals between
18     buses and the frequency with which buses
19     came; this information along with court
20     testimony and statements helped us to fill
21     in our time line from 7:30 pm until 8:35 pm
22     on the night of the shooting . . .

19     There was also discussion about access to guns
20     which was in reference to defendant Greg
21     Brown's prior arrest.

22     There were also discussions about defendant
23     Greg Brown being a drug dealer and his
24     propensity for violence and drugs and that
25     kind of lifestyle. This was mostly in
       reference to defendant Brown's state of mind.

26

Continuation Of "Ground 3"; Page #6

Some jurors Also discussed that as a drug dealer, Brown's state of mind may be twisted, And power hungry. Some jurors also discussed that as a drug dealer, Brown might feel that there would be no consequences to his actions if he killed Robin Williams. The jurors who brought up discussions of def. Brown's lifestyle were reminded by other jurors that this line of discussion was speculation and could not be considered in deliberations.

Someone Also made reference to the fact that if you do crack cocaine, it does not mean you lose your memory.

(CT 451-452.) This statement taken on its face is clearly juror bias of the worst sort in and of itself. Nevertheless, juror Jordan Owens corroborated the fact that jury did in fact disregarded and disobeyed the court's instructions and considered the seizure of a gun and drugs from defendant Gregory Brown as evidence of his guilt in the charged crimes. (Declaration of Maggie Richards at, CT 473-474)

Early in the prosecution case, the trial court gave the following limiting instruction to the jury regarding the evidence seized during the January 6, 1995 arrest of Greg. The court admonished:

[T]he evidence or testimony that's being received at this point regarding the gun and cocaine seized at 126 Blythdale on January 26th [sic], 1995, in the presence of Mr. Brown is being offered only to show motive for Mr. Brown to

25

152

Continuation Of "Ground 3"; Page #7

from Ms. Williams. You may not consider this evidence for ANY other purpose At this time.

(RT 347-348.) After the completion of the presentation of all of the evidence, the court gave the jury the following instructions:

Evidence was introduced of an arrest on January 6, 1995 of defendant Gregory Brown And seizure of guns And drugs from the premises of 126 Blythdale. This evidence was admitted and may be considered by you only for the purpose of showing a possible motive for the commission of the crimes charged. You're to consider this evidence only for the purpose of determining whether such motive exists And for no other purpose. Such evidence, if believed, was not received and may not be considered by you to prove that defendant Gregory Brown is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may considered by you only for the limited purpose of determining if it tends to show a motive for the commission of the crimes charged. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner you do all other evidence in this case. You're not permitted to consider such evidence for any other purpose.

Evidence that a gun was seized on January 6th, 1995, may not be considered by you to infer or prove that any of the defendants had a gun on February 7th, 1995, when Robin Williams was shot.

Certain evidence was Admitted for a limited purpose. At the time this testimony was admitted you were admonished it could not be considered by you for for any purpose other than the limited purpose for which it was admitted. Do not consider such evidence for any purpose except the limited purpose for which it was admitted.

A0 72
(Rev. 8/82)

26

153

Continuation Of "Ground 3"; Page #8

(RT 1213-1215.) These instructions were also provided to the jury in written form during their deliberations. (CT 306, 318-320, 323.)

Jurors clearly disregarded and disobeyed these instructions. Far from limiting their consideration of the evidence of the gun and cocaine to the issue whether Gates had a motive to harm Williams, jurors discussed that the January 6, 1995 gun and cocaine evidence showed that Gates had "access to guns," was "a drug dealer," had a "propensity for violence and drugs," had a "twisted and power hungry state of mind," and felt that "there would be no consequences to his actions if he killed Robin Williams." The fact that some jurors convinced other jurors not to consider this line of discussion does not indicate whether any or all of the improper discussion ceased, and there is no indication that the reminder was given by the jury foreman or otherwise carried special authority. And the reminder could not erase the previous improper discussion. The record is without any contradictory declarations on this issue. Nor is there any indication in the record that the prosecutor or the trial court questioned the credibility of juror John Elwood's declaration on this subject.

/ / / /
/ / / /
/ / / /

<u>Continuation Of "Ground 3"; Page #9</u>

1   The declaration of Greg's trial defense investigator,
2   Maggie Richards, states, among other things:

3       On May 30, 1995, I spoke with juror KAREN
4       Pemberton by telephone. At that time, she
5       told me she heard "a couple" jurors discussing
        the fact that defendant Gregory Brown did not
6       testify in his own defense, and that this was
7       an indication of guilt.

8       On May 30, 1995, I spoke with juror Alvin Bernstein
9       by telephone. He told me that in jury deliberations
        . . . jurors did consult maps and bus schedules.

10      On May 30, 1995, I spoke with juror Jordan T.
11      Owens by telephone. She told me that the jury
12      considered as evidence of one of defendant's being
        shot the victim that there were guns in Gregory
13      Brown's past, and that he was a drug dealer.

14  (CT 473-474.)

15      The sworn declarations of jurors John Elwood and
16  Karen Pemberton and that of investigator Maggie Richards,
17  demonstrate that the jurors consulted bus schedules and/or
18  maps during deliberations. The record shows that neither
19  were admitted into evidence at trial. It is juror misconduct
20  to consider and discuss "evidence" other than that which
21  was received at trial, whether a juror acted intentionally
22  or inadvertently in being exposed to the outside source
23  of information.
        The jurors were also specifically instructed:
24
25      You must decide all questions of fact in this
        case from the evidence received in this trial
26      and not from any other source . . .

<u>Continuation Of "Ground 3"; Page #10</u>

1   You must not make any independent
2   investigation of the facts ... nor consider
3   nor discuss facts as to which there's no
    evidence.

4   (CALJIC 1.03; CT 313; RT 1210.) Clearly, the jurors use
5   of the bus schedules constituted misconduct.

6       Timing was an important issue in this case. The
7   prosecution theory was that Fain, Diggs and Williams left
8   126 Blythdale at around 7:30 p.m., walked to the bus stop,
9   waited for the bus, rode the bus for twenty to twenty five
10  minutes, and walked a block and a half, before co-defendants
11  Fain and Diggs shot Williams. The wounded Williams was first
12  discovered around 8:30 p.m. There is no evidence that Fain or
13  Diggs were anywhere in sight at that time. Given all of this,
14  plus the co-defendants denial of any involvement in Williams'
15  shooting, the expert witness evidence regarding Williams' memory
16  problems, and the defense theories that third parties were
17  responsible; the jury plainly had a question as to whether
18  all that Williams described could have happened within
19  the one hour time period. Thus, they obviously felt a need
20  to fill in important gaps in the prosecution case time line,
21  and used the bus schedules to do so. Inasmuch as Greer's
22  culpability as a conspirator rested on the jury's
23  evaluations of the actions of Fain's and Diggs and on the
24  credibility and reliability of Williams' testimony, the
25  jury's consultation of the bus schedules to bolster the
26  prosecution's case was prejudicial to Greer.

Continuation Of "Ground 3"; Page #11

1  The sworn declaration of juror John Elwood makes clear
2  that a juror injected his own outside expertise into deliberations.
3  The comment of a juror that if you do crack cocaine it does not
4  mean you lose your memory is also misconduct. The relationship
5  between crack cocaine use and memory loss is not a subject of
6  commonplace knowledge. Moreover, the juror comment is not
7  a reasonable interpretation of expert witness psychiatrist
8  Eugene Schoenfeld trial testimony. (RT 932-935.) The juror
9  who made the comment regarding cocaine and memory was,
10 clearly relying on first hand experience, observation, or study.
11 As such, his comment injected his outside expertise into the
12 deliberations, which constituted misconduct.
13     Here, the evidence is so very slim against Greg, non-
14 existent by most standards, that a very minimal amount of
15 error can have a substantial weight in affecting the verdict.
16 All that ties Greg to the shooting of Robin Williams is, the
17 January 6 arrest, and his connection to the delivery of a
18 purportedly threatening note. Other than his presence earlier
19 in the day, there is nothing connecting Greg to the events
20 leading up to Williams' shooting. Absent the varieties of jury
21 misconduct in this case, no trier of facts could have
22 found Greg guilty of the crimes charged.
23     As stated herein, the defense counsels explicitly asked
24 the jury material questions during voir dire which the
25 jury intentionally failed to respond honestly to; specifically,
26 the jury concealed their unwillingness to (1) follow the court's

<u>Continuation Of "Ground 3"; Page #12</u>

1   instructions; (2) give the defendants, particularly Gree, the

2   presumption of innocence; (3) vote not guilty if the

3   prosecution failed to produce evidence of the defendants' guilt

4   beyond a reasonable doubt; and (4) ascertain the

5   "difference between a mere suspicion, a creating of a

6   suspicion and creating evidence that convinces beyond a

7   reasonable doubt." (RT 132; 136-137; 140-141; 147. Also,

8   see, this Ground at pages 1 & 2.)

9       The jury's failure to respond honestly to the defense

10  counsels' questions during voir dire violated Gree right to a

11  fair trial, an impartial jury, due process, confrontation,

12  and a verdict based on admissible trial evidence under the

13  Fifth, Sixth and Fourteenth Amendments of the United

14  States Constitution; and was the direct cause of the

15  violation set forth in Ground 1.

16      Based on the above, the Court must grant habeas

17  relief to Gree on this ground along with any other

18  relief the Court deems fair and just.

19

20

21

22

23

24

25

26

AO 72
(Rev. 8/82)

7. Ground 2 or Ground __4__ (if applicable): "Ground 4"; Page #1

GREG'S Right to Effective Assistance of Trial Counsel, as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, was violated when counsel failed to : Challenge overt Acts; object to false and unsupported material statements at trial; and use preemptory challenge to excuse a bias juror.

a. Supporting facts:

Trial counsel's failure to make an obvious challenge of overt Acts constitutes ineffective trial representation.

Trial counsel failed to challenge the validity and the legality of the overt Acts in his motion to dismiss (Calif. Penal Code Sec. 995 motion). (CT 70, 152; RT 27.) To support a crime of conspiracy, the prosecution must prove the commission of an overt act by one or more of the parties engaged in the agreed upon conspiracy. In this case, only four overt Acts in support of the conspiracy was related to GREG. (Nos. 2, 4, 5, and 6.). Overt Act No. 2 alleged that GREG took a photo and gave it to Wanda Fain; No. 4 alleged that GREG Accompanied Fain to deliver a note; No. 5 alleged that GREG encouraged Fain and Joseph Diggs to murder Robin Williams; and No. 6 alleged that GREG and Fain resided at 126 Blythdale. (CT 1-4.) As stated in "Ground 1" and supported by the record, there was no finding of overt Act No. 6.; No evidence to support No. 5; and Nos. 2 and 4 fail because (1) there is no evidence of an agreement (See Continuation, Additional Page)

b. Supporting cases, rules, or other authority:

Strickland V. Washington, 466 U.S. 668 (1984); Brecht V. Abrahamson, 507 U.S. 619 (1893); Donnelly V. DeChristoforo, 416 U.S. 637 (1974);

<u>Continuation Of "Ground 4"; Page #2</u>

1 between Greg and anyone to commit murder and (2) they
2 do not meet the legal requirement of an overt act.
3 In light of the fact that Greg pled not guilty to the
4 crimes accused (CT 9-11), any reasonably effective
5 counsel would have moved to challenge all evidence against
6 his client in which the prosecution relies upon to obtain a
7 conviction. It is reasonable to assume that had counsel
8 challenged the overt acts, the prosecution would have
9 been forced to produce sufficient evidence to support each
10 act or run the risk of having one or more acts dismissed.
11 As shown herein, the mentioned overt acts were either not
12 acts in and of themselves or unsupported or lacked
13 finding. Therefore, had counsel challenge the overt acts
14 it is more than likely that one or more or all of the acts
15 would have been dismissed which would have further weaken
16 the prosecution's case or resulted in the entire case against
17 Greg being dismissed, because, the essence of a conspiracy
18 lies within the commission of an overt act.

19 Here, the prosecution's case against Greg is non-existent
20 by most standards, therefore, a minimal of error such as
21 the failure to challenge the overt acts contributed to and
22 proximately caused the subjection of Greg to an unfair trial,
23 a bias jury, prosecutorial misconduct, and a conviction on
24 less than proof beyond a reasonable doubt. Counsel's failure
25 to challenge the overt acts in question amount to
26 defective and ineffective representation.

33                    160

<u>Continuation Of "Ground 4"; Page #3</u>

1  Trial counsel's failure to make meritorious objections to
2  false and unsupported material statements at trial constitutes
3  ineffective trial representation.

4       As stated in "Ground 2" and supported by the record,
5  in closing arguments, the prosecutor told the jury that
6  Winola Fair wrote the note "for Gregory Brown," (RT 1349.)
7  And "... he (Greg) can get her (Robin Williams) out to
8  Jerrold Avenue and shoot her and leave her dead through
9  the other two (Fair and Joseph Diggs)." (RT 1349.)
10 The prosecutor further repeatedly exhorted the jury to bring
11 in a "guilty" verdict, not based on the evidence, but
12 "because they did it." (RT 1350.) There was not a
13 scintilla of evidence presented at trial that supports
14 any of those false material statements. Any reasonably
15 effective counsel would have fervently objected to each
16 and every one of those improper statements, particularly,
17 in light of the fact that closing arguments are limited
18 to the issue in the case and the evidence that has been
19 presented.   Counsel's non-objections to the false and
20 unsupported material statements allowed the prosecutor
21 to : (1) argue facts that are not supported by the
22 evidence in the record; (2) inject his personal beliefs
23 and opinions; (3) influence and inflame the jury's
24 prejudices against Greg; (4) encourage the jury to
25 disregard the court's instruction regarding innocence
26 and guilt; and (5) divert the jury's attention from

<u>Continuation Of "Ground 4"; Page #4</u>

1  its duty to decide the case on the merit of the evidence
2  presented at trial. Moreover, counsel's non-objections gave
3  credence to the prosecutor's baseless opening statements.

4      Had counsel objected to the improper statements,
5  the objections would have undoubtedly resulted in the
6  judge ordering the jury to disregard the statements which
7  would have put the jury on notice that they are not
8  allowed to consider the improper statements, and that alone
9  could have changed the outcome of the trial. However,
10 counsel's failure to object to the false and unsupported
11 material statements resulted in and contributed to and
12 proximately caused Green's convictions for the crimes
13 accused and subjected him to an unfair trial, a bias jury,
14 PROSECUTORIAL misconduct, and a conviction on less than
15 proof beyond a reasonable doubt. Counsel's non-objections
16 to the statements in question amount to defective and
17 ineffective REPRESENTATION.

18     Trial counsel's failure to use preemptory challenge to
19 excuse a potential bias juror from the jury panel constitutes
20 ineffective trial REPRESENTATION.

21     Here, during voir dire, juror John Elwood was
22 questioned and answered as follows:

23     Mr. Fuotsch (co-defendant Wanda Fair's defense counsel):
24     "Does anyone have a problem or would they have
25 a problem with following the instructions of the Court even
26 if the result that would be reached by following the

<u>Continuation Of "Ground 4"; Page #5</u>

1   Instructions of the Court were contrary to your gut
2   reaction in a case as serious as the that's charged here?"
3       Prospective Juror: "I think I would have a problem
4   with it."
5       Mr. Fuetsch: "... could you explain what you mean
6   by you would have a problem with that?"
7       Prospective Juror: "I believe there's a higher
8   authority than legal authority that is like moral authority,
9   and to follow like a set of rules rather than more of a
10  moral thing, I think I would be hardpressed to follow the
11  set of rules that are outlined by law."
12      "... but I think if you misconstrue the constitution
13  or broaden its actual authority, then I think that
14  could be potentially wrong."
15  (RT 132-133.)
16      Mr. Arian (Greg's trial counsel):
17      "Mr. Elwood, I heard you say something about
18  broadening the authority of the constitution. Do you recall
19  that comment?"
20      Prospective Juror: "I do."
21      Mr. Arian: "I wonder if you could say any more
22  about that. I didn't get your complete thought."
23      Prospective Juror: "My thought is a lot of, let's
24  say, somebody's on trial, the jurors sit through the
25  entire trial, they have a gut feeling that these defendants
26  are, let's say, guilty, but a lot of circumstantial

<u>Continuation Of "Ground 4"; Page #6</u>

1  EVIDENCE HAS BEEN brought iN AND it's been found — — or A

2  legal issue has been brought up, A minor legal issue that

3  speaks to their iNNoceNce. You're supposed to think

4  they're iNNoceNt EVEN though they're guilty, because it's

5  A legal Argument and it takes precedence over how you feel."

6       Mr. AriaN: " you're saying that As A juror your gut

7  reaction is very important and you're going to pay a lot

8  of AtteNtion to that?"

9       Prospective Juror: " If you've listened to All the

10 facts And you say, yes, they Are iNNoceNt or guilty, but

11 Some legal precedence makes you dismiss that, then I

12 have A big problem with that."

13       Mr. AriaN: "You might not be Able to do that?".

14       Prospective Juror: " No, I would not."

15       Mr. AriaN: " Would that hold if the judge At the

16 close of the case instructed you that you were to consider

17 this EVidence iN A certain way and the instructions of the

18 judge went counter to the feelings you just described."

19       Prospective Juror: "I really don't know sitting

20 here right NOW."

21       Mr. AriaN: " Would you have trouble with it?"

22       Prospective Juror: "I would have major problems."

23 (RT 142-143.)

24       The Court: " At this point does Any party wish

25 to ENter A Challenge for cause?

26 / / / /

<u>Continuation Of "Ground 4"; Page #7</u>

1    But before you do that, Mr. Elwood, I was little
2 unclear about your statements.
3    Let me just read this question to you again:
4 "It [sic] important that I have your assurance that you
5 will without reservation follow my instructions and
6 rulings on the law and will apply that law to the case.
7 To put it differently, whether you approve or disapprove
8 of my instructions, it is your solemn duty to accept as
9 correct my statements of the law. You may not
10 substitute your own idea of what you think the law
11 ought to be.
12    Would you be able to follow the law as given
13 by me in this case?"
14    Prospective Juror: "I would, but I may have a
15 problem with that, internal conflict."
16 (RT 158-159.)
17    As demonstrated, juror Elwood's responses during
18 voir dire were evasive and misleading and concealed his
19 unwillingness to follow the court's instructions. Any
20 reasonably effective counsel would have used a preemptory
21 challenge to excuse juror Elwood from the jury panel as a
22 result of his explicit or implicit allegiance to his "gut"
23 feelings opposed to the law and instructions given by
24 the court. Moreover, Elwood's declaration illustrates
25 an abundance of juror misconduct (CT 451-452.),
26 therefore, it is reasonable to assume that Elwood's

<u>Continuation Of "Ground 4"; Page #8</u>

1  Reliance on his gut feelings during deliberations, rather
2  than the Court's instructions, was influential in the jury's
3  decision to find Greg guilty of the crimes charged,
4  particularly since the verdicts were contrary to law.
5  Counsel's failure to excuse potential bias Elwood from
6  the jury panel contributed to and proximately caused
7  Greg's deprivation of a fair trial and impartial jury.
8      Greg's right to effective assistance of trial counsel
9  as guaranteed by the Fifth, Sixth and Fourteenth
10  Amendments of the United States Constitution was violated
11  when counsel failed to (1) challenge the overt acts;
12  (2) object to false and unsupported material statements
13  at trial; and (3) use preemptory challenge to
14  excuse the bias juror John Elwood from the jury panel.
15      (Attachment No. I affixed hereto is exact copies
16  of the Court and the Reporter's transcripts
17  referred to in this ground.)
18      Based on the above, the Court must grant
19  habeas relief to Greg on this ground along with
20  any other relief the Court deems fair and just.
21
22
23
24
25
26

Ground 2 or Ground __5__ (if applicable): "_Ground 5_"; _Page #1_

Gregg's right to effective assistance of Appellate Counsel, As guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, was violated when counsel deliberately failed to discover and include non-frivolous issues into the appellant's brief.

a. Supporting facts:

It was defective and ineffective representation of appellate counsel when counsel failed to raise on appeal the following non-frivolous issues: (1) Gregg's convictions are based on less than proof beyond a reasonable doubt of every element of the charged crimes as fully set forth herein at Ground One; (2) the prosecutor committed several instances of prosecutorial misconduct as fully set forth herein at Ground Two; (3) the jury failed to respond honestly to the defense counsel's questions during voir dire as fully set forth herein at Ground Three; and (4) trial counsel was ineffective when he failed to challenge the overt acts in support of the conspiracy charge; failed to object to the false and unsupported and deceitful material statements presented at trial by the prosecutor; and failed to use preemptory challenge to excuse juror John Elwood, as fully set forth herein at Ground Four. None of these issues are frivolous. (SEE Continuation, Additional Page)

Supporting cases, rules, or other authority:
Smith V. Robbins, 538 U.S. 259 (2000); Brecht V. Abrahamson, 507 U.S. 619 (1993); Donnelly V. DeChristoforo, 416 U.S. 637 (1974)

<u>Continuation of "Ground 5"; Page #2</u>

1   Any reasonably effective appellate counsel would have
2   raised each of the mentioned issues on direct appeal
3   to acquire the reversal of the lower court's judgment.
4        Appellate counsel raised the following claims on
5   appeal: insufficient evidence to prove conspiracy to
6   commit murder; insufficient evidence to prove
7   attempted murder; jury misconduct; remand for
8   resentencing under People V. Superior Court; and
9   joinder in co-defendants' arguments. Had
10  counsel incorporated the mentioned non-frivolous
11  issues into the appellate brief, the issues would have
12  provided evidentiary support for the claims raised
13  therein and contributed to the perseverance of a
14  successful appeal. However, appellate counsel's
15  failure to raise the issues in question deprived Greg
16  of a prosperous and triumphant appeal and the
17  right to effective representation of counsel on appeal
18  in violation of his Fifth, Sixth and Fourteenth
19  Amendments of the United States Constitution.
20       Based on the above, the Court must grant habeas
21  relief to Greg on this ground and any other relief
22  the Court deems fair and just.
23
24
25
26

168

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
_Court of Appeal of the State of Calif., First Appellate District, Division Four_

b. Result _Affirmed_                              c. Date of decision: _January 28, 1998_

d. Case number or citation of opinion, if known: _No. A072126_

e. Issues raised: (1) _Insufficient evidence to prove conspiracy to commit murder;_
(2) _Insufficient evidence to prove attempted murder; (3) Jury Misconduct; (4) Remand_
_for Resentencing under People V. Superior Court; And (5) Joinder of co-defendant_
_Arguments._

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:
_Victor Blumenkrantz; P.O. Box 9586; Berkeley, CA 94709_

9. Did you seek review in the California Supreme Court? ☒ Yes ☐ No. If yes, give the following information:

a. Result _Denied_                              b. Date of decision: _April 29, 1998_

c. Case number or citation of opinion, if known: _S068320_

d. Issues raised: (1) _Same As Above_

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
_The Issues Raised herein are based on matters outside the record on appeal._
_Trial and Appellate counsels were ineffective in failing to raise these issues._

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See _In re Muszalski_ (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
_N/A_

b. Did you seek the highest level of administrative review available? ☐ Yes.   ☐ No.
Attach documents that show you have exhausted your administrative remedies.

MC-275 (Rev. July 1, 2005)                 **PETITION FOR WRIT OF HABEAS CORPUS**                 Page five of six

_4.2_                                                                                      _169_

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court  *Superior Court of San Francisco*

    (2) Nature of proceeding (for example, "habeas corpus petition"):  *Habeas Corpus Petition*

    (3) Issues raised: (a)  *(SEE: Attachment No. 2 affixed hereto.)*

        (b) _____

    (4) Result (Attach order or explain why unavailable):  *Denied; SEE Attachment No. 3*

    (5) Date of decision:  *May 30, 2007*

  b. (1) Name of court:  *Court of Appeal of the State of California*

    (2) Nature of proceeding:  *Habeas Corpus Petition*

    (3) Issues raised: (a)  *(SEE: Attachment No. 2 affixed hereto.)*

        (b) _____

    (4) Result (Attach order or explain why unavailable):  *Denied; SEE Attachment No. 4*

    (5) Date of decision:  *July 5, 2007*

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:  *N/A*

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)  *(SEE: Attachment No. 2 affixed hereto.)*

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:  *The petition was denied by the Superior Court of San Francisco and by the Court of Appeal of the State of California.*

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.  *Under penalty of perjury I also declare that the Attachments are what I declare them to be.*

Date:  *8/1/07*  *Gregory L. Brown*
                        (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 2007]  PETITION FOR WRIT OF HABEAS CORPUS  Page 6 of 6

*170*

## Declaration of Service

Case Name: Brown V. Walker, SATF-Corcoran Prison

Case No. : _____

I declare:

On August 1, 2007, I served the attached Writ of Habeas Corpus

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the prison mail collection system at SATF-Corcoran _____, in California, addressed as follows:

California Supreme Court
350 McAllister St.
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 8/1/07

Gregory L. Brown
GREGORY L. BROWN

171

173

1

2

3  GREGORY L. BRAUN, the Appellant, declares
4  UNDER PENALTY of PERJURY that the foregoing is true
5  AND CORRECT.

6

7  DATE: 8/1/07                    Respectfully submitted,

8                                  Gregory L. Braun

9                                  GREGORY L. BRAUN,
10                                 Appellant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                    2 of 2

                                        175

ATTACHMENT 1

176

F I L E D
San Francisco County Superior Coun

MAR 1 7 1995

ALAN CARLSON, Clerk
BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | NO. 159271 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | F. ANDREWS |
| | ) | |
| GREGORY BROWN, WANDA FAIN | ) | |
| and JOSEPH DIGGS, | ) | INFORMATION |
| | ) | |
| Defendants | ) | |

COUNT I:

GREGORY BROWN, WANDA FAIN and JOSEPH DIGGS

are accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit: VIOLATION OF SECTION 182.1 OF THE CALIFORNIA PENAL CODE committed as follows:  The said defendants on or about the 7th day of January, 1995 to the 7th day of February, 1995, both dates inclusive, at the City and County of San Francisco, State of California, did wilfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of MURDER, in violation of Section 187 of the Penal Code, a felony; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the County of San Francisco:

OVERT ACTS

OVERT ACT NUMBER 1

It is alleged in the City and County of San Francisco, on or about the 7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did write a note containing threats against Robin Williams.

/77

002

People v. Gregory Brown, et al.                    SC 159271

Page 2


OVERT ACT NUMBER 2

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did
put the note in an envelope with a photograph of Robin Williams which
was taken by defendant Gregory Brown and which was given to Fain by
defendant Gregory Brown.


OVERT ACT NUMBER 3

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did
deliver the threatening note and photograph to Robin Williams.


OVERT ACT NUMBER 4

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Gregory Brown
did accompany defendant Wanda Fain to deliver the threatening note to
Robin Williams.


OVERT ACT NUMBER 5

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Gregory Brown
did encourage defendants Wanda Fain and Joseph Diggs to murder Robin
Williams.


OVERT ACT NUMBER 6

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Gregory Brown, Wanda Fain
and Joseph Diggs did reside at the same address of 126 Blythdale
Street in San Francisco.


OVERT ACT NUMBER 7

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendant Wanda Fain did provide
cocaine base, also called "crack" cocaine, to Robin Williams.

G03

People v. Gregory Brown, et al.                          SC 159271

Page 3


## OVERT ACT NUMBER 8

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendant Wanda Fain did encourage
Robin Williams to go to Jerrold Street with defendants Wanda Fain and
Joseph Diggs.


## OVERT ACT NUMBER 9

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did get on the Number 15 bus with Robin Williams.


## OVERT ACT NUMBER 10

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did exit the bus with Robin Williams at 3rd and McKinnon Streets in
San Francisco.


## OVERT ACT NUMBER 11

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did take Robin Williams with them to Jerrold Street with the intention
of murdering Robin Williams.


## OVERT ACT NUMBER 12

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did walk on Jerrold Street approaching Quint Street with Robin
Williams.


## OVERT ACT NUMBER 13

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that while walking with Robin Williams
defendants Wanda Fain and Joseph Diggs did shoot Robin Williams in the
back of the head with a 9mm semi-automatic pistol.

179

G04

People v. Gregory Brown, et al.                    SC 159271

Page 4

OVERT ACT NUMBER 14

It is alleged in the City and County of San Francisco, on or about the 7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs did shoot at Robin Williams again while she was lying on the ground.

USE OF FIREARM ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5(a) [As to defendant JOSEPH DIGGS only]:

It is further alleged that in the commission and attempted commission of the above offense, the said defendant, JOSEPH DIGGS, personally used a firearm, to wit, a 9 mm semi-automatic pistol, within the meaning of Penal Code Section 12022.5(a) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(8).

ARMED WITH A FIREARM ALLEGATION PURSUANT TO PENAL CODE SECTION 12022(a)(1)[As to defendants GREGORY BROWN and WANDA FAIN only]:

It is further alleged that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm, to wit, a 9 mm semi-automatic pistol, said arming not being an element of the above offense, within the meaning of Penal Code Section 12022(a)(1).

ALLEGATION OF FELONY COMMITTED WHILE ON BAIL AND ON OWN RECOGNIZANCE PURSUANT TO PENAL CODE SECTION 12022.1[As to defendant GREGORY BROWN only]:

It is further alleged that the defendant, GREGORY BROWN, committed the above offense while he was released from custody in a felony offense, on bail and on his own recognizance, within the meaning of Penal Code Section 12022.1.

COUNT II:

The said defendants GREGORY BROWN, WANDA FAIN AND JOSEPH DIGGS, are further accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit:  VIOLATION OF SECTION 664/187 OF THE CALIFORNIA PENAL CODE committed as follows:  The said defendant on or about the 7th day of February, 1995, at the City and County of San Francisco, State of California, did wilfully, unlawfully, and with malice aforethought attempt to murder ROBIN WILLIAMS, a human being.

*180*

| SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES | | | | 009 |
|---|---|---|---|---|

People of the State of California vs. GREGORY L. BROWN | ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 159271-01 | | ☐ Present | S. ARIAN | ☒ Present |
| | Clerk | | Judge | |
| | JOSIE C. ROQUE | | DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Defendant has retained ARIAN/S, Esq.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 1 | PC | 182.1/F | | 01563370 | NG |
| 2 | PC | 664.187/F | | 01563370 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

## SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES

010

People of the State of California vs.    WANDA LOUISE  FAIN     ☒ Present

| SC # 159271-02 | Assistant DA of Record . | ☐ Present | Attorney of Record F. FUETSCH | ☒ Present |
|---|---|---|---|---|
| | Clerk JOSIE C. ROQUE | | Judge DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Court has appointed FUETSCH/F, Public Defender.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 2 | PC | 664.187/F | 1 | 01559424 | NG |
| 3 | PC | 245(A).2/F | | 01559424 | NG |
| 1 | PC | 182.1/F | | 01559424 | NG |

Defendant waives formal reading of the Information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

182

| Dept. | S22 | Date | 03/20/95 | Page | 1 |
|---|---|---|---|---|---|

Attest:    JOSIE C. ROQUE    Deputy Clerk

| SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES | | | | | 011 |

People of the State of California vs.  JOSEPH  DIGGS | ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
| 159271-03 | F. ANDREWS | ☐ Present | MARC  SILVERSMIT | ☒ Present |
| | **Clerk** JOSIE C. ROQUE | | **Judge** DAVID A. GARCIA | |

**Reporter**

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Court has appointed SILVERSMIT/MARC, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea |
| 2 | PC | 664.187/F | 1 | 01559442 | NG |
| 3 | PC | 245(A).2/F | | 01559442 | NG |
| 4 | PC | 12021A1/F | | 01559442 | NG |
| 1 | PC | 182.1/F | | 01559442 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

*183*

| Dept. | S22 | Date | 03/20/95 | Page | 1 |

Attest:  JOSIE C. ROQUE  Deputy Clerk

F I L E D   070

San Francisco County Superior Court

MAR 2 4 1995

ALAN CARLSON, Clerk
BY: _____
         Deputy Clerk

STEPHEN ARIAN, Attorney at Law
State Bar No. 38939
Pier 33 South, #200
San Francisco, CA 94111
(415) 434-1550

Attorney for Defendant GREGORY L. BROWN

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> GREGORY L. BROWN, ) <br> WANDA FAIN, and JOSEPH DIGGS, ) <br><br>_____ Defendants. ___ ) | No. 159271- 01 <br><br> NOTICE OF MOTION FOR <br> DISMISSAL OF COUNTS I <br> AND II OF THE INFORM- <br> ATION UNDER SECTION 995 <br> OF THE PENAL CODE <br><br> Date: April 7, 1995 <br> Time: 9:00 A.M. <br> Dept: 23 |

To the District Attorney of the City and County of San Francisco and to FLOYD ANDREWS, Deputy District Attorney:

PLEASE TAKE NOTICE that on the 7 day of April 1995, at 9:00 A.M. or as soon thereafter as the matter may be heard in Department 23 of the above entitled court, defendant GREGORY L. BROWN, through counsel will move the court for dismissal of Count I and II of the indictment herein as it relates to said defendant GREGORY L. BROWN, and to strike the enhancement allegations as they relate to said GREGORY L. BROWN, all under Section 995 of the California State Penal Code.

This motion is made on the grounds that there is no competent evidence to show probable cause to hold defendant

152

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO

PEOPLE OF THE STATE OF CALIFORNIA VS.　　ACTION NO.____159271____

F. Andrews
ASSISTANT D.A.　　PRESENT

| GREGORY L. BROWN    -1 | | S. Arian | |
|---|---|---|---|
| DEFENDANT | PRESENT | DEFENSE COUNSEL | PRESENT |

| WANDA LOUISE FAIN    -2 | | F. Fuetsch  PD | |
|---|---|---|---|
| DEFENDANT | PRESENT | DEFENSE COUNSEL | PRESENT |

| JOSEPH DIGGS    -3 | | M. Silversmit | |
|---|---|---|---|
| DEFENDANT | PRESENT | DEFENSE COUNSEL | PRESENT |

=====================================================================

CAUSE ON CALENDAR  Mo. 995 PC (all); Mo. handwriting exemplar (Diggs)
Mo. discovery (Diggs); Motion for joinder in motions (Fain, Brown)

9:15 A.M.
The Court grants motion for joinder.
The Court grants the motion for discovery in part.
The Court grants the motion for handwriting exemplar.

9:30 A.M.  The Court orders the matter continued to 1:30 P.M. for
hearing on 995 PC motion.
2:50 P.M.

Hearing resumes.  The Court grants the 995 PC motion as to defendant BROWN
(Great Bodily Injury Allegation only).  The 995 PC motion is denied in all
other respects.

Defendants are given standing to participate in the 1538.5 PC hearing in case
#159194  (Gregory Brown)  Copy of proceedings had in that matter are attached
and incorporated herein by reference.

DEPT._27__ DATE_April 5, 1995__ PAGE_____

ATTEST:_____ DEPUTY CLERK

156

1  MARC J. ZILVERSMIT, ESQ.
   RIORDAN & ROSENTHAL
2  Attorney At Law
   523 Octavia Street
3  San Francisco, CA 94102
   Telephone: (415) 431-3472
4
   Attorney for Defendant JOSEPH DIGGS
5

6              SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                    FOR THE COUNTY OF SAN FRANCISCO

8
   THE PEOPLE OF THE STATE OF CALIFORNIA    )  No. 159271
9                                           )
                        Plaintiff,          )
10                                          )  DECLARATION OF
                    vs.                     )  JUROR JOHN ELWOOD
11                                          )
   JOSEPH DIGGS,                            )
12                                          )
                    Defendant.              )
13  _____)

14       I, John Elwood, declare under penalty of perjury that:

15       I was a juror in the case of People v. Joseph Diggs, Wanda

16  Fain, and Gregory Brown, No. 159271.

17       During our deliberations we prepared a time line from

18  January 6 to February 10 and made a time line for the evening of

19  the incident.  We were particularly concerned with the period

20  between 7:30 pm and 8:35 pm on the night of the shooting.  To

21  help reconstruct what happened during that period, we consulted

22  bus schedules that Jurors Alvin Bernstein and Monell Beurmann

23  brought in on the second day of deliberations.  These schedules

24  provided us information about the intervals between buses and the

25  frequency with which buses came; this information helped us fill

26  in our time line from 7:30 pm until 8:35 pm on the night of the shooting

27
   Declaration of John Elwood
28  Page 1

186

452

1       We also discussed a number of other things in our
2   deliberations.  We discussed the inconsistencies between
3   defendant Wanda Fain's statement and defendant Joseph Diggs'
4   statement.  We discussed how these inconsistencies demonstrated
5   that at least one of them was lying.

6       There was also discussion about access to guns which was in
7   reference to defendant Greg Brown's prior arrest.

8       There were also discussions about defendant Greg Brown being
9   a drug dealer and his propensity for violence and drugs and that
10  kind of lifestyle.  This was mostly in reference to defendant
11  Brown's state of mind.  Some jurors discussed that as a drug
12  dealer, Brown's state of mind may be twisted and power hungry.
13  Some jurors also discussed that as a drug dealer, Brown might
14  feel that there would be no consequences to his actions if he
15  killed Robin Williams. *The jurors who brought up discussions of def. Brown's lifestyle were reminded by other jurors that this line of discussion was speculation & couldn't*
16      Someone also made reference to the fact that if you do crack *be considered in deliberations*
17  cocaine, it does not mean you lose your memory. *discussed*   *JE*

18      Some jurors also discussed defendant Joseph Diggs' medical
19  condition, specifically his tremor.  Juror Jordan Owens stated
20  that this might explain how Diggs could have shot at Robin
21  Williams and missed.

22      Executed this  5  day of  JULY , 1995 in San Francisco,
23  California.

24

25                                    JOHN ELWOOD
                                    Declarant
26

27

Declaration of John Elwood
28  Page 2

1    record that Mr. Brown personally did it?

2         MR. ANDREWS:  I don't believe that with the conspiracy

3    count I have to prove personal great bodily injury.

4         THE COURT:  Well, you read it.  It says:

5              "It is further alleged in the commission of

6         the above offense said defendant, with the

7         intent to inflict such injury, personally

8         inflicted great bodily injury on Robin Williams."

         If you look at page 6 of the Information.

         MR. ANDREWS:  If it's plead that way, it is incorrect.

         The matter is submitted.

         THE COURT:  All right.  Is the matter submitted?

3        MR. ARIAN:  Submitted, your Honor.

4         THE COURT:  All right.  The Court will grant the 995

5    Motion as to the great bodily injury allegation as to Mr.

16   Brown.  The other counts, the 995 motion is denied.

17        Let's go to the motion to suppress now.

18        All right.  We will get started with it now.  All right.

19   Call your first witness.

20        MR. ANDREWS:  Thank you, your Honor.

21        I will call Officer Walsh to the stand.

22        I will ask that Officer Jefferson be designated as my

23   investigating officer.

24        THE COURT:  All right.

25        MR. ARIAN:  Your Honor, may I ask for an order excluding

26   all witnesses?

27        THE COURT:  Yes.  All witnesses will be ordered excluded

28   from the courtroom.  You are not to discuss the testimony

1    instructions as it relates to how you are to conduct

2    yourself.   The process is as important as the product.

3                  Does anyone have a problem or would they

4    have a problem with following the instructions of the

5    Court even if the result that would be reached by

6    following the instructions of the Court were contrary to

7    your gut reaction in a case as serious as the one that's

8    charged here?

9                  PROSPECTIVE JUROR:   I think I would have a

10   problem with it.

11                 MR. FUETSCH:   Do you feel as though --

12   well, actually could you explain what you mean by you

13   would have a problem with that?

14                 PROSPECTIVE JUROR:   I believe there's a

15   higher authority than legal authority that is like moral

16   authority, and to follow like a set of rules rather than

17   more of a moral thing, I think I would be hardpressed to

18   follow the set of rules that are outlined by law.

19                 MR. FUETSCH:   Let me ask you a pointed

20   question.   If, for example, and I'm not saying it's going

21   to happen, if, for example, in the middle of the night

22   the police came to your home and forced their way in and

23   just searched your house and in your home discovered

24   bombs, machine guns, bottom making material, whatever

25   they discovered is illegal.   And the prosecution sought

26   to prosecute you for the crime of possessing that

27   material or that item.   There are laws, of course, that

28   allow you as an individual through your attorney or

133

1      individually to challenge the admissibility of such

2      evidence, and the basis or reason for the law that allows

3      you to challenge such evidence is the law of the

4      constitution.  That is, while we may not condone your

5      conduct in possessing that, we nevertheless must hold the

6      authorities to a very high standard.  In the case I've

7      described, that evidence wouldn't be admissible against

8      you to convict you.

9                Do you think that's wrong?

10               PROSPECTIVE JUROR:  No.  In that particular

11     case I don't think that's wrong, but I think if you

12     misconstrue the constitution or broaden its actual

13     authority, then I think that could be potentially wrong.

14               MR. FUETSCH:  But in the illustration I've

15     given you --

16               PROSPECTIVE JUROR:  That's fine, I wouldn't

17     have any problem with that.

18               MR. FUETSCH:  One individual, and I think

19     actually it was you again, indicated that you had been

20     attacked some years ago by someone, correct?

21               PROSPECTIVE JUROR:  That's correct.

22               MR. FUETSCH:  And you suffered a concussion

23     as a result of that?

24               PROSPECTIVE JUROR:  A mild concussion.

25               MR. FUETSCH:  Has anybody else here

26     suffered a severe injury, say in, for example, an

27     automobile accident or been attacked, anything wherein

28     they've lost consciousness as a result of that injury.

142

1    All of us have ways of looking at things that control the

2    way we lead our lives.  We may think of that as a bias,

3    but it's there.  In this rather imperfect process we try

4    to get at that a little bit, and I'm sure you'll all

5    agree this is an imperfect process.

6              In that connection, and I don't want

7    anyone, as Mr. Zilversmit said, to think that any of us

8    are picking on you.  We're really not, but when we hear

9    things we feel the necessity within the time alotted to

10   us to explore it.

11             Mr. Elwood, I heard you say something about

12   broadening the authority of the constitution.  Do you

13   recall that comment?

14             PROSPECTIVE JUROR:  I do.

15             MR. ARIAN:  I wonder if you could say any

16   more about that.  I didn't get your complete thought.

17             PROSPECTIVE JUROR:  My thought is a lot of,

18   let's say, somebody's on trial, the jurors sit through

19   the entire trial, they have a gut feeling that these

20   defendants are, let's say, guilty, but a lot of

21   circumstantial evidence has been brought in and it's been

22   found -- or a legal issue has been brought up, a minor

23   legal issue that speaks to their innocence.  You're

24   supposed to think they're innocent even though they're

25   guilty, because it's a legal argument and it takes

26   precedence over how you feel.  You're suppose to follow

27   that rather than now you feel, and you're supposed to

28   say, yes, in fact, they're innocent when you feel they're

143

1    guilty.

2              MR. ARIAN:  As I hear what you're telling

3    me, and please correct me, you're saying that as a juror

4    your gut reaction is very important and you're going to

5    pay a lot of attention to that?

6              PROSPECTIVE JUROR:  No, you pay attention

7    to the facts, but I'm saying that the facts don't

8    necessarily jibe with, let's say, some legal arguments

9    that take precedence over the facts.  If you've listened

10   to all the facts and you say, yes, they are innocent or

11   guilty, but some legal precedence makes you dismiss that,

12   then I have a big problem with that.

13             MR. ARIAN:  You might not be able to do

14   that?

15             PROSPECTIVE JUROR:  No, I would not.

16             MR. ARIAN:  Would that hold if the judge at

17   the close of the case instructed you that you were to

18   consider this evidence in a certain way and the

19   instructions of the judge went counter to the feelings

20   you just described, would you be forced to go with your

21   feelings or the higher moral law you found, or would you

22   feel compelled to follow the instructions of the Court

23   with respect to that specific issue that was presented?

24             PROSPECTIVE JUROR:  I really don't know

25   sitting here right now.

26             MR. ARIAN:  Would you have trouble with it?

27             PROSPECTIVE JUROR:  I would have major

28   problems.

158

1       MR. ANDREWS:  Was that a trial here on the

2    third floor of the building?

3       PROSPECTIVE JUROR:  Uh-huh.

4       MR. ANDREWS:  Was that by any chance in

5    front of the same judge?

6       PROSPECTIVE JUROR:  No, it was not.

7       MR. ANDREWS:  Was there a feeling on your

8    part that it was as a result of a lack -- something

9    lacking on the part of the police department?

10       PROSPECTIVE JUROR:  No.

11       MR. ANDREWS:  How about the District

12    Attorney?

13       PROSPECTIVE JUROR:  No.

14       MR. ANDREWS:  When you say there was not

15    enough evidence, was there an identification issue.

16       MR. ZILVERSMIT:  I'll object.  He's seeking

17    to find out how this juror voted on that.

18       MR. ANDREWS:  I didn't ask that.

19       THE COURT:  Sustained.

20       MR. ANDREWS:  Did you -- you don't have any

21    problem with serving as a juror today on a similar kind

22    of case?

23       PROSPECTIVE JUROR:  No.

24       MR. ANDREWS:  Thank you, Your Honor, I have

25    nothing further.

26       THE COURT:  At this point does any party

27    wish to enter a challenge for cause?

28       But before you do that, Mr. Elwood, I was

193

159

little unclear about your statements.

Let me just read this question to you

again:  It important that I have your assurance that you

will without reservation follow my instructions and

rulings on the law and will apply that law to the case.

To put it differently, whether you approve or disapprove

of my instructions, it is your solemn duty to accept as

correct my statements of the law.  You may not substitute

your own idea of what you think the law ought to be.

Would you be able to follow the law as

given by me in this case?

PROSPECTIVE JUROR:  I would, but I may have

a problem with that, internal conflict.

THE COURT:  I understand that.  Okay.

Any party wish to exercise a challenge for

cause?  Please approach sidebar with the court reporter.

[Following bench conference not reported:]

MR. ZILVERSMIT:  I have three challenges

for cause, Judge.  Wiley, Elwood and Lee.

Taking those, Mr. Lee because he obviously

doesn't comprehend sufficient language to participate as

a juror.

MR. ANDREWS:  Are we doing --

THE COURT:  Cause.

MR. ANDREWS:  -- the whole 24 or just

people in the box?

THE COURT:  All 24.

MR. ZILVERSMIT:  So Mr. Lee because of

1349

1    The defense talk about, and it's all smoke

2    and mirrors, he talks about all these other people who

3    could want to kill her; it's the 240 pound guy, the 190

4    pound guy, all these people.

5    And yet how does this work?  How do you we

6    get those people on Jerrold Avenue to shoot her in the

7    head?  It does not happen.  How else do you figure it?

8    Robin is wandering down the street and --

9    finish the sentence somehow.  You can't.  The only thing

10   that works, the only thing that fits the physical

11   evidence, the testimony of the witnesses, the taped

12   statements, testimony from the experts, the only thing

13   that works is that she's on Jerrold Avenue because she's

14   following Joseph Diggs and Wanda Fain.

15   The only theory that fits about the note,

16   Wanda is not writing this because she's mad, she's

17   writing this for Gregory Brown.  They're all in the same

18   house.  Gregory has got a problem, he's got a court case

19   coming up.  But he knows how to deal with this problem.

20   Because he's got a gullible little girl, and he can get

21   her out to Jerrold Avenue and shoot her and leave her for

22   dead through the other two, and that's it.  That would be

23   easier.  That will be clean.  If they had done the wrong

24   right and killed her, you wouldn't be here today because

25   we wouldn't have any clue.

26   And that's all I have to say.  I want you

27   to look carefully at what you've heard, what you saw.  If

28   somebody said something on that stand, just because we're

1350

1    in court, we're in a formal setting, everybody says

2    "please" and "thank you," does not mean you should

3    believe anything you hear here that you wouldn't believe

4    outside those doors?

5              Use your common sense.  You certainly

6    shouldn't believe anything you've heard here unless it

7    fits the evidence you've heard.

8              Based on that I'm asking you to find the

9    defendants guilty of attempted murder of Robin Williams.

10   Because they did it.

11             Conspiracy to commit murder.

12             Assault with a deadly weapon.

13             Possession of a firearm by an ex-felon.

14             Because they did it, for no other reason.

15   They did it, and that's why you're here today.

16             Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Andrews.

18             At this point, ladies and gentlemen, it's

19   quarter to 5.  I have about ten minutes worth of

20   instructions to read you, the concluding instructions,

21   then I want to go over the verdict forms with you which

22   is going to take some time.

23             Rather than do that today we're going to

24   reconvene tommorow at 10.  I will then finish the

25   instructions, go over the jury forms, and we'll be

26   finished.

27             I know one of you has a problem tomorrow,

28   and hopefully you can change the appointment either later

196

# ATTACHMENT 2

194

Response to Question #13a of this petition:

(3) Issues Raised: 1.) Greg's conviction was based on less than proof beyond a reasonable doubt of every element of the charged crime; 2.) Prosecutorial misconduct: the prosecutor introduced false and unsupport and deceitful material statements at trial; 3.) Jury misconduct: juror gave intentional false answers during voir dire; 4.) Ineffective Assistance of trial counsel; and 5.) Ineffective Assistance of appellate counsel.

Response to Question #15 of this petition:

"Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition." Ineffective Assistance of trial and appellate counsels. The issues raised herein are on matters outside the record on appeal, and Greg lacked basic education and all legal knowledge, until now, to pursue the issues herein. Moreover, Greg has been suffering from major depression and mental illnesses since and as a result of his wrongful convictions and imprisonment.

198

# ATTACHMENT 3

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE CITY AND COUNTY OF SAN FRANCISCO

Department No. 22

IN THE MATTER OF THE APPLICATION )
OF                                )
                                  )    WRIT NO. 5568
                                  )
GREGORY L. BROWN                  )    ORDER      ENDORSED
                                  )               F I L E D
      Petitioner,                 )        San Francisco County Superior Court
                                  )
FOR A WRIT OF HABEAS CORPUS       )             MAY 3 0 2007
                                  )
_____  )    GORDON PARK-LI, Clerk
                                       BY: ____ CARLOS BARRAZA
                                                        Deputy Clerk

On April 25, 2007 this Court received a Petition for Writ of
Habeas Corpus from petitioner Gregory L. Brown ("Petitioner").  On
May 25, 1995, Petitioner was convicted of conspiring to commit
murder and of attempted murder.  On January 28, 1998, the First
District Court of Appeal affirmed the judgment with sentencing
modifications.  On April 29, 1998, the California Supreme Court
denied review.  Petitioner is serving 56 years to life at Corcoran
State Prison.

Petitioner seeks habeas relief on four grounds.  He claims
that the verdict was not supported by sufficient evidence and that
the prosecutor "maliciously and intentionally introduced false and
unsupported and deceitful material statements at trial."  He also
claims that jurors committed misconduct and that his trial and
appellate counsel provided ineffective assistance of counsel.

Petitioner was convicted almost 12 years ago and the Court of
Appeal affirmed his conviction over nine years ago.  Under well-
established California law, a petition should be filed as promptly
as the circumstances allow.  As a result, the petitioner must
explain in detail and "justify any substantial delay in presenting
a claim."  (*In re Clark* (1993) 5 Cal.4th 750, 765); *In re Swain*
(1949) 34 Cal.2d 300, 302.)  Where there has been significant delay
in seeking habeas relief, the petitioner must describe
circumstances sufficient to justify or explain the delay.  To avoid
the bar of untimeliness, the petitioner has the burden of
establishing: (1) the absence of substantial delay; (2) good cause

1   for the delay; or (3) that the claim falls within an exception to
    the bar of untimeliness. (*In re Robbins* (1998) 18 Cal.4th 770,
2   781; *see also Clark, supra*, 5 Cal.4th at 775 ["[i]f a petitioner
    had reason to suspect that a basis for habeas corpus relief was
3   available, but did nothing to promptly confirm those suspicions,
    that failure must be justified"].)
4

5        As an initial matter, Petitioner's insufficient evidence
    and juror misconduct claims are barred because they were raised
6   - and rejected - on appeal.  Because these issues were
    "previously raised and rejected on direct appeal, and because
7   the [P]etitioner does not allege sufficient justification for
    the issues['] renewal on habeas corpus," the issues are
8   "procedurally barred from being raised again."  (*Harris, supra*,
    5 Cal.4th at 825; *see also In re Sakarias* (2005) 35 Cal.4th 140,
9   145.)

10       Petitioner's ineffective assistance of trial and appellate
    counsel claims fail for two reasons.  First, he has failed to
11  justify the delay in bringing these claims.  Instead of alleging
    facts to demonstrate good cause for the delay, Petitioner claims
12  that he "lacked basic education and all legal knowledge, until now"
    and that he was somehow prevented from seeking relief because he
13  has "been suffering from major depression and mental illness."
    These contentions have no merit.  Petitioner does not allege when
14  he began suffering "major depression and mental illness," nor does
    he allege how these conditions prevented him from seeking writ
15  relief.  Moreover, Petitioner does not explain how his alleged lack
    of "legal knowledge" prevented him from consulting his appellate
16  attorney about a possible claim for ineffective assistance of trial
    counsel, or from contacting an attorney to inquire into the quality
17  of representation provided by his appellate counsel.
18

19       Even assuming Petitioner's ineffective assistance of
    counsel claims are not time-barred, these claims fail because
20  Petitioner has not provided any documentation to support his
    claims that his trial and appellate counsel provided ineffective
21  assistance.  It is well settled that a petition for writ of
    habeas corpus should:  (1) state fully and with particularity
22  the facts upon which relief is sought; and (2) include copies of
    reasonably available documentary evidence supporting the claim,
23  including pertinent portions of trial transcripts and affidavits
    or declarations.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)
24  Conclusory allegations made without any explanation of their
    basis do not warrant relief.  (*People v. Karis* (1988) 46 Cal.3d
25  612, 656; *see also In re Swain* (1949) 34 Cal.2d 300, 303-304.)

1  Petitioner's failure to attach any supporting documentation to
   his petition prevents this Court from conducting a meaningful
2  review of his ineffective assistance of counsel claims.

3      "To establish ineffective assistance of counsel . . . a
4  defendant must show that counsel's representation fell below an
   objective standard of reasonableness under prevailing
5  professional norms, and that counsel's deficient performance was
   prejudicial, i.e., that a reasonable probability exists that,
6  but for counsel's failings, the result would have been more
   favorable to the defendant." (*Strickland v. Washington* (1984)
7  466 U.S. 668, 687-688; *People v. Waidla* (2000) 22 Cal.4th 690,
   718.)  Even assuming Petitioner's claims about his attorneys'
8  conduct at trial and during his appeal are accurate, his claims
   fail because he has not demonstrated that his counsels'
9  performance "fell below an objective standard of reasonableness"
   and that there is a reasonable probability that, but for
10 counsel's alleged errors, "the result of the proceeding would
   have been different." (*People v. Ledesma* (1987) 43 Cal.3d 171,
11 218.)  "When a defendant challenges a conviction, the question
   is whether there is a reasonable probability that, absent the
12 errors, the factfinder would have had a reasonable doubt
   respecting guilt." (*Ledesma, supra,* 43 Cal.3d at 218, citing
13 *Strickland, supra,* 466 U.S. at 693-94].)

14
       For the foregoing reasons, Petitioner's writ of habeas corpus
15 is DENIED.

16  5/25/07
17  Date                              Judge of the Superior Court

18

19

20

21

22

23

24

25

ATTACHMENT $4$



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

**FILED**

DIVISION FOUR

JUL - 5 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
by _____
DEPUTY

In re GREGORY L. BROWN,

on Habeas Corpus.

A118248

(San Francisco County
Super. Ct. No. 5568)

BY THE COURT:

The petition for writ of habeas corpus is denied. Petitioner has not demonstrated good cause for a delay of over 9 years in seeking habeas relief, nor has he shown his petition should be considered under one of the exceptions to the requirement that habeas relief be timely sought. (See *In re Robbins* (1998) 18 Cal.4th 770, 780-781.) Further, some of the claims asserted in the petition are barred because they were raised and rejected on appeal. (*In re Waltreus* (1965) 62 Cal.2d 218, 225.)

(Ruvolo, P.J., and Rivera, J., joined in the decision.)

JUL - 5 2007

**RUVOLO, P.J.**

Date: _____    _____ P.J.



_Declaration of Service_

Case Name : _Brown V. Wheden, SATF-Corcoran Prison_

Case No. : _____

I declare :

On _August 1, 2007_ , I served the attached
_Gregg's Supporting Documents For The Petition For Writ_
_Of Habeas Corpus Served On August 1, 2007_
by placing a true copy thereof enclosed in a sealed
envelope with postage thereon fully prepaid, in the
prison mail collection system at _SATF-Corcoran_
_____, in California, addressed as follows :

California Supreme Court
350 McAllister St.
San Francisco, CA 94102

I declare under penalty of perjury that
the foregoing is true and correct.

Dated : 8/1/07

_Gregory L. Brown_
Gregory L. Brown

205

# EXHIBIT F



S155258

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re GREGORY L. BROWN on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Swain* (1949) 34 Cal.2d 300, 304; *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Waltreus* (1965) 62 Cal.2d 218; *In re Lindley* (1947) 29 Cal.2d 709; *In re Dixon* (1953) 41 Cal.2d 756.)

George, C. J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN **3 0** 2008

Frederick K. Ohlrich Clerk

---

Deputy

---

**BAXTER**

Acting Chief Justice



# EXHIBIT G

FILED 001
San Francisco County Superior Court

MAR 1 7 1995

ALAN CARLSON, Clerk
BY: _Nuan C. a. for_
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff,<br><br>  vs.<br><br>GREGORY BROWN, WANDA FAIN<br>and JOSEPH DIGGS,<br><br>    Defendants | NO. 159271<br><br>F. ANDREWS<br><br>INFORMATION |

COUNT I:

GREGORY BROWN, WANDA FAIN and JOSEPH DIGGS

are accused by the District Attorney of the City and County of San Francisco, State of California, by this Information, of the crime of felony, to wit:  VIOLATION OF SECTION 182.1 OF THE CALIFORNIA PENAL CODE committed as follows:  The said defendants on or about the 7th day of January, 1995 to the 7th day of February, 1995, both dates inclusive, at the City and County of San Francisco, State of California, did wilfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of MURDER, in violation of Section 187 of the Penal Code, a felony; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the County of San Francisco:

OVERT ACTS

OVERT ACT NUMBER 1

It is alleged in the City and County of San Francisco, on or about the 7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did write a note containing threats against Robin Williams.

002

People v. Gregory Brown, et al.                    SC 159271

Page 2


OVERT ACT NUMBER 2

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did
put the note in an envelope with a photograph of Robin Williams which
was taken by defendant Gregory Brown and which was given to Fain by
defendant Gregory Brown.


OVERT ACT NUMBER 3

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Wanda Fain did
deliver the threatening note and photograph to Robin Williams.


OVERT ACT NUMBER 4

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Gregory Brown
did accompany defendant Wanda Fain to deliver the threatening note to
Robin Williams.


OVERT ACT NUMBER 5

It is alleged in the City and County of San Francisco, on or about the
7th day of January, 1995 to February 7, 1995, defendant Gregory Brown
did encourage defendants Wanda Fain and Joseph Diggs to murder Robin
Williams.


OVERT ACT NUMBER 6

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Gregory Brown, Wanda Fain
and Joseph Diggs did reside at the same address of 126 Blythdale
Street in San Francisco.


OVERT ACT NUMBER 7

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendant Wanda Fain did provide
cocaine base, also called "crack" cocaine, to Robin Williams.

G 03

People v. Gregory Brown, et al.                    SC 159271

Page 3


## OVERT ACT NUMBER 8

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendant Wanda Fain did encourage
Robin Williams to go to Jerrold Street with defendants Wanda Fain and
Joseph Diggs.


## OVERT ACT NUMBER 9

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did get on the Number 15 bus with Robin Williams.


## OVERT ACT NUMBER 10

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did exit the bus with Robin Williams at 3rd and McKinnon Streets in
San Francisco.


## OVERT ACT NUMBER 11

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did take Robin Williams with them to Jerrold Street with the intention
of murdering Robin Williams.


## OVERT ACT NUMBER 12

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did walk on Jerrold Street approaching Quint Street with Robin
Williams.


## OVERT ACT NUMBER 13

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that while walking with Robin Williams
defendants Wanda Fain and Joseph Diggs did shoot Robin Williams in the
back of the head with a 9mm semi-automatic pistol.

311

G04

People v. Gregory Brown, et al.                    SC 159271

Page 4


OVERT ACT NUMBER 14

It is alleged in the City and County of San Francisco, on or about the
7th day of February, 1995, that defendants Wanda Fain and Joseph Diggs
did shoot at Robin Williams again while she was lying on the ground.


USE OF FIREARM ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5(a)
[As to defendant JOSEPH DIGGS only]:

It is further alleged that in the commission and attempted commission
of the above offense, the said defendant, JOSEPH DIGGS, personally
used a firearm, to wit, a 9 mm semi-automatic pistol, within the
meaning of Penal Code Section 12022.5(a) and also causing the above
offense to be a serious felony within the meaning of Penal Code
Section 1192.7(c)(8).


ARMED WITH A FIREARM ALLEGATION PURSUANT TO PENAL CODE SECTION
12022(a)(1)[As to defendants GREGORY BROWN and WANDA FAIN only]:

It is further alleged that in the commission and attempted commission
of the above offense a principal in said offense was armed with a
firearm, to wit, a 9 mm semi-automatic pistol, said arming not being
an element of the above offense, within the meaning of Penal Code
Section 12022(a)(1).

ALLEGATION OF FELONY COMMITTED WHILE ON BAIL AND ON OWN RECOGNIZANCE
PURSUANT TO PENAL CODE SECTION 12022.1[As to defendant GREGORY BROWN
only]:

It is further alleged that the defendant, GREGORY BROWN, committed the
above offense while he was released from custody in a felony offense,
on bail and on his own recognizance, within the meaning of Penal Code
Section 12022.1.

COUNT II:

The said defendants GREGORY BROWN, WANDA FAIN AND JOSEPH DIGGS, are
further accused by the District Attorney of the City and County of San
Francisco, State of California, by this Information, of the crime of
felony, to wit:  VIOLATION OF SECTION 664/187 OF THE CALIFORNIA PENAL
CODE committed as follows:  The said defendant on or about the 7th day
of February, 1995, at the City and County of San Francisco, State of
California, did wilfully, unlawfully, and with malice aforethought
attempt to murder ROBIN WILLIAMS, a human being.

*FB 312*

SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES          009

People of the State of California vs.    GREGORY L. BROWN          ☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|------|------------------------|---|--------------------|---|
| 159271-01 | | ☐ Present | S. ARIAN | ☒ Present |
| | Clerk | | Judge | |
| | JOSIE C. ROQUE | | DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Defendant has retained ARIAN/S, Esq.

| Count | Code | Section | Degree | MC # | Plea |
|-------|------|---------|--------|------|------|
| 1 | PC | 182.1/F | | 01563370 | NG |
| 2 | PC | 664.187/F | | 01563370 | NG |

Defendant waives formal reading of the information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

| SUPERIOR COURT IN THE CITY AND COUNTY OF SAN FRANCISCO - MINUTES | | 010 |
|---|---|---|

People of the State of California vs.    WANDA LOUISE  FAIN          ☒ Present

| SC #<br>159271-02 | Assistant DA of Record<br>. | ☐ Present | Attorney of Record<br>F. FUETSCH | ☒ Present |
|---|---|---|---|---|
| | Clerk<br>JOSIE C. ROQUE | | Judge<br>DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN #4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Court has appointed FUETSCH/F, Public Defender.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 2 | PC | 664.187/F | 1 | 01559424 | NG |
| 3 | PC | 245(A).2/F | | 01559424 | NG |
| 1 | PC | 182.1/F | | 01559424 | NG |

Defendant waives formal reading of the Information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

| Dept. S22 | Date 03/20/95 | Page 1 |
|---|---|---|
| Attest: JOSIE C. ROQUE | | Deputy Clerk |

| | SUPERIOR CO IN THE CITY AND COUNTY OF SAN F CISCO - MINUTES | | | 0 1 1 |
|---|---|---|---|---|

People of the State of California vs.    JOSEPH    DIGGS

☒ Present

| SC # | Assistant DA of Record | | Attorney of Record | |
|---|---|---|---|---|
| 159271-03 | F. ANDREWS | ☐ Present | MARC    SILVERSMIT | ☒ Present |
| | Clerk | | Judge | |
| | JOSIE C. ROQUE | | DAVID A. GARCIA | |

Reporter

JOSEPH H. VICKSTEIN#4780, 850 BRYANT STREET, ROOM 306 - SAN FRANCISCO, CA 94103

Cause on Calendar for Arraignment
Special appearance by G. KOELLING, DA for the Assistant DA of Record.
Court has appointed SILVERSMIT/MARC, conflict counsel.

| Count | Code | Section | Degree | MC # | Plea |
|---|---|---|---|---|---|
| 2 | PC | 664.187/F | 1 | 01559442 | NG |
| 3 | PC | 245(A).2/F | | 01559442 | NG |
| 4 | PC | 12021A1/F | | 01559442 | NG |
| 1 | PC | 182.1/F | | 01559442 | NG |

Defendant waives formal reading of the Information.

Defendant is duly arraigned. Not guilty plea(s) as to each count
and denial of any and all allegation(s), entered.

The defendant declares his/her true name to be that stated in the accusatory pleading.

Cause is ordered continued to 04/24/95 at 09:30 a.m. in Department S22 for Trial.

| | | | |
|---|---|---|---|
| Dept. S22 | Date | 03/20/95 | Page 1 |
| Attest: | JOSIE C. ROQUE | | Deputy Clerk |

F I L E D
San Francisco County Superior Court

MAR 2 4 1995

ALAN CARLSON, Clerk
BY: _____
Deputy Clerk

STEPHEN ARIAN, Attorney at Law
State Bar No. 38939
Pier 33 South, #200
San Francisco, CA 94111
(415) 434-1550

Attorney for Defendant GREGORY L. BROWN

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>GREGORY L. BROWN, )<br>WANDA FAIN, and JOSEPH DIGGS, )<br>)<br>Defendants. ) | No. 159271- 01<br><br>NOTICE OF MOTION FOR<br>DISMISSAL OF COUNTS I<br>AND II OF THE INFORM-<br>ATION UNDER SECTION 995<br>OF THE PENAL CODE<br><br>Date: April 7, 1995<br>Time: 9:00 A.M.<br>Dept: 23 |

To the District Attorney of the City and County of San Francisco and to FLOYD ANDREWS, Deputy District Attorney:

PLEASE TAKE NOTICE that on the 7 day of April 1995, at 9:00 A.M. or as soon thereafter as the matter may be heard in Department 23 of the above entitled court, defendant GREGORY L. BROWN, through counsel will move the court for dismissal of Count I and II of the indictment herein as it relates to said defendant GREGORY L. BROWN, and to strike the enhancement allegations as they relate to said GREGORY L. BROWN, all under Section 995 of the California State Penal Code.

This motion is made on the grounds that there is no competent evidence to show probable cause to hold defendant

BROWN 2/995                1

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO                152

PEOPLE OF THE STATE OF CALIFORNIA VS.        ACTION NO.____159271_____

|  |  | F. Andrews | |
|---|---|---|---|
|  |  | ASSISTANT D.A. | PRESENT |
| GREGORY L. BROWN          -1 |  | S. Arian | |
| DEFENDANT | PRESENT | DEFENSE COUNSEL | PRESENT |
| WANDA LOUISE FAIN          -2 |  | F. Fuetsch  PD | |
| DEFENDANT | PRESENT | DEFENSE COUNSEL | PRESENT |
| JOSEPH DIGGS          -3 |  | M. Silversmit | |
| DEFENDANT | PRESENT | DEFENSE COUNSEL | PRESENT |

=====================================================================

CAUSE ON CALENDAR  Mo. 995 PC (all); Mo. handwriting exemplar (Diggs)
Mo. discovery (Diggs); Motion for joinder in motions (Fain, Brown)

9:15 A.M.
The Court grants motion for joinder.
The Court grants the motion for discovery in part.
The Court grants the motion for handwriting exemplar.

9:30 A.M.  The Court orders the matter continued to 1:30 P.M. for
hearing on 995 PC motion.
2:50 P.M.

Hearing resumes.  The Court grants the 995 PC motion as to defendant BROWN
(Great Bodily Injury Allegation only).  The 995 PC motion is denied in all
other respects.

Defendants are given standing to participate in the 1538.5 PC hearing in case
#159194 (Gregory Brown) Copy of proceedings had in that matter are attached
and incorporated herein by reference.

DEPT. 27   DATE April/5, 1995   PAGE_____

ATTEST:_____  DEPUTY CLERK

CRM-04 (8/89)

451

1 | MARC J. ZILVERSMIT, ESQ.
RIORDAN & ROSENTHAL
2 | Attorney At Law
523 Octavia Street
3 | San Francisco, CA 94102
Telephone: (415) 431-3472
4 |
Attorney for Defendant JOSEPH DIGGS
5 |

6 |               SUPERIOR COURT OF THE STATE OF CALIFORNIA

7 |                   FOR THE COUNTY OF SAN FRANCISCO

8 |

9 | THE PEOPLE OF THE STATE OF CALIFORNIA   )   No. 159271
                                            )
10 |                        Plaintiff,        )
                                            )   DECLARATION OF
11 |            vs.                           )   JUROR JOHN ELWOOD
                                            )
12 | JOSEPH DIGGS,                           )
                                            )
13 |                        Defendant.       )
     _____    )

14 |     I, John Elwood, declare under penalty of perjury that:

15 |     I was a juror in the case of People v. Joseph Diggs, Wanda

16 | Fain, and Gregory Brown, No. 159271.

17 |     During our deliberations we prepared a time line from

18 | January 6 to February 10 and made a time line for the evening of

19 | the incident.  We were particularly concerned with the period

20 | between 7:30 pm and 8:35 pm on the night of the shooting.  To

21 | help reconstruct what happened during that period, we consulted

22 | bus schedules that Jurors Alvin Bernstein and Monell Beurmann

23 | brought in on the second day of deliberations.  These schedules

24 | provided us information about the intervals between buses and the

25 | frequency with which buses came; this information helped us fill

26 | in our time line from 7:30 pm until 8:35 pm on the night of the shooting

27 |
Declaration of John Elwood
28 | Page 1

1     We also discussed a number of other things in our                    · 452

2  deliberations.  We discussed the inconsistencies between

3  defendant Wanda Fain's statement and defendant Joseph Diggs'

4  statement.  We discussed how these inconsistencies demonstrated

5  that at least one of them was lying.

6     There was also discussion about access to guns which was in

7  reference to defendant Greg Brown's prior arrest.

8     There were also discussions about defendant Greg Brown being

9  a drug dealer and his propensity for violence and drugs and that

10 kind of lifestyle.  This was mostly in reference to defendant

11 Brown's state of mind.  Some jurors discussed that as a drug

12 dealer, Brown's state of mind may be twisted and power hungry.

13 Some jurors also discussed that as a drug dealer, Brown might

14 feel that there would be no consequences to his actions if he    · lifestyle

15 killed Robin Williams. *The jurors who brought up discussions of def. Browns lifestyle*
   *were reminded by other jurors that this line of derivation was speculation & could not*

16    Someone also made reference to the fact [that if you do crack *be considered*
                                                    *discussed*                       *M delbossi*

17 cocaine, it does not mean you lose your memory.                              *SPL*

18     Some jurors also discussed defendant Joseph Diggs' medical

19 condition, specifically his tremor.  Juror Jordan Owens stated

20 that this might explain how Diggs could have shot at Robin

21 Williams and missed.

22     Executed this __5__ day of __JULY__, 1995 in San Francisco,

23 California.

24

25                                          _____
                                            JOHN ELWOOD
26                                          Declarant

27

    Declaration of John Elwood
28  Page 2

1    record that Mr. Brown personally did it?

2        MR. ANDREWS:  I don't believe that with the conspiracy

3    count I have to prove personal great bodily injury.

4        THE COURT:  Well, you read it.  It says:

5            "It is further alleged in the commission of

6        the above offense said defendant, with the

7        intent to inflict such injury, personally

8        inflicted great bodily injury on Robin Williams."

        If you look at page 6 of the Information.

        MR. ANDREWS:  If it's plead that way, it is incorrect.

        The matter is submitted.

        THE COURT:  All right.  Is the matter submitted?

3        MR. ARIAN:  Submitted, your Honor.

4        THE COURT:  All right.  The Court will grant the 995

5    Motion as to the great bodily injury allegation as to Mr.

16    Brown.  The other counts, the 995 motion is denied.

17        Let's go to the motion to suppress now.

18        All right.  We will get started with it now.  All right.

19    Call your first witness.

20        MR. ANDREWS:  Thank you, your Honor.

21        I will call Officer Walsh to the stand.

22        I will ask that Officer Jefferson be designated as my

23    investigating officer.

24        THE COURT:  All right.

25        MR. ARIAN:  Your Honor, may I ask for an order excluding

26    all witnesses?

27        THE COURT:  Yes.  All witnesses will be ordered excluded

28    from the courtroom.  You are not to discuss the testimony



1    instructions as it relates to how you are to conduct

2    yourself.  The process is as important as the product.

3                 Does anyone have a problem or would they

4    have a problem with following the instructions of the

5    Court even if the result that would be reached by

6    following the instructions of the Court were contrary to

7    your gut reaction in a case as serious as the one that's

8    charged here?

9                 PROSPECTIVE JUROR:  I think I would have a

10   problem with it.

11                MR. FUETSCH:  Do you feel as though --

12   well, actually could you explain what you mean by you

13   would have a problem with that?

14                PROSPECTIVE JUROR:  I believe there's a

15   higher authority than legal authority that is like moral

16   authority, and to follow like a set of rules rather than

17   more of a moral thing, I think I would be hardpressed to

18   follow the set of rules that are outlined by law.

19                MR. FUETSCH:  Let me ask you a pointed

20   question.  If, for example, and I'm not saying it's going

21   to happen, if, for example, in the middle of the night

22   the police came to your home and forced their way in and

23   just searched your house and in your home discovered

24   bombs, machine guns, bottom making material, whatever

25   they discovered is illegal.  And the prosecution sought

26   to prosecute you for the crime of possessing that

27   material or that item.  There are laws, of course, that

28   allow you as an individual through your attorney or

1    individually to challenge the admissibility of such

2    evidence, and the basis or reason for the law that allows

3    you to challenge such evidence is the law of the

4    constitution.  That is, while we may not condone your

5    conduct in possessing that, we nevertheless must hold the

6    authorities to a very high standard.  In the case I've

7    described, that evidence wouldn't be admissible against

8    you to convict you.

9                   Do you think that's wrong?

10                  PROSPECTIVE JUROR:  No.  In that particular

11   case I don't think that's wrong, but I think if you

12   misconstrue the constitution or broaden its actual

13   authority, then I think that could be potentially wrong.

14                  MR. FUETSCH:  But in the illustration I've

15   given you --

16                  PROSPECTIVE JUROR:  That's fine, I wouldn't

17   have any problem with that.

18                  MR. FUETSCH:  One individual, and I think

19   actually it was you again, indicated that you had been

20   attacked some years ago by someone, correct?

21                  PROSPECTIVE JUROR:  That's correct.

22                  MR. FUETSCH:  And you suffered a concussion

23   as a result of that?

24                  PROSPECTIVE JUROR:  A mild concussion.

25                  MR. FUETSCH:  Has anybody else here

26   suffered a severe injury, say in, for example, an

27   automobile accident or been attacked, anything wherein

28   they've lost consciousness as a result of that injury.

1    All of us have ways of looking at things that control the

2    way we lead our lives.  We may think of that as a bias,

3    but it's there.  In this rather imperfect process we try

4    to get at that a little bit, and I'm sure you'll all

5    agree this is an imperfect process.

6            In that connection, and I don't want

7    anyone, as Mr. Zilversmit said, to think that any of us

8    are picking on you.  We're really not, but when we hear

9    things we feel the necessity within the time alotted to

10   us to explore it.

11           Mr. Elwood, I heard you say something about

12   broadening the authority of the constitution.  Do you

13   recall that comment?

14           PROSPECTIVE JUROR:  I do.

15           MR. ARIAN:  I wonder if you could say any

16   more about that.  I didn't get your complete thought.

17           PROSPECTIVE JUROR:  My thought is a lot of,

18   let's say, somebody's on trial, the jurors sit through

19   the entire trial, they have a gut feeling that these

20   defendants are, let's say, guilty, but a lot of

21   circumstantial evidence has been brought in and it's been

22   found -- or a legal issue has been brought up, a minor

23   legal issue that speaks to their innocence.  You're

24   supposed to think they're innocent even though they're

25   guilty, because it's a legal argument and it takes

26   precedence over how you feel.  You're suppose to follow

27   that rather than now you feel, and you're supposed to

28   say, yes, in fact, they're innocent when you feel they're

223

143

guilty.

MR. ARIAN:  As I hear what you're telling me, and please correct me, you're saying that as a juror your gut reaction is very important and you're going to pay a lot of attention to that?

PROSPECTIVE JUROR:  No, you pay attention to the facts, but I'm saying that the facts don't necessarily jibe with, let's say, some legal arguments that take precedence over the facts.  If you've listened to all the facts and you say, yes, they are innocent or guilty, but some legal precedence makes you dismiss that, then I have a big problem with that.

MR. ARIAN:  You might not be able to do that?

PROSPECTIVE JUROR:  No, I would not.

MR. ARIAN:  Would that hold if the judge at the close of the case instructed you that you were to consider this evidence in a certain way and the instructions of the judge went counter to the feelings you just described, would you be forced to go with your feelings or the higher moral law you found, or would you feel compelled to follow the instructions of the Court with respect to that specific issue that was presented?

PROSPECTIVE JUROR:  I really don't know sitting here right now.

MR. ARIAN:  Would you have trouble with it?

PROSPECTIVE JUROR:  I would have major problems.

158

| | |
|---|---|
| 1 | MR. ANDREWS:  Was that a trial here on the |
| 2 | third floor of the building? |
| 3 | PROSPECTIVE JUROR:  Uh-huh. |
| 4 | MR. ANDREWS:  Was that by any chance in |
| 5 | front of the same judge? |
| 6 | PROSPECTIVE JUROR:  No, it was not. |
| 7 | MR. ANDREWS:  Was there a feeling on your |
| 8 | part that it was as a result of a lack -- something |
| 9 | lacking on the part of the police department? |
| 10 | PROSPECTIVE JUROR:  No. |
| 11 | MR. ANDREWS:  How about the District |
| 12 | Attorney? |
| 13 | PROSPECTIVE JUROR:  No. |
| 14 | MR. ANDREWS:  When you say there was not |
| 15 | enough evidence, was there an identification issue. |
| 16 | MR. ZILVERSMIT:  I'll object.  He's seeking |
| 17 | to find out how this juror voted on that. |
| 18 | MR. ANDREWS:  I didn't ask that. |
| 19 | THE COURT:  Sustained. |
| 20 | MR. ANDREWS:  Did you -- you don't have any |
| 21 | problem with serving as a juror today on a similar kind |
| 22 | of case? |
| 23 | PROSPECTIVE JUROR:  No. |
| 24 | MR. ANDREWS:  Thank you, Your Honor, I have |
| 25 | nothing further. |
| 26 | THE COURT:  At this point does any party |
| 27 | wish to enter a challenge for cause? |
| 28 | But before you do that, Mr. Elwood, I was |

159

1        little unclear about your statements.

2                Let me just read this question to you

3        again:   It important that I have your assurance that you

4        will without reservation follow my instructions and

5        rulings on the law and will apply that law to the case.

6        To put it differently, whether you approve or disapprove

7        of my instructions, it is your solemn duty to accept as

8        correct my statements of the law.  You may not substitute

9        your own idea of what you think the law ought to be.

10               Would you be able to follow the law as

11       given by me in this case?

12               PROSPECTIVE JUROR:  I would, but I may have

13       a problem with that, internal conflict.

14               THE COURT:  I understand that.  Okay.

15               Any party wish to exercise a challenge for

16       cause?  Please approach sidebar with the court reporter.

17               [Following bench conference not reported:]

18               MR. ZILVERSMIT:  I have three challenges

19       for cause, Judge.  Wiley, Elwood and Lee.

20               Taking those, Mr. Lee because he obviously

21       doesn't comprehend sufficient language to participate as

22       a juror.

23               MR. ANDREWS:  Are we doing --

24               THE COURT:  Cause.

25               MR. ANDREWS:  -- the whole 24 or just

26       people in the box?

27               THE COURT:  All 24.

28               MR. ZILVERSMIT:  So Mr. Lee because of

1349

1       The defense talk about, and it's all smoke

2    and mirrors, he talks about all these other people who

3    could want to kill her; it's the 240 pound guy, the 190

4    pound guy, all these people.

5            And yet how does this work?  How do you we

6    get those people on Jerrold Avenue to shoot her in the

7    head?  It does not happen.  How else do you figure it?

8            Robin is wandering down the street and --

9    finish the sentence somehow.  You can't.  The only thing

10   that works, the only thing that fits the physical

11   evidence, the testimony of the witnesses, the taped

12   statements, testimony from the experts, the only thing

13   that works is that she's on Jerrold Avenue because she's

14   following Joseph Diggs and Wanda Fain.

15           The only theory that fits about the note,

16   Wanda is not writing this because she's mad, she's

17   writing this for Gregory Brown.  They're all in the same

18   house.  Gregory has got a problem, he's got a court case

19   coming up.  But he knows how to deal with this problem.

20   Because he's got a gullible little girl, and he can get

21   her out to Jerrold Avenue and shoot her and leave her for

22   dead through the other two, and that's it.  That would be

23   easier.  That will be clean.  If they had done the wrong

24   right and killed her, you wouldn't be here today because

25   we wouldn't have any clue.

26           And that's all I have to say.  I want you

27   to look carefully at what you've heard, what you saw.  If

28   somebody said something on that stand, just because we're

1350

1    in court, we're in a formal setting, everybody says
2    "please" and "thank you," does not mean you should
3    believe anything you hear here that you wouldn't believe
4    outside those doors?
5                   Use your common sense.  You certainly
6    shouldn't believe anything you've heard here unless it
7    fits the evidence you've heard.
8                   Based on that I'm asking you to find the
9    defendants guilty of attempted murder of Robin Williams.
10   Because they did it.
11                  Conspiracy to commit murder.
12                  Assault with a deadly weapon.
13                  Possession of a firearm by an ex-felon.
14                  Because they did it, for no other reason.
15   They did it, and that's why you're here today.
16                  Thank you, Your Honor.
17                  THE COURT:  Thank you, Mr. Andrews.
18                  At this point, ladies and gentlemen, it's
19   quarter to 5.  I have about ten minutes worth of
20   instructions to read you, the concluding instructions,
21   then I want to go over the verdict forms with you which
22   is going to take some time.
23                  Rather than do that today we're going to
24   reconvene tommorow at 10.  I will then finish the
25   instructions, go over the jury forms, and we'll be
26   finished.
27                  I know one of you has a problem tomorrow,
28   and hopefully you can change the appointment either later

EXHIBIT - *H*

229

SAN QUENTIN STATE PRISON
PSYCHOLOGICAL EVALUATION FORM

Status: NC

I. Identifying Information

Rec,d: 10/31/95

Name: BROWN, GREGORY   CDC#: J-8 2241

II. Basis of Referral/Presenting Problem:

30 year old, SINGLE AFRO-AMERICAN MALE

Referred by: BRIEF SCREENING Due to: POSSIBLE MAJOR DEPRESSION

INMATE HIMSELF EXPRESS HES UPSET OVER HIS CASE WHERE

HE CLAIMS TO HAVE BEEN WRONGFULLY ACCUSED.

III. Mental Health History:

Social: RAISED BY MOTHER, EMPLOYED, 2 CHILDREN,

Psych Hosp: DENIES

Psych Meds: DENIES

Suicide Attempts: DENIES

Medical Problems: BACK & KNEE INJURY

Substance Abuse: DENIED

IV. Current Mental Status Examination:

Appearance: WELL GROOMED    Behavior: APPROPRIATE

Mood/Affect: DEPRESSED    Speech: NORMAL

Perceptual Disorders: Ø AUDITORY OR VISUAL HALLUCINATION

Thought Content: Ø SUICIDAL, HOMICIDAL, OR PARANOID IDEATION

Thought Process: INTACT    Sensorium: INTACT

Memory: GOOD    Concentration: FAIR

Information: GOOD    Judgement: GOOD

Insight: GOOD

(CONTINUED)

| Clinician's Name | Date | Inmate Name (Last, First) |
|---|---|---|
| (Print)  R. Flax, Ph.D. | 11/3/95 | BROWN, GREGORY |
| (Signature) | | CDC # J-8224 1    Cell # 4C44 |

230

State of California, Department of Corrections: N / C / S Region, SA = C , Institution = MCSP ☒Male ☐Female

**CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER:** Date 3/6/98

Variety Use Include: Admission Intake, Transfer, Parole, Discharge, MHCB Screen & Assessment. Page 1 of 5

Current Setting: ☐GP ☐Ad Seg ☐SHU | ☐RC ☒CCCMS ☐ EOP ☐ PSU ☐ MHCB ☐ Other:

| I/M Ethnicity: AA | Non English Language: | Level: I / II /III / IV /AS / SHU |
|---|---|---|
| CDC Arrival date: | CDC Release date: 2032 | ☐MH 1 /MH 4, MH 7 Date: 3/6/98 |
| Inmate interviewed on: 3/6/98 | Level of Cooperation: Good | DDPS ____ - ____ ☐Not Noted. |

**I. Purpose for Condensed Mental Health Assessment:**

**A.** ☒Condensed Initial Assessment (Intake) Form (May Replace or Delay MH 1 Assessment / Data Base.)

☐ MH 1; ☐ MH 7; ☐ Bus Screening; ☐ Page 2 (Psychiatric History) as ☐ Update or ☐ Initial history

**B.** ☐ Transfer to New Setting Recommended DDPS Code Change To: ____ -

☐ Return to Custody ☐GP ☐OSAP ☐POC & Complete Page 5.

☐ To Out-patient ☐CCCMS

☐EOP: Was tele-fax used? yes☐ no☐; Was approval obtained? yes☐ no☐ Conditional☐

☐PSU

☐ To In-patient ☐MHCB ☐Infirmary: CTC pre-screening? yes☐ no☐ Details:

☐ DMH ☐ Criminal History Supplemental Form needed. DMH Care Level → ☐ Intermediate ☐ Acute

Describe referral methods:

Describe current symptoms/concerns that indicate a need for Inpatient:

Desired Inpatient Treatment outcome:

Was Above: ☐Intra or ☐Inter Institution ☐Other (Outside)_____ ☐No ☐Yes Transfer Chrono by ____

**C.** ☐ Pre Parole Release (Complete page 5: MH 4> CCI > C&PR > Form 611> Parole Regional HQ & POC Clinician.)

**D.** ☐ Department of Correction Discharge. No CDC Follow Up. ☐ Inter State Compact to: ____ (state)

☐ To Other Treatment Source:

Name: _____ Telephone: ( ) ___-____ FAX: ( ) ___-____

Address: _____

☐ Consent to Release Specific Records, Coordinate with Health Records. ☐ QA Follow Up Plan Discussed Below.

**II. Brief Narrative Summary:** ☐ Expanded on Insert-a-Page

I/M seen per teacher referral and self-referral. Extremely paranoid
that the "cops are going to kill me" Gave a Px of 6 yrs ago
when the cops on the street were even watching him "even the
ones in plain clothes, the ones working on telephone poles, and the
one with clipboards." Afraid to take meds.

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM **MH 4** Page: 1 of 5 [3/28/96] Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** | Last Name: First Name: MI: Brown , Gregory |
|---|---|---|
| | Inpatient | CDC # J.82241 DOB 8/26/65 |
| | Outpatient | |

231

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 2 of 5 |
|---|---|

**III. MENTAL HEALTH & HEALTH HISTORY:** ☐ See Unit Health Record _____
(If an item is normal, check normal or none. If a deviation, elaborate.)

| | |
|---|---|
| A. Developmental Problem ☐ **Normal** ☒ Abnormal | ☐ |
| B. Marital: circle: S / M / D / W | ☐ |
| C. Work History: ☐None ☐Some ☐Erratic ☐Extensive | ☐ |
| D. Mental Health History: ☐ **None known** ☐Yes | ☐ |

E. Issues and Problems    ☐

   1. Psychiatric Hospitalization ☒None ☐Yes
   2. Psychotropic Medication in the last 2 years ☒None ☐Yes
   3. Outpatient Treatment ☒None ☐Yes
   4. MH Treatment while incarcerated/paroled ☒None ☐Yes
   5. History of Substance Abuse ☐None ☒Yes
   6. Release of information requested ☒ No  Yes

| | |
|---|---|
| F. Suicidal Behavior ☒Denies    History ☐None Found    ☐Present | ☐ |
| G. Violent Behavior ☒Denies    History ☐None Found    ☐Present | ☐ |
| H. Discuss Significant Medical History (Head Traumas, HIV, Seizures)☐ **None Found**    ☐Present | ☐ |

I. Other or Additional Comments: *IM was able to interact appropriately,*
*refused meds; Denied SI or HI. But will place on ccms*
*for F/U.*    ☐

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM **MH 4** Page: 2 of 5 [3/28/96] Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** Inpatient Outpatient | Last Name:  *Brown*    First Name:    MI: CDC # *J.82241*    DOB _/_/_ |
|---|---|---|

*232*

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 3 of 5 |
|---|---|

**IV. Present Mental Status** Date 3/6/98

A) Appearance ☒WNL

B) Behavior ☐WNL *tearful, fearful*   Speech ☒WNL

C) Mood ☒WNL   Sleep ☐WNL *2-2½ hrs*   Appetite ☐WNL   Affect ☐WNL *flat*

D) Cognition:
1) Fund of Information ☒WNL
2) Intellectual Functions ☒WNL
3) Organization of Thought ☒WNL
4) Association of Thought ☒WNL
5) Reality Contact ☐WNL *poor*
6) Thought Quality ☐WNL

E) Perception Disturbances (Hallucinations) ☐ None A/H *"but that's not realistic"*

F) Thought Content (Delusions) ☐ None *Severe paranoia.*

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐WNL *poor*

H) Insight & Judgment ☐WNL *poor.*

I) Interview Attitude ☒WNL

J) Current Suicidality ☒None noted or stated.

K) Current Violence Risk ☒None noted or stated.

**V. DSM IV   Numerical   - Transferring / Discharge / Provisional (Discussion, diagnostic certainty.)**

| | |
|---|---|
| Axis I | R/O Major Depression, c psychotic features. Substance-Induced Delusional Disorder. Polysubstance Abuse |
| Axis II | Deferred |
| Axis III | |
| Axis IV | (current) 1. incarceration. |
| Axis V | GAF = 51 (Discuss basis.) |

Discussion and Diagnostic Certainty:

☐ Dual Diagnosis

CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 3 of 5 [3/28/96] Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328

LEVEL OF CARE

Inpatient

Outpatient

Last Name: Brown   First Name:   MI:

CDC # J-82241   DOB /  /

233

State of California, Department of Corrections   N / C / S Region,   Service Area = _C_ , Institution = _MCSP_

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | Page 1 of 2 |
|---|---|---|
| ☒Original    ☐Update    ☐Rejustification | | ☐ CCCMS Annual Case Review |

**I. General Information:**
Arrival Date This Treatment Setting: ___/___/___
☐ CCCMS ☐ EOP ☐ MHCB/Infirmary
☐ PSU -- ☐ _____ week observation.
Anticipated Date of Transfer to GP: ___/___/___
Custody Level:  I / II / III / IV / AdS / SHU

**By:** ☐ Team    ☐Individual Clinician
☐ MH 6 ☐ C File ☐ Health Record
☐ Unit Health Record ☐ MH 1
☐ MH 4 ☐ Prior MH 2 ___/___/___

Today Date  3/23/98
Next Up Date  3/23/99

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| J Hess MD | | |
| S Sands PSW | | |
| | | |
| | | |

**III. Present Mental Status** Date 3/6/98 By S Sands, AcSW   Title PSW

A) Appearance ☒WNL

B) Behavior ☐WNL  tearful, fearful          Speech ☒WNL

C) Mood ☒WNL / Sleep ☐WNL 2-2½ hrs/hs   Appetite ☐WNL ↑↓   Affect ☐WNL flat

D) Cognition:
   1) Fund of Information ☒WNL
   2) Intellectual Functions ☒WNL
   3) Organization of Thought ☒WNL
   4) Association of Thought ☒WNL
   5) Reality Contact ☐WNL ⟩ poor
   6) Thought Quality ☐WNL /

E) Perception Disturbances (Hallucinations) ☐ None  A/H "but that's not realistic"

F) Thought Content (Delusions) ☐ None  Severe paranoia

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐WNL  fair

H) Insight & Judgment ☐WNL  poor

I) Interview Attitude ☒WNL

J) Current Suicidality ☒None noted or stated.

K) Current Violence Risk ☐None noted or stated.

| **MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION** MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** Inpatient Outpatient | Last Name: Brown  First Name: Gregory  MI: CDC # V-82241  DOB 8/26/65 |

234

| Mental Health Treatment Plan Part One: | | Page 2 of 2 |
|---|---|---|

IV. DSM IV   Numerical ☐Last MSE 8-31-00 ☐Last TP 7-10-00   MH 1☐ / / Last MH 4 ☐ 3/23/98   8-31-00

| Axis I | 297.1 | R/o Delusional Disorder |
| | | Persecutory Type |
| Axis II | 301.0 | Paranoid Personality |
| | | |
| Axis III | | Aseptic Necrosis of Hip - Bilateral. Back and hip problems; walks assisted with cane |
| Axis IV | | (current) transfer to HOSP; perceived lack of medical services |
| Axis V | | GAF = 65   Describe basis. 8-31-00 clinical interview |

**V.  Problem / Symptom List**

| #1 | history of extreme anxiety, fearfulness, hypervigilance |
|---|---|
| #2 | R/o persecutory delusions |
| #3 | |

**VI. Inmate's Strength and Weakness, Goals       Inmate's Treatment Goals, ☑MH 6 Input**

S - trying to adjust, polite, attempts to please
W - angers easily, poor self-responsibility
G - maintain current stability, adjust to HOSP

Treatment Readiness: ☑Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To: ☑GP ☐CCCMS ☐EOP   ☐MHCB ☐DMH**

Transfer to GP when IDTT determines clinically appropriate

Signature(s)
S. Michels, PSW    D. Dennis PhD

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE C3 MS Inpatient ⟨Outpatient⟩ | Last Name:   First Name:   MI: Brown, Gregory CDC # J-82241   DOB 8-26-65 |
|---|---|---|

**Mental Health Treatment Plan Part One:**                                    Page 2 of 2

IV. DSM IV  Numerical ☐Last MSE  _/_/_  ☐Last TP _/_/_  MH 1☐_/_/_   Last MH 4 ☐ _/_/_

| Axis I | R/o Major Depression - a Psychotic Features |
| | R/o Delusional Disorder |
| | |

| Axis II | Deferred |
| | |

| Axis III | |

| Axis IV | (current) 8 incarceration |

| Axis V | GAF = 3    Describe basis. |

**V. Problem / Symptom List**

**#1** Severe Paranoia.

**#2**

**#3**

**VI. Inmate's Strength and Weakness, Goals**       Inmate's Treatment Goals, ☐ MH 6 Input

Treatment Readiness: ☒Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☒GP ☐CCCMS ☐EOP    ☐MHCB ☐DMH

XI yr 5 S/Sof major mental illness or Vintervention

**Signature(s)** S Sandy, ACSW

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown | First Name: | MI: |
| | | | | |
| | Inpatient | | | |
| | Outpatient | CDC # J-82241  DOB _/_/_ | | |

236

State of California, Department of Corrections: N / C / S Region, Service Area = _C_, Institution, _MCSP_

| TREATMENT PLAN PART TWO: PROBLEM → # _O 1_ pg. _O O 3_ | | Today Date: _9/18/98_ | |
|---|---|---|---|
| ☐Initial Treatment Plan    ☐Update because ___ | | ☐Re-justify, ___ weeks | |

| Prob.<br># _O1_ | Describe Problem: | Possible Completion | Date |
|---|---|---|---|
| | _Severe Paranoia,_ | Next Review | Date |
| | **Target Behavior(s):** | | |
| | _↑ Paranoia_ | | |
| | **Target Objective(s):** | | |
| | _↓ Paranoia,_ | | |

| Date | Intervention (s) & Staff Assigned. | Frequency and Duration. | Results. |
|---|---|---|---|
| 3/28/98 | _Continue 4 meds per physician order_ | _g 90days_ | |
| | _acm contact_ | _g 90days_ | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| MENTAL HEALTH<br>TREATMENT PLANS,<br>UPDATES, REJUSTIFICATION<br>MH 2 [3/29/96]<br>Part One: General, Team, MSE<br>Diagnosis, Problems, Inmate Strengths<br>Part Two: Problem Pages -- Results<br>Use Insert-a-Page of MH 1<br>Confidential Client/Patient Information<br>See W & I Code, Section 5328 | LEVEL OF<br>CARE<br><br>Inpatient<br><br>Outpatient | Last Name:    First Name:    MI:<br>_Brown_<br><br><br>CDC # _J.8 22 4/_   DOB __/__/__ |
|---|---|---|

237

State of California, Department of Corrections: N / C / S Region, Service Area = **A**, Institution = **SAC**

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | Page 1 of 2 |
|---|---|---|

☐ Original   ☑ Update   ☐ Rejustification   ☐ CCCMS Annual Case Review

**I. General Information:**
Arrival Date This Treatment Setting: __/__/__
☑ CCCMS  ☐ EOP  ☐ MHCB/Infirmary
☐ PSU -- ☐ _____ week observation.
Anticipated Date of Transfer to GP: __/__/__
Custody Level: I / II / III / **IV** / AdS / SHU

**By:** ☐ Team   ☑ Individual Clinician
☐ MH 6  ☐ C File  ☐ Health Record
☐ Unit Health Record  ☐ MH I
☐ MH 4  ☐ Prior MH 2 __/__/__

Today Date: **7/10/00**
Next Up Date: __/__/__

**II. Print Treatment Team Members**

| Members | Position | Telephone & Extension |
|---|---|---|
| T. HEDBLAD, PhD | CCM | 6336 |
| P. MARROW, MD | CMD | 6335 |

**III. Present Mental Status**  Date **7/10/00**  By **T. Hedblad, PhD**

A) Appearance ☑ WNL

B) Behavior ☑ WNL                    Speech ☑ WNL

C) Mood ☑ WNL    Sleep ☐ WNL    Appetite ☑ WNL    Affect ☑ WNL
**MILD DYSTHYMIA    INSOMNIA**

D) Cognition:
1) Fund of Information ☑ WNL
2) Intellectual Functions ☑ WNL
3) Organization of Thought ☑ WNL
4) Association of Thought ☑ WNL
5) Reality Contact ☐ WNL  **PARANOID**
6) Thought Quality ☑ WNL

E) Perception Disturbances (Hallucinations) ☑ None

F) Thought Content (Delusions) ☐ None  **PARANOID**

G) Sensorium (Orientation, Memory, Attention, Concentration) ☑ WNL

H) Insight & Judgment ☐ WNL  **IMPAIRED AROUND DELUSIONS**

I) Interview Attitude ☑ WNL

J) Current Suicidality ☑ None noted or stated.

K) Current Violence Risk ☐ None noted or stated.  **POSSIBLE**

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages – Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE **3C** Inpatient / ~~Outpatient~~ | Last Name: **BROWN**  First Name:  MI: |
|---|---|---|

CDC # **J82241**  DOB __/__/__

238

**Mental Health Treatment Plan Part One:**                                    Page 2 of 2

IV. DSM IV  Numerical ☐Last MSE  _/_/_  ☐Last TP  _/_/_   MH 1☐_/_/_   Last MH 4 ☐ _/_/_

| Axis I | | DELUSIONAL D/O, PARANOID |
| --- | --- | --- |
| | | |
| | | |

| Axis II | | DEFERRED |
| --- | --- | --- |

| Axis III | | HIP (ASEPTIC NECROSIS) |
| --- | --- | --- |
| Axis IV | | (current) IN CANCELLATION |
| Axis V | | GAF= 55 Describe basis. |

**V. Problem / Symptom List**

| #1 | PARANOIA |
| --- | --- |
| #2 | |
| #3 | |

**VI. Inmate's Strength and Weakness, Goals**       Inmate's Treatment Goals, ☐ MH 6 Input

Treatment Readiness: ☐ Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☑GP ☐CCCMS ☐EOP    ☐MHCB ☐DMH

Signature(s) _____ PLD

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  3 C  Inpatient  Outpatient | Last Name:  BROWN    First Name:    MI:    CDC # J-82241  DOB __/__/__ |
| --- | --- | --- |

239

State of California, Departmen. of Corrections: N C / S Region, Service Area = _L_, Institution, _SAC_

| TREATMENT PLAN PART TWO:  PROBLEM → # | | pg. | Today Date: _7 / /a/ 00_ |
|---|---|---|---|
| ☐Initial Treatment Plan | ☑Update because _____ / _92_ . | ☐Re-justify, _____ | weeks |

| Prob. # | Describe Problem: | | Possible Completion | Date |
|---|---|---|---|---|
| | _PARANOID_ | | Next Review | Date |
| | Target Behavior(s): | | | |
| | _POTENTIAL VIOLENCE_ | | | |
| | Target Objective(s): | | | |
| | _↓ SX_ | | | |
| Date | Intervention (s) & Staff Assigned. | Frequency and Duration. | | Results. |
| _7/10/00_ | _WRITE SINGLE CELL CHRONO_ | | | |
| | _F/U IN 6 WEEKS_ | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE _3C_ Inpatient Outpatient | Last Name: _BROWN_    First Name:    MI: CDC # _J-8 2241_    DOB _/_/_ |
|---|---|---|

_240_

State of California, Department of Corrections: N / C / S Region,   Service Area = _C_ ,   Institution = __MCSP__

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | Page 1 of 2 |
|---|---|---|
| ☐Original    ☐Update    ☐Rejustification | | ☐ CCCMS Annual Case Review |

| I. General Information: | By: ☐ Team   ☐Individual Clinician | Today Date |
|---|---|---|
| Arrival Date This Treatment Setting: __/__/__ | ☐ MH 6  ☐ C File  ☐ Health Record | __/__/__ |
| ☐ CCCMS  ☐ EOP  ☐ MHCB/Infirmary | ☐ Unit Health Record  ☐ MH 1 | Next Up Date |
| ☐ PSU -- ☐ _____ week observation. | ☐ MH 4  ☐ Prior MH 2 __/__/__ | __/__/__ |
| Anticipated Date of Transfer to GP: __/__/__ | | |
| Custody Level: I / II / III / IV / AdS / SHU | | |

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**III. Present Mental Status** Date 5/7/99 By _Administrator_ Title _PSW_

A) Appearance ☑WNL

B) Behavior ☑WNL    Speech ☐WNL
14N52    GATE LOUDER   WHM ARRUT CRP?

C) Mood ☐WNL    Sleep ☐WNL    Appetite ☐WNL    Affect ☐WNL
ANXIOUS    UAF99 FM9...72Y    ʼʼ ↓

D) Cognition:    DANIAS ALCOHEL DEU./OR
  1) Fund of Information ☑WNL    POT.
  2) Intellectual Functions ☐WNL    DANIAS DAP.
  3) Organization of Thought ☑WNL
  4) Association of Thought ☑WNL
  5) Reality Contact ☐WNL
  6) Thought Quality ☐WNL    POOR. SOMEWHAT PARANOID

E) Perception Disturbances (Hallucinations) ☑None    DENIES

F) Thought Content (Delusions) ☐None    FEELS IS COP. PPF9 ARE WATCHING HIM.

G) Sensorium (Orientation, Memory, Attention, Concentration) ☑WNL    GUAN MADS.

H) Insight & Judgment ☐WNL    LACKS INSIGHT, POOR JUDGEMENT

I) Interview Attitude ☐WNL    FEARFUL

J) Current Suicidality ☑None noted or stated.    PARANOIA DOWD DRIVE SI

K) Current Violence Risk ☑None noted or stated.    ((   )(   )(   H/

| **MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION** MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** Inpatient Outpatient | Last Name:    First Name:    MI: BROWN, OLAGOAY CDC #J.82241   DOB __/__/__ |
|---|---|---|

241

**Mental Health Treatment Plan Part One:**  Page 2 of 2

IV. DSM IV  Numerical ☐Last MSE __/__/__  ☐Last TP __/__/__  MH 1☐ __/__/__  Last MH 4 ☐ __/__/__

| Axis I | 297.1 | DELUSION S/O, PERSECUTORY |
| | | EVERYONE CONSPIRES VS. me "FUD UP. |
| Axis II | 799.9. | DPO≠ |
| Axis III | | |
| Axis IV | | (current) |
| Axis V | | GAF = 55  Describe basis. |
| | | POOR INSIGHT WANT MEDS |

**V. Problem / Symptom List**

| #1 | |
| #2 | |
| #3 | |

**VI. Inmate's Strength and Weakness, Goals**   Inmate's Treatment Goals, ☐ MH 6 Input

Treatment Readiness: ☐ Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☐GP ☐CCCMS ☐EOP   ☐MHCB ☐DMH

**Signature(s)**

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  Inpatient  Outpatient | Last Name:    First Name:    MI:  CDC # __-__ __ __ __    DOB __/__/__ |

242

State of California, Department of Corrections: N / C / S Region, Service Area = ___ , Institution, _____

| TREATMENT PLAN PART TWO: PROBLEM → # _____ pg. _____ | | Today Date: / / |
|---|---|---|
| ☐ Initial Treatment Plan   ☐ Update because _____ | | ☐ Re-justify, _____ weeks |

| Prob. # | Describe Problem: | Possible Completion | Date |
|---|---|---|---|
| | STAYS IN CELL | Next Review | Date |
| | **Target Behavior(s):** A B DIOG | | |
| | | | |
| | **Target Objective(s):** SOCIALIZE MORE. | | |
| | | | |
| | | | |

| Date | Intervention (s) & Staff Assigned. | Frequency and Duration. | Results. |
|---|---|---|---|
| | REJECTS MADICATION | | |
| | 1 x 90 PM. | | |
| | RAF. MARRITT — | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages — Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  Inpatient  Outpatient | Last Name: ___ First Name: ___ MI: ___  CDC # __ - __ __ __ __   DOB __/__/__ |
|---|---|---|

243

State of California, Department of Corrections: N / C / S Region,  Service Area = __B__ , Institution = __HDSP__

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | Page 1 of 2 |
|---|---|

☐ Original    ■ Update    ☐ Rejustification                    ☐ CCCMS Annual Case Review

**I. General Information:**              6  HDSP
Arrival Date This Treatment Setting: 8 /21 /00
■ CCCMS ☐ EOP ☐ MHCB/Infirmary
☐ PSU – ☐ _____ week observation.
Anticipated Date of Transfer to GP: 9 /6 /0

By: ☑ Team / ☐ Individual Clinician
☐ MH 6 ☐ C File ☐ Health Record
☐ Unit Health Record ☐ MH 1
☑ MH 4 ☑ Prior MH 2 7 /6 /00

Today Date
9 /6 /00
Next Up Date
9 /6 /01

Custody Level: I / II / III / IV / AdS / SHU

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| T. NOLAN | SR. PSYCHOLOGIST | (530)251-5100 X6748 |
| C. LETT | STAFF PSYCHIATRIST | "            " |
| S. MICHELS | PSYCH. SOC. WORKER | "            " |
| | | |

**III. Present Mental Status**  Date 8 /31 /00  By  S. Michels  Title  PSW

A) Appearance  ☑ WNL

B) Behavior  ☑ WNL                          Speech ☑ WNL

C) Mood  ☐ WNL        Sleep ☑ WNL        Appetite ☑ WNL        Affect ☑ WNL

D) Cognition:
  1) Fund of Information  ☑ WNL
  2) Intellectual Functions  ☑ WNL
  3) Organization of Thought  ☐ WNL
  4) Association of Thought  ☑ WNL
  5) Reality Contact  ☐ WNL
  6) Thought Quality  ☑ WNL

E) Perception Disturbances  (Hallucinations) ☑ None

F) Thought Content (Delusions) ☑ None  History of hypervigilance; fears others
  are informants

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☑ WNL

H) Insight & Judgment ☑ WNL

I) Interview Attitude ☐ WNL

J) Current Suicidality ☑ None noted or stated.

K) Current Violence Risk ☑ None noted or stated.

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages — Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  C₃ mS  Inpatient  (Outpatient) | Last Name:  Brown,  First Name:  Gregory  MI:  |
|---|---|---|

CDC # J -8224l        DOB  8-26-65

244

State of California, Department of Corrections: N / C / S Region, SA = S, Institution = HDSP ☑Male ☐Female

| **CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER:** | Date 8 31 00 |
|---|---|
| Variety Use Include: Admission Intake, Transfer, Parole, Discharge, MHCB Screen & Assessment. | Page 1 of 5 |

**Current Setting:** ☐GP ☐Ad Seg ☐SHU   ☐RC ☑CCCMS ☐ EOP ☐ PSU ☐ MHCB ☐ Other:

| I/M Ethnicity: Black | Non English Language: — o — | Level: I / II / III / IV / AS / SHU |
|---|---|---|
| CDC Arrival date: 2-2t-00 to H/30 | CDC Release date: 1-29-2043 | ☐MH 1☐MH 4☐MH 7  Date: 3 23 99 |
| Inmate interviewed on: 8 31 / 00 | Level of Cooperation: adequate | DDPS _ - _  ☑Not Noted. |

## I. Purpose for Condensed Mental Health Assessment:
**A.** ☑Condensed Initial Assessment (Intake) Form   (May Replace or Delay MH 1 Assessment / Data Base.)
☐ MH 1; ☐ MH 7; ☐ Bus Screening; ☑Page 2 (Psychiatric History) as a ☑Update or ☐ Initial history
**B.** ☐ Transfer to New Setting    Recommended DDPS Code Change To: ___ - ___
  ☐ Return to Custody ☐GP   ☐OSAP   ☐POC & Complete Page 5.
  ☐ To Out-patient ☐CCCMS
    ☐EOP:  Was tele-fax used? yes☐ no☐;  Was approval obtained? yes☐ no☐  Conditional☐
    ☐PSU
  ☐ To In-patient    ☐MHCB ☐Infirmary: CTC pre-screening? yes☐ no☐ Details:
    ☐ DMH  ☐ Criminal History Supplemental Form needed.  DMH Care Level → ☐ Intermediate ☐ Acute
    Describe referral methods:
    Describe current symptoms/concerns that indicate a need for Inpatient:

    Desired Inpatient Treatment outcome:

  Was Above:  ☐Intra or ☐Inter Institution ☐Other (Outside)___ ☐No ☐Yes Transfer Chrono by ___
**C.** ☐ Pre Parole Release  (Complete page 5: MH 4> CCI > C&PR > Form 611> Parole Regional HQ & POC Clinician.)

**D.** ☐ Department of Correction Discharge. No CDC Follow Up.  ☐ Inter State Compact to: ___ (state)
  ☐ To Other Treatment Source:
  Name: ___  Telephone: ( ) ___-___  FAX: ( ) ___-___
  Address: ___
  ☐ Consent to Release Specific Records, Coordinate with Health Records. ☐ QA Follow Up Plan Discussed Below.

## II. Brief Narrative Summary: ☐ Expanded on Insert-a-Page

35 yr old Black male, arrived HDSP 8-21-00 from CSP-SAC. Current MHPC in
C-file dated 7-18-00 C3MS, GAF 75, no meds. Previous MH4 done 3-23-98 at MCSP.
Previous MH2s done 3-23-98 and 5-07-99 at MCSP, and 7-10-00 at CSP-SAC.
Diagnoses since 1995 have been adjustment Disorder with Depressed Mood, R/o Major
Depression with Psychotic Features, Physical abuse, Substance-Induced Psychotic Disorder,
Delusional Disorder, Persecutory Type, No dx on axis I, Personality D/O, and Schizoaffective

| **CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4** Page: 1 of 5 [3/28/96] Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** C3MS  Inpatient  Outpatient | Last Name: **Brown,** CDC # **J-82241** | First Name: **Gregory** DOB **8-26-65** | MI: |
|---|---|---|---|---|

245

Condensed Mental Health Assessment & Treatment Setting Transfer:

III. MENTAL HEALTH & HEALTH HISTORY: ☐ See Unit Health Record
(If an item is normal, check normal or none. If a deviation, elaborate.)

A. Developmental Problem ☒ Normal ☐ Abnormal   Claims 12th grade completion and "some college"   ☐

B. Marital: circle: (S) M / D / W   claims 2 daughters, ages 13 and 8 - minimal contact w/ oldest   ☐

C. Work History: ☐ None ☒ Some ☐ Erratic ☐ Extensive   claims he is certified auto mechanic - others describe his job as tire installer   ☐

D. Mental Health History: ☒ None known ☐ Yes   Denies   ☐

E. Issues and Problems

1. Psychiatric Hospitalization ☒ None ☐ Yes   Denies   ☐
2. Psychotropic Medication in the last 2 years ☒ None ☐ Yes   doesn't want - concerned they'll make him ill   ☐
3. Outpatient Treatment ☒ None ☐ Yes   Denies   ☐
4. MH Treatment while incarcerated/paroled ☐ None ☒ Yes   Placed in C3MS due to concerns over his extreme fearfulness   ☐
5. History of Substance Abuse ☐ None ☒ Yes   C/M minimizes but acknowledges   ☐
6. Release of information requested ☒ No ☐ Yes   alcohol, marijuana, crack cocaine   ☐

F. Suicidal Behavior ☒ Denies   History ☒ None Found ☐ Present   ☐

G. Violent Behavior ☐ Denies (History) ☐ None Found ☐ Present   Conspiracy to commit murder, and attempted murder. Conviction for voluntary manslaughter,   ☐

H. Discuss Significant Medical History (Head Traumas, HIV, Seizures) ☐ None Found ☒ Present   ☐
Claims work-related injury caused back problems. Does have substantiation in UHR for hip problems. Walks with cane and is currently medically unassigned.

I. Other or Additional Comments:
Appears stable currently. Denies guilt for commitment offense. Is frustrated with transfer and perceived lack of medical services. Escalates to anger quickly when discussing these subjects.

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 2 of 5 [3/28/96] Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE C3MS Inpatient (Outpatient) | Last Name: Brown, First Name: Gregory MI: CDC # J-82241  DOB 8-26-65 |

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 3 of 5 |
|---|---|

**IV. Present Mental Status**    Date X /31/ ○○

A) Appearance ☑WNL

B) Behavior ☑WNL          Speech ☑WNL

C) Mood ☑WNL      Sleep ☐WNL      Appetite ☐WNL      Affect ☐WNL *full range*

D) Cognition:
1) Fund of Information ☐WNL
2) Intellectual Functions ☐WNL
3) Organization of Thought ☐WNL
4) Association of Thought ☐WNL
5) Reality Contact ☐WNL
6) Thought Quality ☐WNL

E) Perception Disturbances (Hallucinations) ☑ None

F) Thought Content (Delusions) ☑ None   *says he uses word "cop" to mean informer. He believes most of his are informants*

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐WNL

H) Insight & Judgment ☑WNL

I) Interview Attitude ☑WNL

J) Current Suicidality ☑None noted or stated.

K) Current Violence Risk ☐None noted or stated.

| V. DSM IV | Numerical | - Transferring / Discharge / Provisional (Discussion, diagnostic certainty.) |
|---|---|---|
| Axis I | 300.0 | *anxiety D/O NOS (Provisional)* |
| | 297.1 | *R/O Delusional Disorder, Persecutory Type* |
| Axis II | 301.0 | *R/O Paranoid Personality Disorder* |
| Axis III | | *Back and hip problems 2° to injury ; walks assisted with cane* |
| Axis IV | | (current) *transfer to HDSP ; perceived lack of medical services* |
| Axis V | GAF = 65 | (Discuss basis.) *clinical interview* |

Discussion and Diagnostic Certainty: *needs further diagnostic clarification*

☐ Dual Diagnosis   *no*

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 3 of 5 [3/28/96] Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE C3M S Inpatient Outpatient | Last Name: First Name: MI: *Brown, Gregory* CDC # J-8224 DOB 8-26-65 |

*247*

State of California, Department of Corrections — Institution: ___HDS___   Prior Page Number : _____

CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES:   All Staff, Clinicians, Treatment Teams.

| Date/Time: | | Use Name & Title Stamp. |
|---|---|---|

Pts Chart N/Available @ OP

1/10/01  serving 56 to life. Pt adamant that he
2:30  doesn't want meds.
Past ψ hx — Denies hospitalizations, states he
never took ψ meds. Denies family ψhx.
Past Med hx — Avascular Necrosis of
Both; Rt leg injury; takes Motrin
Allergies NKDA

MSE: Pleasant ♂ cooperative. Appropriate Behavior.
At one pt appeared to be
responding to internal stimuli
when questioned re: sentence
Speech nl. Mood "I'm in prison but
ok. Affect appropriate
Illogical TC denies SI/HI
violent thts ⊕ V/H ⊕ internal
stimuli ⊕ delusional thts re: demons
20x4   ↓↓ limited impulse control
A/P Psychosis NOS
R/o Schizophrenia   CPT
Pt encouraged at length to try meds
but refuses. Pt does not appear
to meet criteria to forcibly medicate;
Pt agreed to request ψ TX demons
become bothersome or if SI/HI   V/O

Page #

| MENTAL HEALTH INTERDISCIPLINARY PROGRESS NOTES  MH 3 [3/21/96]  Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name:   First Name:   MI: |
|---|---|---|
| | | BROWN, Gregory |
| | | J-82241 |
| | Inpatient | |
| | Outpatient | CDC # __-__ ___ ___   DOB __/__/__ |

248

State of California, Department of Corrections -- Institution: _HDSp_   Prior Page Number : _____

CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES: All Staff/Clinicians, Treatment Teams.

| Date/Time: | PSYCHIATRY UNAVAILABLE Use Name & Title Stamp. |
|---|---|

1/10/01
12:30

Pt is 35 y/o BOF who states he put in a request to see a psychiatrist ~ 1 month ago b/c he at that time felt there were demons trying to bother him & that they wd wake him up in the middle of the night. Pt states he was able to "run the demons out". Pt denies SI/plan intent. Pt denies HI/violent thts. Pt states that if demons began to bother him more he wd ask for help. Pt denies current AH, states they're gone away mostly since he now has a single cell. Pt reports he occasionally experiences sensation that he sees "shadows" or a grey ghost only @ night. Pt reports ↓ sleep ~ 3-4°/nt & energy during day "strong". Pt states he has learned to "just not give a damn" as opposed to feeling depressed. Pt reports ↑ sense of hope b/c he's _____

| MENTAL HEALTH INTERDISCIPLINARY PROGRESS NOTES | LEVEL OF CARE | Last Name: BROWN   First Name: GREGORY   MI: |
|---|---|---|
| MH 3 [3/21/96] | | J-82241 |
| Confidential Client/Patient Information See W & I Code, Section 5328 | Inpatient | |
| | Outpatient | CDC # __-__ __ __ __ __   DOB __/__/__ |

247

State of California, Department of Corrections - High Desert State Prison | **Prior Page Number:**

**CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES:** | **All Staff, Clinicians, Treatment Teams**

Date/Time: 11-20-02   07 30
Reason for Contact: **POST SUICIDE WATCH/PRECAUTION FOLLOWUP**
Day   ☒1   ☐2   ☐3   ☐4   ☐5

| Level of Orientation: | ☒ Person | ☒ Place | ☒ Time |
|---|---|---|---|

| Eye Contact: | ☐ Good | ☒ Fair | ☐ Poor | | |
|---|---|---|---|---|---|
| General Appearance | ☐ Disheveled | ☒ Groomed | ☐ Poor Hygiene | | |
| Sleep: | | ☒ WNL | ☐ Appetite: | | ☒ WNL |
| Facial Expression: | ☐ Angry  ☐ Flat | ☐ Blunted  ☐ Happy | ☐ Frightened  ☐ Withdrawn | | ☒ WNL |
| Body Behavior: | ☐ Withdrawn  ☐ Stiff | ☐ Overactive  ☐ Tremor | ☐ Restless | | ☒ WNL |
| Speech: | ☐ Clear  ☐ Slow | ☐ Excessive  ☐ Stammer | ☐ Incoherent  ☐ Slurred/Mumbled | ☐ Mute  ☐ Understandable | ☐ Rapid  ☒ WNL |
| Mood: | ☐ Anxious  ☐ Euphoric | ☐ Cheerful  ☐ Silly | ☐ Congruent  ☐ Unconcerned | ☐ Depressed  ☐ Dysphoric | ☒ WNL |
| Presenting Attitude: | ☐ Argumentative  ☐ Helpless  ☐ Passive | ☐ Cooperative  ☐ Hostile  ☐ Resistant | ☐ Demanding  ☐ Intimidating  ☐ Suspicious | ☐ Evasive  ☐ Manipulative  ☐ Threatening | ☐ Guarded  ☒ WNL |

| Perception Disturbances | ☒ None | | |
|---|---|---|---|
| Thought Content (Delusions) | ☒ None | | |
| Current Suicidality | ☒ None noted or stated. | | |
| Current Violence Risk | ☐ None noted or stated. | | |
| Psychotropic Medications? | ☒ Yes | ☐ No | |

Custody Rounds: ☒ Continue Hourly   ☐ Every 2 Hours   ☐ Every 4 Hours

Custody Input:
I/M calm and cooperative

Comments:
I/M reports no S/I or H/I. Has been resting in cell appropriately. Check tomorrow.

☐ Next case manager contact to be on or before: 1 day    GAF: 60
Clinician Name/Title: F. Upshaw
Signature: Matthew PM

MENTAL HEALTH
INTERDISCIPLINARY
PROGRESS NOTES
Post SW/P FU
MH 3 (7/26/99)
Confidential Client/Patient
Information
See W&I Code, Section 5328

| LEVEL OF CARE | Last Name: | First Name: |
|---|---|---|
| | Brown | |
| Inpatient | D-6   123 | |
| Outpatient | CDC# J 822-41 | DOB __/__/__ |

250

| State of California, Department of Corrections - High Desert State Prison | | | | Prior Page Number: |
|---|---|---|---|---|

| CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES: | | | All Staff, Clinicians, Treatment Teams |
|---|---|---|---|

Date/Time: 11/22/02
Reason for Contact: POST SUICIDE WATCH/PRECAUTION FOLLOWUP
Day  ☐ 1  ☐ 2  ☒ 3  ☐ 4  ☐ 5

| Level of Orientation: | ☒ Person | ☒ Place | ☒ Time | | |
|---|---|---|---|---|---|

| Eye Contact: | ☐ Good | ☒ Fair | ☐ Poor | | |
|---|---|---|---|---|---|
| General Appearance | ☐ Disheveled | ☐ Groomed | ☐ Poor Hygiene | | |
| Sleep: | | ☒ WNL | ☐ Appetite: | | ☒ WNL |
| Facial Expression: | ☐ Angry | ☐ Blunted | ☐ Frightened | | ☒ WNL |
| | ☐ Flat | ☐ Happy | ☐ Withdrawn | | |
| Body Behavior: | ☐ Withdrawn | ☐ Overactive | ☐ Restless | | ☒ WNL |
| | ☐ Stiff | ☐ Tremor | | | |
| Speech: | ☐ Clear | ☐ Excessive | ☐ Incoherent | ☐ Mute | ☐ Rapid |
| | ☐ Slow | ☐ Stammer | ☐ Slurred/Mumbled | ☐ Understandable | ☒ WNL |
| Mood: | ☐ Anxious | ☐ Cheerful | ☒ Congruent | ☐ Depressed | ☒ WNL |
| | ☐ Euphoric | ☐ Silly | ☐ Unconcerned | ☐ Dysphoric | |
| Presenting Attitude: | ☐ Argumentative | ☒ Cooperative | ☐ Demanding | ☐ Evasive | ☐ Guarded |
| | ☐ Helpless | ☐ Hostile | ☐ Intimidating | ☐ Manipulative | ☐ WNL |
| | ☐ Passive | ☐ Resistant | ☐ Suspicious | ☐ Threatening | |
| Perception Disturbances | | ☒ None | | | |
| Thought Content (Delusions) | | ☒ None | | | |
| Current Suicidality | | ☒ None noted or stated. | | | |
| Current Violence Risk | | ☒ None noted or stated. | | | |
| Psychotropic Medications? | | ☐ Yes | ☐ No | | |

Custody Rounds: ☐ Continue Hourly   ☐ Every 2 Hours   ☐ Every 4 Hours
Start 11/22/02

Custody Input:
∅ problems

Comments:
I was present as quiet, oriented, denise SI/I
denise problems. Has been eating
better. ∅ specific issue, no complaint

☐ Next case manager contact to be on or before:  11/27/02      GAF: 55

Clinician Name/Title: G Partusa LCSW

Signature:

MENTAL HEALTH
INTERDISCIPLINARY
PROGRESS NOTES
Post SW/P FU
MH 3 (7/26/99)
Confidential Client/Patient
Information
See W&I Code, Section 5328

LEVEL OF CARE

L 3

Inpatient

Outpatient

Last Name: BROWN      First Name: GREGORY
D6-123
CDC# J82241      DOB  /  /

251

| State of California, Department of Corrections - High Desert State Prison | | | | | Prior Page Number: | |
|---|---|---|---|---|---|---|
| **CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES:** | | | | | **All Staff, Clinicians, Treatment Teams** | |

Date/Time: 11/23/52

Reason for Contact: POST SUICIDE WATCH/PRECAUTION FOLLOWUP

Day   ☐ 1   ☐ 2   ☐ 3   ☒ 4   ☐ 5

| Level of Orientation: | ☒ Person | | ☒ Place | | ☒ Time | |
|---|---|---|---|---|---|---|
| Eye Contact: | ☒ Good | ☐ Fair | | ☐ Poor | | |
| General Appearance | ☐ Disheveled | ☒ Groomed | | ☐ Poor Hygiene | | |
| Sleep: *has had difficulty* | ☐ WNL | | ☐ Appetite: | | | ☒ WNL |
| Facial Expression: | ☐ Angry | ☐ Blunted | ☐ Frightened *pained* | | | ☒ WNL |
| | ☐ Flat | ☐ Happy | ☐ Withdrawn *worried* | | | |
| Body Behavior: | ☐ Withdrawn | ☐ Overactive | ☐ Restless | | | ☒ WNL |
| | ☐ Stiff | ☐ Tremor | | | | |
| Speech: | ☐ Clear | ☐ Excessive | ☐ Incoherent | ☐ Mute | | ☐ Rapid |
| | ☐ Slow | ☐ Stammer | ☐ Slurred/Mumbled | ☒ Understandable | | ☒ WNL |
| Mood: | ☐ Anxious | ☐ Cheerful | ☒ Congruent | ☐ Depressed | | ☒ WNL |
| | ☐ Euphoric | ☐ Silly | ☐ Unconcerned | ☐ Dysphoric | | |
| Presenting Attitude: | ☐ Argumentative | ☒ Cooperative | ☐ Demanding | ☐ Evasive | | ☐ Guarded |
| | ☐ Helpless | ☐ Hostile | ☐ Intimidating | ☐ Manipulative | | ☒ WNL |
| | ☐ Passive | ☐ Resistant | ☐ Suspicious | ☐ Threatening | | |
| Perception Disturbances | | ☒ None | | | | |
| Thought Content (Delusions) | | ☐ None | | | | |
| Current Suicidality | | ☒ None noted or stated. | | | | |
| Current Violence Risk | | ☒ None noted or stated. | | | | |
| Psychotropic Medications? | | ☐ Yes | | ☒ No | | |

Custody Rounds: ☐ Continue Hourly   ☐ Every 2 Hours   ☒ Every 4 Hours
*routine.*

Custody Input: ∅ problem;

Comments:
I am presents as uncomfortable due to report of physical discomfort. I am denies S/I. Requests inquiry as to personal property. (informed N/o). I/m is somewhat stressed due on physical issues "depressed" over pain.

☐ Next case manager contact to be on or before: 11/24/2                          GAF: 55

Clinician Name/Title: S. D. Aristophishin

Signature:

| MENTAL HEALTH INTERDISCIPLINARY PROGRESS NOTES Post SW/P FU MH 3 (7/26/99) Confidential Client/Patient Information See W&I Code, Section 5328 | LEVEL OF CARE   C° Inpatient Outpatient | Last Name: BROWN CDC# J8224 | First Name: DOB _/_/_ |
|---|---|---|---|

257

| State of California, Department of Corrections - High Desert State Prison | | | | Prior Page Number: | |
|---|---|---|---|---|---|

**CHRONOLOGICAL INTERDISCIPLINARY PROGRESS NOTES:**     All Staff, Clinicians, Treatment Teams

Date/Time: 11/24/02 - 0830
Reason for Contact: **POST SUICIDE WATCH/PRECAUTION FOLLOWUP**
Day   ☐ 1   ☐ 2   ☐ 3   ☐ 4   ☒ 5

| Level of Orientation: | ☒ Person | | ☒ Place | | ☒ Time | | |
|---|---|---|---|---|---|---|---|

| Eye Contact: | ☒ Good | ☐ Fair | ☐ Poor | | |
|---|---|---|---|---|---|
| General Appearance | ☐ Disheveled | ☒ Groomed | ☐ Poor Hygiene | | |
| Sleep: | Fair | ☒ WNL | ☐ Appetite: | | ☒ WNL |
| Facial Expression: | ☐ Angry | ☐ Blunted | ☐ Frightened | | ☒ WNL |
| | ☐ Flat | ☐ Happy | ☐ Withdrawn | | |
| Body Behavior: | ☐ Withdrawn | ☐ Overactive | ☐ Restless | | ☒ WNL |
| | ☐ Stiff | ☐ Tremor | | | |
| Speech: | ☐ Clear | ☐ Excessive | ☐ Incoherent | ☐ Mute | ☐ Rapid |
| | ☐ Slow | ☐ Stammer | ☐ Slurred/Mumbled | ☒ Understandable | ☒ WNL |
| Mood: | ☐ Anxious | ☐ Cheerful | ☐ Congruent | ☒ Depressed | ☒ WNL |
| | ☐ Euphoric | ☐ Silly | ☐ Unconcerned | ☒ Dysphoric *Some* | |
| Presenting Attitude: | ☐ Argumentative | ☒ Cooperative | ☐ Demanding | ☐ Evasive | ☐ Guarded |
| | ☐ Helpless | ☐ Hostile | ☐ Intimidating | ☐ Manipulative | ☒ WNL |
| | ☐ Passive | ☐ Resistant | ☐ Suspicious | ☐ Threatening | |
| Perception Disturbances | | ☒ None | | | |
| Thought Content (Delusions) | | ☒ None | | | |
| Current Suicidality | | ☒ None noted or stated. | | | |
| Current Violence Risk | | ☒ None noted or stated. | | | |
| Psychotropic Medications? | | ☐ Yes | ☒ No | | |

Custody Rounds: ☐ Continue Hourly   ☐ Every 2 Hours   ☐ Every 4 Hours
     D/C PWP

Custody Input:
∅ problems since transfer.

Comments:
I/m transfer to D 7 on 11/23/02.
Still feels he is making an adjustment. Denies
SI; expresses concern abort property.
Reports distress assoc c physical discomfort.

☐ Next case manager contact to be on or before: ⊘      GAF: 60

Clinician Name/Title: D Smodawski len
Signature:

| MENTAL HEALTH INTERDISCIPLINARY PROGRESS NOTES Post SW/P FU MH 3 (7/26/99) Confidential Client/Patient Information See W&I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown | First Name: |
|---|---|---|---|
| | Inpatient | | |
| | Outpatient | CDC# J82241 | DOB __/__/__ |

253

| Mental Health Treatment Plan Part One: | | Page 2 of 2 |
|---|---|---|

IV. DSM IV   Numerical ☑Last MSE _1/1/05_ ☑Last TP _5/05_ MH 1☐ _/_/_   Last MH 4 ☐ _2/30/2_

| Axis I | 311.0 | Depressive D/O NOS |
|---|---|---|
| | | |
| Axis II | 301.83 | Borderline Personality D/O |
| Axis III | | Variety Med Rx; Hip Replacement needed |
| Axis IV | | (current) Incarceration |
| Axis V | | GAF = 65  Describe basis. |

**V. Problem / Symptom List**

#1   Depression

#2

#3

**VI. Inmate's Strength and Weakness, Goals**          Inmate's Treatment Goals, ☐ MH 6 Input

— Treatment non-compliance

Treatment Readiness: ☐ Amenable ☐ Motivated ☑ Resistant

**VII. Discharge Plan To:** ☑GP ☐CCCMS ☐EOP   ☐MHCB ☐DMH

D/C Chrono as of 2/8/04 - 1 yr meds Rx free

| Signature(s) | R. Dahl, **Ph.D.**  ~~Psychologist~~ |
|---|---|

**High Desert State Prison**

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE CMS | Last Name: Brown   First Name: Gregory   MI: |
|---|---|---|
| | Inpatient | |
| | Outpatient | CDC# T82241   DOB 8266_ |

254

**DATE    TIME**              **PSYCHIATRIC PROGRESS NOTE**

1/21/03

Inmate:  BROWN, GREGORY  J82241

**S:**  Mr. Brown was seen as a CTC follow up. He had been in CTC for a suicide attempt. Mr. Brown
states that he was feeling like hurting himself. He no longer feels that way. He is in considerable
pain; walks with a walker, has necrosing hips bilaterally and is awaiting hip replacements. Patient
also states he is under stress from some legal cases. Patient describes feeling confused, sleepy, and
having headaches, which I expect are attributed to his Paxil. I discussed with him the effects of
reducing Paxil and patient stated that he would like to be off the medication. I explained to him
that he needs all his wits about him to deal with his legal case and when I explained to him the
symptoms and so on, the patient said yes, that was exactly what he felt and he would like to be off
the medication. Patient was told that if he is having any difficulties to put him in a request and I
would see him. Patient is not depressed, not suicidal, and has no major mental disorder.

**O:**
**A:**
**P:**
**E:**

_____, MD

S. SALENGER, MD
SS:cj

255

State of California, Department of Corrections: N / C / S Region,   Service Area = _____ , Institution = _____

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | Page 1 of 2 |
|---|---|---|
| ☐ Original   ☐ Update   ☐ Rejustification | | ☐ CCCMS Annual Case Review |

**I. General Information:**
By: ☐ Team   ☑ Individual Clinician
Arrival Date This Treatment Setting: ___/___/___
☐ MH 6   ☐ C File   ☐ Health Record
☑ CCCMS   ☐ EOP   ☐ MHCB/Infirmary
☑ Unit Health Record   ☐ MH 1
☐ PSU – ☐ _____ week observation.
☐ MH 4   ☑ Prior MH 2 /23/02

Today Date 9/8/03
Next Up Date 12/8/03

Anticipated Date of Transfer to GP:   /   /
Custody Level: I / II / III / IV / AdS / SHU

**II. Print Treatment Team Members**

| Name | Position | Telephone & Extension |
|---|---|---|
| R. Dahl, Ph.D.  Psychologist  High Desert State Prison | PhD | 6790 |
| | | |
| | | |
| | | |

**III. Present Mental Status** Date 9/2/03 By R. Dahl, Ph.D.   Title PhD
Psychologist
High Desert State Prison

A) Appearance ☑ WNL

B) Behavior ☑ WNL          Speech ☐ WNL Slow

C) Mood ☐ WNL Dysphoric  - Sleep ☑ WNL   Appetite ☑ WNL   Affect ☐ WNL Flat

D) Cognition:
  1) Fund of Information ☑ WNL
  2) Intellectual Functions ☑ WNL
  3) Organization of Thought ☑ WNL
  4) Association of Thought ☑ WNL
  5) Reality Contact ☑ WNL
  6) Thought Quality ☑ WNL

E) Perception Disturbances  (Hallucinations) ☑ None

F) Thought Content  (Delusions) ☑ None

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☑ WNL

H) Insight & Judgment ☐ WNL Limited

I) Interview Attitude ☑ WNL

J) Current Suicidality ☑ None noted or stated.

K) Current Violence Risk ☐ None noted or stated.

Signature(s) /R. Dahl, Ph.D. R. Dahl, Ph.D.
Psychologist
High Desert State Prison

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96]  Part One:  General, Team, MSE Diagnosis, Problems, Inmate Strengths  Part Two: Problem Pages -- Results  Use Insert-a-Page of MH 1  Confidential Client/Patient Information  See W & I Code, Section 5328 | LEVEL OF CARE CMS  Inpatient  Outpatient | Last Name: BROWN   First Name: Gregory   MI:  CDC # J82241   DOB 8-26-65 |

256

**Mental Health Treatment Plan Part One:**                    Page 2 of 2

IV. DSM IV  Numerical ☐Last MSE __/__/__ ☐Last TP __/__/__ MH 1☐__/__/__ Last MH 4 ☐__/__/__

| Axis I | 311.0 | Depressive Nanos |
| --- | --- | --- |

| Axis II | 301.83 | Borderline Per Dx. |
| --- | --- | --- |

Axis III         Hip replacement surgery imminent-

Axis IV          (current) Incarceration

Axis V           GAF = 55  Describe basis.

**V. Problem / Symptom List**

#1  Depression

#2

#3

**VI. Inmate's Strength and Weakness, Goals**       Inmate's Treatment Goals, ☐ MH 6 Input

– Borderline Fx

– Depression                      Treatment Readiness: ☐ Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☐GP ☐CCCMS ☐EOP  ☐MHCB ☐DMH

Signature(s)

R. Dahl, Ph.D.
Psychologist
High Desert State Prison

| **MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION** MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** 3/5 Inpatient Outpatient | Last Name: First Name: MI: BROWN, A CDC # T-82241 DOB |
| --- | --- | --- |

257

State of California, Department of Corrections: N / C / S Region, Service Area = B, Institution HDSP

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | | Page 1 of 2 |
|---|---|---|---|
| ☐ Original   ☑ Update   ☐ Rejustification | | ☐ CCCMS Annual Case Review | |

**I. General Information:**
Arrival Date This Treatment Setting: 6/19/03
☑ CCCMS ☐ EOP ☐ MHCB/Infirmary
☐ PSU -- ☐ _____ week observation.
Anticipated Date of Transfer to GP:    /    /
Custody Level: I / II / III / IV / Ad / SHU

By: ☑ Team   ☐ Individual Clinician
☐ MH 6 ☐ C File ☐ Health Record
☑ Unit Health Record ☐ MH 1
☐ MH 4 ☐ Prior MH 2 7/30/03

Today Date 11/18/03
Next Up Date 2/8/03

**II. Print Treatment Team Members**

| Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| T. Ah, Ph.D | Psy.D | 6790 |
| C. Crawford, RN | P.N | 6795 |
| W. Eden, MD | MD | |
| | | |

**III. Present Mental Status**  Date 11/17/03 By  R. Dahl, Ph.D  Title Psy.

A) Appearance ☐ WNL  hobbled - trouble sitting / walking

B) Behavior ☐ WNL  demanding  Speech ☐ WNL

C) Mood ☐ WNL  agitated  Sleep ☐ WNL   Appetite ☑ WNL   Affect ☐ WNL  depressed

D) Cognition:
1) Fund of Information ☑ WNL
2) Intellectual Functions ☑ WNL
3) Organization of Thought ☐ WNL
4) Association of Thought ☐ WNL
5) Reality Contact ☑ WNL
6) Thought Quality ☑ WNL

E) Perception Disturbances (Hallucinations) ☐ None

F) Thought Content (Delusions) ☐ None  Paranoid ideation re: ...

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐ WNL  distracted

H) Insight & Judgment ☐ WNL  poor

I) Interview Attitude ☐ WNL  demanding

J) Current Suicidality ☑ None noted or stated.

K) Current Violence Risk ☐ None noted or stated.

Signature(s)  **R. Dahl, Ph.D.**
**Psychologist**
**High Desert State Prison**

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  CCCMS | Last Name: Brown   First Name: Gregory   MI: |
|---|---|---|
| | Inpatient | |
| | Outpatient | CDC # T-82241   DOB 8-26-65 |

258

State of California, Department of Corrections: (N) C / S Region, Service Area = _B_ , Institution = _HDSP_

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | Page 1 of 2 |
|---|---|---|
| ☐ Original   ☑ Update   ☐ Rejustification | | ☐ CCCMS Annual Case Review |

**I. General Information:**
Arrival Date This Treatment Setting: 6/9/03
☐ CCCMS ☐ EOP ☐ MHCB/Infirmary
☐ PSU – ☐ _____ week observation.
Anticipated Date of Transfer to GP:  /  /
Custody Level: I / II / III / IV (AdSeg) SHU

By: ☑ Team   ☐ Individual Clinician
☐ MH6 ☐ C File ☐ Health Record
☑ Unit Health Record ☐ MH1
☐ MH 4 ☑ Prior MH 2 11/18/03

Today Date 2/9/04
Next Up Date
—/—/—

**II. Print Treatment Team Members**

| Position | Telephone & Extension |
|---|---|
| R. Dahl, Ph.D. | PhD | 6790 |
| Riddle Ph.D | PhD | 6786 |
| Pierson | CC-I | 6812 |
| | | PhD |

**III. Present Mental Status**  Date 2/2/04  By _____  Title PhD

A) Appearance ☑WNL   uses wheel chair

B) Behavior ☐WNL  dismissive     Speech ☑WNL

C) Mood ☐WNL  dysphoria   Sleep ☑WNL   Appetite ☑WNL   Affect ☑WNL

D) Cognition:
   1) Fund of Information ☑WNL
   2) Intellectual Functions ☑WNL
   3) Organization of Thought ☐WNL
   4) Association of Thought ☑WNL
   5) Reality Contact ☑WNL
   6) Thought Quality ☑WNL

E) Perception Disturbances (Hallucinations) ☑None

F) Thought Content (Delusions) ☑None

G) Sensorium (Orientation, Memory, Attention, Concentration) ☑WNL

H) Insight & Judgment ☐WNL  fair

I) Interview Attitude ☐WNL  fair  dismissive

J) Current Suicidality ☑None noted or stated.

K) Current Violence Risk ☑None noted or stated.

Signature(s)
**R. Dahl, Ph.D.**
**Psychologist**
**High Desert State Prison**

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown   First Name: Gregory   MI: |
|---|---|---|
| | Inpatient | |
| | Outpatient (as of 2/9/04) | CDC #: T-82241   DOB 8/26/65 |

259

**Mental Health Treatment Plan Part One:**  Page 2 of 2

IV. DSM IV  Numerical ☑Last MSE 2-20-04 ☑Last TP 11/30/03 MH 1☐ _/_/_  Last MH 4 ☑ 12-23-02

| Axis I | TC 10 | 311 | Depressive Δ Gr NOS |
| | | V71.09 | No Axis I Δ r |

| Axis II | 301.83 | Borderline Personality Δ r/o |

| Axis III | | Uses wheel chair. Bad hips |

| Axis IV | (current) Incarceration |

| Axis V | GAF = 70 Describe basis. |

**V. Problem / Symptom List**

#1  Depressive Thoughts

#2

#3

**VI. Inmate's Strength and Weakness, Goals**   Inmate's Treatment Goals, ☐ MH 6 Input

+ Verbal.

Treatment Readiness: ☐ Amenable ☐ Motivated ☑ Resistant

− Dysphoric leg/hx

**VII. Discharge Plan To:** ☑GP ☐CCCMS ☐EOP ☐MHCB ☐DMH

Return to GP

Meds PreValid 2/9/04

**Signature(s)**  R. Dahl, **Ph.D.**
  Psychologist
  **High Desert State Prison**

| **MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2** [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | **LEVEL OF CARE** Return GP ☐ Inpatient ☐ Outpatient | Last Name: Brown  First Name: Gregory  MI: <br><br> CDC # V-82241  DOB 2-26-65 |

260

State of California, Department of Corrections, *N/C / S Region, Service Area = *R* Institution, *HDSP*

| TREATMENT PLAN PART TWO:  PROBLEM → # | | | pg. | | Today Date: *2/9/04* | |
|---|---|---|---|---|---|---|
| ☐Initial Treatment Plan | | ☐Update because | | | ☐Re-justify, | weeks |

| Prob. # | Describe Problem: | | Possible Completion | Date |
|---|---|---|---|---|
| *1* | *Dr. Coughran w* | Next Review | Date | |
| | **Target Behavior(s):** *Off X lyr Sx* | | | |
| | *& Meds Free.* | | | |
| | **Target Objective(s):** | | | |
| | *D/C OXP 2/9/04* | *2/9/04* | | |

| Date | Intervention (s) & Staff Assigned. | Frequency and Duration. | Results. |
|---|---|---|---|
| *2/9/04* | *Return to* | *2/9/04* | |
| | *Off - lyr Meds X Sx Free.* | | |
| | *No follow-up* | | |
| | | | |
| | | | |
| Signature(s) | *R. Dahl Ph.D.* | | |

R. Dahl, Ph.D.
Psychologist
High Desert State Prison

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One:  General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE *CYP* Inpatient Outpatient *(2/9/04)* | Last Name: *Brown* First Name: *Trevor* MI: *g* CDC #: *T-82291* DOB: *8/6/65* |
|---|---|---|

*J61*

| DATE | TIME | PSYCHIATRIC PROGRESS NOTE |
|------|------|---------------------------|
| 1/13/04 | 0840 | |

Inmate: BROWN, GREGORY    J82241

**S:**  Mr. Brown is complaining of anxiety and difficulty sleeping. He has put in a 602 because he does not feel that he is getting sufficient mental health needs. However, patient has been told that we would be happy to give him some therapy, have him see the psychologist, and all he has to do is request that, to help him deal with his stress. On the other hand he has no Axis I Diagnosis, does not need sleeping medication or antidepressant medication at this time.

**O:**  MS does not indicate any severe depression.

**A:**

**P:**  Patient is on a clock to return to GP.

_____, MD
S. SALENGER, MD
SS:cj

'04 JAN 26 PM 1 05    RECEIVED HDSP

260

State of California, Department of Corrections: (N) C/S Region, Service Area = _B_ , Institution = _HDSP_

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | | Page 1 of 2 |
|---|---|---|
| ☐ Original   ☑ Update   ☐ Rejustification | | ☐ CCCMS Annual Case Review |

| I. General Information: '04 AUG 26 | ☐ Team   ☑ Individual Clinician | Today Date |
|---|---|---|
| Arrival Date This Treatment Setting: _6_ /_19_/_03_ <br> ☑ CCCMS ☐ EOP ☐ MHCB/Infirmary <br> ☐ PSU -- ☐ _____ week observation. <br> Anticipated Date of Transfer to GP: _/_ / | ☐ MH 6  ☐ C File ☐ Health Record <br> ☑ Unit Health Record ☐ MH 1 <br> ☐ MH 4  ☐ Prior MH 2 _/_ /_ | _8_ /_25_/_04_ <br> Next Up Date <br> _8_ /_25_/_04_ |
| Custody Level:  I / II / III / IV /(AdS) SHU | | |

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| E. Jenesky | PhD | 6779 |
| | | |
| | | |
| | | |

**III. Present Mental Status** Date _8/25/04_ By _E. Jenesky_ Title _PhD_

A) Appearance ☐WNL

B) Behavior ☐WNL                               Speech ☐WNL

C) Mood ☐WNL        Sleep ☐WNL        Appetite ☐WNL        Affect ☐WNL

D) Cognition:
  1) Fund of Information ☐WNL
  2) Intellectual Functions ☐WNL
  3) Organization of Thought ☐WNL
  4) Association of Thought ☐WNL
  5) Reality Contact ☐WNL
  6) Thought Quality ☐WNL

E) Perception Disturbances (Hallucinations) ☐ None

F) Thought Content (Delusions) ☐ None

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐WNL

H) Insight & Judgment ☐WNL

I) Interview Attitude ☐WNL

J) Current Suicidality ☐None noted or stated.

K) Current Violence Risk ☐None noted or stated.

Signature(s)  _E. Jenesky_

Refused IDTT

| MENTAL HEALTH <br> TREATMENT PLANS, <br> UPDATES, REJUSTIFICATION <br> MH 2 [3/29/96] <br> Part One: General, Team, MSE <br> Diagnosis, Problems, Inmate Strengths <br> Part Two: Problem Pages -- Results <br> Use Insert-a-Page of MH 1 <br> Confidential Client/Patient Information <br> See W & I Code, Section 5328 | LEVEL OF <br> CARE <br><br> $C^3$ <br><br> Inpatient <br><br> Outpatient | Last Name:        First Name:        MI: <br><br> Brown, Gregory <br><br><br> CDC # J-82241  DOB 8/26/65 |

263

| Mental Health Treatment Plan Part One: | | | Page 2 of 2 |
|---|---|---|---|

IV. DSM IV  Numerical ☐Last MSE __/__/__  ☐Last TP __/__/__   MH 1☐__/__/__   Last MH 4 ☐__/__/__

RECEIVED HDSP
'04 AUG 26  PM 1 58

| Axis I | 311 | Dep D/o NOS | |
|---|---|---|---|
| | | | |
| | | | |
| Axis II | 799.9 | | |
| | | | |
| Axis III | | none | |
| Axis IV | | (current)  Lunl II  AdSy | |
| Axis V | | GAF = 65   Describe basis. | |

### V. Problem / Symptom List

| #1 | Refuses IDTT |
|---|---|
| #2 | |
| #3 | |

### VI. Inmate's Strength and Weakness, Goals     Inmate's Treatment Goals, ☐ MH 6 Input

Treatment Readiness: ☐ Amenable ☐ Motivated ☐ Resistant

### VII. Discharge Plan To: ☐GP ☐CCCMS ☐EOP   ☐MHCB ☐DMH

Signature(s)  E Jusy

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  C³  Inpatient  Outpatient | Last Name:  Brown   First Name:  Gregory   MI:  CDC # J-82241  DOB 8/26/65 |
|---|---|---|

264

RECEIVED HDSP

'04 SEP 9 AM 9 31

State of California, Department of Corrections: N / C / S Region, Service Area = B ; Institution = HDSP

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number | Page 1 of 2 |
|---|---|
| ☐ Original ☑ Update ☐ Rejustification | ☐ CCCMS Annual Case Review |

**I. General Information:**
Arrival Date This Treatment Setting: 6/19/03
☐ CCCMS ☐ EOP ☐ MHCB/Infirmary
☐ PSU -- ☐ _____ week observation.
Anticipated Date of Transfer to GP: / /
Custody Level: I / II / III / (IV / AdS) SHU

By: ☑ Team ☐ Individual Clinician
☐ MH 6 ☐ C File ☑ Health Record
☐ Unit Health Record ☐ MH 1
☐ MH 4 ☑ Prior MH 2 2/4/04

Today Date 9/8/04
Next Up Date 12/8/04

**II. Print Treatment Team Members**

| Name | Position | Telephone & Extension |
|---|---|---|
| Ed Jenesky | Ph.D. | 6790 |
| T Nolan | PhD | 6788 |
| Baines | PT | 6744 |

**III. Present Mental Status** Date 9/8/04 By Dr. Jenesky Title PhD

A) Appearance ☑WNL

B) Behavior ☑WNL          Speech ☑WNL

C) Mood ☐WNL   Dull      Sleep ☑WNL      Appetite ☑WNL      Affect ☐WNL   Flat

D) Cognition:
  1) Fund of Information ☑WNL
  2) Intellectual Functions ☑WNL
  3) Organization of Thought ☑WNL
  4) Association of Thought ☑WNL
  5) Reality Contact ☑WNL
  6) Thought Quality ☑WNL

E) Perception Disturbances (Hallucinations) ☑ None

F) Thought Content (Delusions) ☑None

G) Sensorium (Orientation, Memory, Attention, Concentration) ☑WNL

H) Insight & Judgment ☑WNL

I) Interview Attitude ☑WNL

J) Current Suicidality ☑None noted or stated.

K) Current Violence Risk ☑None noted or stated.

Signature(s) E Jeny us TNolanPhD BainesPT

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE

Inpatient

Outpatient | Last Name:    First Name:    MI:

Brown, Gregory

265

CDC # J-82241   DOB 8/26/65 |

**Mental Health Treatment Plan Part One:**                                                                    **Page 2 of 2**

IV. DSM IV  Numerical ☐Last MSE __/__/__ ☐Last TP __/__/__ MH 1☐__/__/__ Last MH 4 ☐ __/__/__

| Axis I | 296.3 | Major Depression D/o recurrent |
|---|---|---|
| | | |
| | | |
| Axis II | | |
| | | |
| Axis III | | Hip problems |
| Axis IV | | (current) |
| Axis V | | GAF = 60  Describe basis. |

**V.  Problem / Symptom List**

#1
Depressive Thoughts

#2
Hip/Health problems with mobility

#3

**VI.  Inmate's Strength and Weakness, Goals**    Inmate's Treatment Goals, ☐ MH 6 Input

Tries to be positive

Treatment Readiness: ☐ Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☐GP ☒CCCMS ☐EOP  ☐MHCB ☐DMH

Was briefly off C3 but decompensated back
on Rx (Remeron) since 7-27-04

**Signature(s)**  E Jung  T. NOLAN PhD  Bacsse PT

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One:  General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE

Inpatient

Outpatient | Last Name:        First Name:        MI:

Brown , Gregory

266

CDC # J.82241   DOB 8,26 65 |

State of California, Department of Corrections: N /C / S Region, Service Area = _B_ , Institution, _HDSP_

| TREATMENT PLAN PART TWO: PROBLEM → # | | pg. | | Today Date: 9 / 8 /04 | |
|---|---|---|---|---|---|
| ☐Initial Treatment Plan   ☐Update because | | | | ☐Re-justify, | weeks |

| Prob. # | Describe Problem: _Recurrent Mood D/o_ | Possible Completion | Date |
|---|---|---|---|
| | | Next Review | Date |
| | Target Behavior(s): _Depression_ | | |
| | | | |
| | Target Objective(s): ↗ _Mood_ | | |
| | | | |
| | | | |

| Date | Intervention (s) & Staff Assigned. | Frequency and Duration. | Results. |
|---|---|---|---|
| | | | |
| | _Case Mgmt_ | _Weekly_ | |
| | _Psychiatry_ | _PRN_ | |
| | | | |
| | | | |
| | | | |
| | | | |

Signature(s)   _B Cain, PT   T NOLAN   E. J____

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name:   First Name:   MI: |
|---|---|---|
| | | _Brown_ , _Gregory_ |
| | Inpatient | _267_ |
| | Outpatient | CDC # _J. 82241_   DOB _8/26/65_ |

State of California, Department of Corrections: N / C / S Region,   Service Area = ___ ,   Institution = ___

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number ___ - ___ | | Page 1 of 2 |
|---|---|---|
| ☐Original    ☐Update    ☐Rejustification | | ☐ CCCMS Annual Case Review |

| I. General Information: | By: ☐ Team    ☐Individual Clinician | Today Date |
|---|---|---|
| Arrival Date This Treatment Setting: __/__/__ | ☐ MH 6  ☐ C File ☐ Health Record | 10 / 1 / 04 |
| ☐ CCCMS ☐ EOP ☐ MHCB/Infirmary | ☐ Unit Health Record ☐ MH 1 | Next Up Date |
| ☐ PSU -- ☐ _____ week observation. | ☐ MH 4 ☐ Prior MH 2 __/__/__ | 10 / 1 / 05 |
| Anticipated Date of Transfer to GP:  __/__/__ | | |
| Custody Level: I / II / III / IV / AdS / SHU | | |

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| *(signature)* George mD | Psychiatrist | 559-992-8800 x7982 |
| *(signature)* Roway PhD | Psychologist | |
| S. Horne Psych Tech | Nursing | |
| | Custody | |

**III. Present Mental Status** Date 10 /6 /04 By Sylvia Roway mD Title Psychologist

A) Appearance ☐WNL  6 '5 - 11 , w/ walker for hip problem

B) Behavior ☑WNL  Polite   Speech ☑WNL

C) Mood ☐WNL  depressed   Sleep ☐WNL > impaired   Appetite ☐WNL   Affect ☐WNL  tearful

D) Cognition:

  1) Fund of Information ☑WNL
  2) Intellectual Functions ☑WNL
  3) Organization of Thought ☑WNL
  4) Association of Thought ☑WNL
  5) Reality Contact ☑WNL
  6) Thought Quality ☑WNL

E) Perception Disturbances  (Hallucinations) ☐ None   Denies

F) Thought Content  (Delusions) ☐ None   Denies

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☐WNL  impairment

H) Insight & Judgment ☐WNL  impaired

I) Interview Attitude ☐WNL  polite, cooperative

J) Current Suicidality ☐None noted or stated.  chronic ideations

K) Current Violence Risk ☐None noted or stated.  BPD = SHU Term.

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] | LEVEL OF CARE | Last Name: Brown   First Name: Gregory   MI: |
|---|---|---|
| Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths | Inpatient | J68 |
| Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | Outpatient | CDC # J82241   DOB 8-24-65 |

Mental Health Treatment Plan Part One:                                          Page 2 of 2

IV. DSM IV  Numerical ☐Last MSE _/_/__ ☐Last TP _/_/__ MH 1☐_/_/__  Last MH 4 ☐ _/_/__

Axis I      296.30    Major Depressive D/O, Recurrent

            304.80    Polysubst Abuse (mg, Alcohol)

Axis II     301.7     ASPD

Axis III

Axis IV     (current)  Hypertensive, Hip Problems, weather
                       SHU  Incarceration

Axis V      GAF = 65    Describe basis.

V. Problem / Symptom List

#1      Depression

#2

#3

VI. Inmate's Strength and Weakness, Goals          Inmate's Treatment Goals, ☐ MH 6 Input

    + = "cont do mis"           F/u Verbal, bright
    - =
                                Treatment Readiness: ☐ Amenable ☐ Motivated ☒Resistant

VII. Discharge Plan To: ☒GP ☐CCCMS ☐EOP      ☐MHCB ☐DMH

    after (yr SX + meds free

Signature(s)  Sylvia Loreny (M.D.)

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] | LEVEL OF CARE | Last Name: Brown   First Name: Gregory   MI: |
| --- | --- | --- |
| Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths | | 269 |
| Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 | Inpatient | |
| Confidential Client/Patient Information See W & I Code, Section 5328 | Outpatient | CDC # J82241   DOB 8·20·65 |

State of California, Department of Corrections: N /C / S Region,   Service Area = E , Institution = CSR

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number _____ | Page 1 of 2 |
|---|---|

☐ Original      ☐ Update      ☐ Rejustification                    ☐ CCCMS Annual Case Review

| I. General Information: | By: ☐ Team  ☒ Individual Clinician | Today Date 3 / 18 / 05 |
|---|---|---|
| Arrival Date This Treatment Setting: ___/___/___ | ☐ MH 6  ☐ C File  ☐ Health Record | |
| ☒ CCCMS  ☐ EOP  ☐ MHCB/Infirmary | ☐ Unit Health Record  ☐ MH 1 | Next Up Date |
| ☐ PSU -- ☐ _____ week observation. | ☐ MH 4  ☐ Prior MH 2 __/__/__ | 6 / 18 / 05 |
| Anticipated Date of Transfer to GP:  ___/___/___ | | |
| Custody Level:  I / II / III / IV / AdS / SHU | | |

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| Falkowitz LCSW | Case Manger | |
| Gel van | LPT | |
| Ramirez | CO | |
| | | |

---

**III. Present Mental Status**  Date 3/18/05 By Falkowltz Title LCJW

A) Appearance ☒ WNL

B) Behavior ☒ WNL                              Speech ☒ WNL

C) Mood ☒ WNL          Sleep ☒ WNL          Appetite ☐ WNL          Affect ☐ WNL

D) Cognition:
   1) Fund of Information ☐ WNL
   2) Intellectual Functions ☒ WNL
   3) Organization of Thought ☒ WNL
   4) Association of Thought ☒ WNL
   5) Reality Contact ☐ WNL
   6) Thought Quality ☒ WNL

E) Perception Disturbances  (Hallucinations) ☒ None

F) Thought Content (Delusions) ☒ None

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☒ WNL

H) Insight & Judgment ☒ WNL

I) Interview Attitude ☒ WNL

J) Current Suicidality ☒ None noted or stated.

K) Current Violence Risk ☒ None noted or stated.

---

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  CCMS  inpatient  Outpatient | Last Name: Brown   First Name:   MI: 270   CDC # J8 2241   DOB 8/26/65 |
|---|---|---|

| Mental Health Treatment Plan Part One: | Page 2 of 2 |
|---|---|

**IV. DSM IV  Numerical** ☐Last MSE __/__/__  ☐Last TP __/__/__  MH 1☐__/__/__  Last MH 4 ☐__/__/__

| Axis I | 296.26 | Major Depression in Remission |
|---|---|---|

| Axis II | 799.90 | Deferred |
|---|---|---|

| Axis III | | None Reported |
|---|---|---|
| Axis IV | | (current) Severe |
| Axis V | | GAF = 72  Describe basis. |

**V. Problem / Symptom List**

#1 Depression - in remission

#2

#3

**VI. Inmate's Strength and Weakness, Goals**      Inmate's Treatment Goals, ☐ MH 6 Input

Intelligent, articulate

Treatment Readiness: ☐ Amenable ☐ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☒GP ☐CCCMS ☐EOP    ☐MHCB ☐DMH

When free of meds, symptoms for one year

Signature(s) (signature)      V.P. SALKOWITZ, LCSW

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General. Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  CCMS  Inpatient  Outpatient | Last Name: Brown      First Name:      MI: 27/  CDC # J82241  DOB 8/26/65 |
|---|---|---|

State of California, Department of Corrections: N / C / S Region, Service Area = ___ , Institution = _____

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number _____ | Page 1 of 2 |
|---|---|

| ☑Original  ☐Update  ☐Rejustification | ☐ CCCMS Annual Case Review |

| I. General Information: | By: ☐ Team  ☐Individual Clinician | Today Date 7 5 05 |
|---|---|---|
| Arrival Date This Treatment Setting: 6 / 16 / 05 | ☐ MH 6 ☐ C File ☐ Health Record | |
| ☑ CCCMS ☐ EOP ☐ MHCB/Infirmary | ☐ Unit Health Record ☐ MH 1 | Next Up Date |
| ☐ PSU -- ☐ _____ week observation. | ☐ MH 4 ☐ Prior MH 2 __/__/__ | __/__/__ |
| Anticipated Date of Transfer to GP: __/__/__ | | |
| Custody Level: I / II / III (IV)/ AdS / SHU | | |

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| Enid Reed PhD | [T.T.Leader] | |
| | [Case Manager] | |
| | | |
| | | |

III. Present Mental Status  Date 7 / 5 / 05 By _____ Q / R / phD

ENID REED, Ph.D,
Clinical Psychologist

A) Appearance ☑WNL

B) Behavior ☑WNL                                   Speech ☐WNL

C) Mood ☑WNL          Sleep ☐WNL .          Appetite ☑WNL          Affect ☑WNL

D) Cognition:
    1) Fund of Information ☐WNL
    2) Intellectual Functions ☐WNL
    3) Organization of Thought ☑WNL
    4) Association of Thought ☑WNL
    5) Reality Contact ☑WNL
    6) Thought Quality ☑WNL

E) Perception Disturbances  (Hallucinations) ☑ None

F) Thought Content  (Delusions) ☑None

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☑WNL

H) Insight & Judgment ☑WNL

I) Interview Attitude ☑WNL

J) Current Suicidality ☑None noted or stated.

K) Current Violence Risk ☑None noted or stated.

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: BROWN | First Name: CRAIG | MI: |
|---|---|---|---|---|
| | | | | 272 |
| | Inpatient | | | |
| | Outpatient | CDC # J 8 2 2 4 1 | DOB __/__/__ | |

c9 171

| Mental Health Treatment Plan Part One: | | Page 2 of 2 |
|---|---|---|

IV. DSM IV  Numerical ☐Last MSE _/_/_  ☐Last TP _/_/_  MH 1☐_/_/_  Last MH 4 ☐ _/_/_

**Axis I**  296.9  Depression vs Bipolar disorder

Rage Reactions poor impulse control at times

**Axis II**  301.7  ASP D

Major orthopedic problems (vascular necrosis)

**Axis III**  R/o closed head trauma sequelae

**Axis IV**  (current)  incarceration plus denial, upcoming surgery

**Axis V**  GAF = 50  Describe basis.

**V. Problem / Symptom List**

#1  Anger/rage/depressive reactions

#2

#3

**VI. Inmate's Strength and Weakness, Goals**  Inmate's Treatment Goals, ☐ MH 6 Input

intelligence  Completion of surgery

temper outbursts & denial

Treatment Readiness: ☐ Amenable ☐ Motivated ☑ Resistant

**VII. Discharge Plan To:** ☐GP ☑CCCMS ☐EOP  ☐MHCB ☐DMH

ENID REED, Ph.D.,
Clinical Psychologist

**Signature(s)**  [signature]  #

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: BROWN, First Name: GREG MI: |
|---|---|---|
| | Inpatient | 273 |
| | Outpatient | CDC # J 8 2 2 4 1  DOB 8/26/65 |

State of California, Department of Corrections: N / C / S Region, SA = ___ , Institution = ___     ☐Male ☐Female

**CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER:**     Date 7/5/05
Variety Use Include: Admission Intake, Transfer, Parole, Discharge, MHCB Screen & Assessment.     Page 1 of 5

Current Setting: ☐GP ☐Ad Seg ☐SHU   ☐RC ☑CCMS ☐ EOP ☐ PSU ☐ MHCB ☐ Other:

| | | |
|---|---|---|
| I/M Ethnicity: **Blk** | Non English Language: | Level: I / II / III / IV / AS / SHU |
| CDC Arrival date: 5/10/05 | CDC Release date: Lifer | ☐MH 1, MH 4, MH 7  Date:  /  / |
| Inmate interviewed on: 7/5/05 | Level of Cooperation: motivated | DDPS ___ - ___  ☐Not Noted. |

**I. Purpose for Condensed Mental Health Assessment:**

A. ☑Condensed Initial Assessment (Intake) Form     (May Replace or Delay MH 1 Assessment / Data Base.)
   ☐ MH 1; ☐ MH 7; ☐ Bus Screening;  ☐ Page 2 (Psychiatric History) as ☐ Update or ☐ Initial history
B. ☐ Transfer to New Setting     Recommended DDPS Code Change To: ____ - ____
   ☐ Return to Custody  ☐GP   ☐OSAP   ☐POC & Complete Page 5.
   ☑ To Out-patient ☐CCCMS
      ☐EOP: Was tele-fax used? yes☐ no☐; Was approval obtained? yes☐ no☐ Conditional☐
      ☐PSU
   ☐ To In-patient    ☐MHCB ☐Infirmary: CTC pre-screening? yes☐ no☐ Details:
      ☐ DMH  ☐ Criminal History Supplemental Form needed.  DMH Care Level → ☐ Intermediate  ☐ Acute
         Describe referral methods:
         Describe current symptoms/concerns that indicate a need for Inpatient:

         Desired Inpatient Treatment outcome:

   Was Above:  ☐Intra or ☐Inter Institution  ☐Other (Outside)____  ☐No ☐Yes Transfer Chrono by ____
C. ☐ Pre Parole Release  (Complete page 5: MH 4> CCI > C&PR > Form 611> Parole Regional HQ & POC Clinician.)

D. ☐ Department of Correction Discharge. No CDC Follow Up.  ☐ Inter State Compact to: ____  (state)
   ☐ To Other Treatment Source:

   Name: _____ . Telephone: ( ) ___-___  FAX: ( ) ___-___

   Address: _____

   ☐ Consent to Release Specific Records, Coordinate with Health Records. ☐ QA Follow Up Plan Discussed Below

**II. Brief Narrative Summary:** ☐ Expanded on Insert-a-Page

avascular necrosis - bilateral hip replacement

| | LEVEL OF CARE | Last Name: **BROWN,** | First Name: **GREG** | MI: |
|---|---|---|---|---|
| **CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM** MH 4 Page: 1 of 5  [3/28/96] Expand With MH Insert-a-Page Confidential Client/Patient Information See W & I Code, Section 5328 | | | 274 | |
| | Inpatient | | | |
| | Outpatient | CDC **rd . 8 2 v 4 1** | DOB **8/24/65** | |

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 2 of 5 |
|---|---|

**III. MENTAL HEALTH & HEALTH HISTORY:** ☐ See Unit Health Record _____
(If an item is normal, check normal or none. If a deviation, elaborate.)

A. Developmental Problem ☑ No ☐ Yes *Ns. 14-cc.* ☐

B. Marital: circle ⬭S / M / D / W *& 13 *2m* ☐

C. Work History: ☐ None ☐ Some ☐ Erratic ☑ Extensive *automotive repair* ☐

D. Mental Health History: ☐ None known ☑ Yes ☐

E. Issues and Problems ☐

 1. Psychiatric Hospitalization ☒ None ☑ Yes *Looks for 10 days* 
 2. Psychotropic Medication in the last 2 years ☐ None ☑ Yes
 3. Outpatient Treatment ☒ None ☐ Yes *Tends to be on demand*
 4. MH Treatment while incarcerated/paroled ☐ None ☑ Yes
 5. History of Substance Abuse ☐ None ☐ Yes
 6. Release of information requested ☒ No Yes

F. Suicidal Behavior ☐ Denies History ☐ None Found ☐ Present ☐
*C# 35 - tried to hang self - frustrated, role suggesting + mages*

G. Violent Behavior ☐ Denies ⬭History ☐ None Found ☐ Present ☐
*voluntary manslaughter, attempting murder*

H. Discuss Significant Medical History (Head Traumas, HIV, Seizures) ☑ None Found ☐ Present ☐
*denies TBI. denies illnesses*
*has nightmares daily - stated no autonomic signs*

I. Other or Additional Comments: ☐
*problems with authority figures - likes autonomy - argues*
*refused to take temporary list - has been a clerk in past*
*IM has difficulty recenting - sdn*

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 2 of 5 [3/28/96] Expand With MH Insert-a-Page Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown | First Name: Greg | MI: |
|---|---|---|---|---|
| | | | | *275* |
| | Inpatient | | | |
| | Outpatient | CDC # J 8 2 2 4 1 | DOB _/_/_ | |

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 3 of 5 |
|---|---|

**IV. Present Mental Status**    Date 7/5/05

A) Appearance ☑WNL

B) Behavior ☑WNL          Speech ☑WNL

C) Mood ☑WNL          Sleep ☐WNL          Appetite ☐WNL          Affect ☑WNL

D) Cognition:
   1) Fund of Information ☑WNL
   2) Intellectual Functions ☑WNL          *refusing of meds*
   3) Organization of Thought ☑WNL
   4) Association of Thought ☑WNL
   5) Reality Contact ☑WNL
   6) Thought Quality ☑WNL

E) Perception Disturbances  (Hallucinations) ☑None

F) Thought Content  (Delusions) ☑None

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☑WNL

H) Insight & Judgment ☑WNL  *own worst enemy*

I) Interview Attitude ☑WNL  *good*

J) Current Suicidality ☑None noted or stated.

K) Current Violence Risk ☑None noted or stated.

**V. DSM IV    Numerical    - Transferring / Discharge / Provisional  (Discussion, diagnostic certainty.)**

| Axis I | 296.9 | Depression *...* / Bipolar |
| | 304.8 | Polysubstance dependence |
| | 301.7 | ASPD |
| Axis II | | Hx violent behavior - 1/n denies |
| | | R/O TBI |
| Axis III | | "vascular necrosis" injuries to be rvld |
| Axis IV | (current) | Incarceration, approaching surgery |
| Axis V | GAF = 50  (Discuss basis.) | |

Discussion and Diagnostic Certainty:

☐ Dual Diagnosis

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 3 of 5 [3/28/96] Expand With MH Insert-a-Page Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown    First Name: Greg    MI: |
|---|---|---|
| | Inpatient | 276 |
| | Outpatient | CDC # J-82444  DOB 8/24/65 |

| VI. Present Treatment Summary (See Treatment Plan detail, MH 2, ___/___/___ ) | | | Page 4 of 5 |
|---|---|---|---|

**a. Medication Chronology:** ☐None ☐No Side Effects Noted ☐Medication Concern Issue ☐Keyhea    Discuss below.

Allergies:

| Name of Medication | Target Symptom | Dose | Side Effect |
|---|---|---|---|
| Elavil | for pain | 50mg. | |
| | | | |
| | | | |
| | | | |

**c. Laboratory Results:**

**d. Special Consultations:**

**e. Treatment Setting Change, if any:**

ENID REED, Ph.D.

Clinician Name: _____    Clinical: Clinical Psychologist    Date: 7 / 5 / 06

Clinician Signature: _____    Telephone: (   ) ___ - _____    Ext. _____

**VII. NEW SETTING ASSESSMENT & INITIAL TREATMENT PLAN:**

Date Receiving Above Assessment ___/___/___ Time ___:___ ; Received by: _____

**Identify Setting:**

**Receiving Assessment:**

**Receiving Plan:**

**Receiving Clinician's Name:**                    **Signature:**

**Clinician Contact Regarding Discharge:** Name & Position

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 4 of 5 [3/28/96] Expand With MH Insert-a-Page Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown   First Name: Greg   MI: |
|---|---|---|
| | | 277 |
| | Inpatient | CDC # _____ DOB 4/1/79 |
| | Outpatient | |

State of California, Department of Corrections:  N / C / S Region, SA = ___, Present Institution = _____

| VIII. PAROLE  DATA: Condensed Mental Health Assessment & Parole Transfer | | | | | Page 5 of 5 | |
|---|---|---|---|---|---|---|
| Date Completed: ___/___/___   MH> CCI> C&PR> Form 611>Parole HQ>POC    DDPS Noted ☐Yes ☐No _____ . | | | | | | |
| Allergies: | | | | | | |
| Anticipated Date of Discharge: | | | | | | |
| Other: | | | | | | |

**Medication Provided at Discharge**   ☐ None   ☐ See page 3

| Name of Medication | Dose size | # of Tablets | Name of Medication | Dose size | # of Tablets |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| **Housing Plans:** | Reside with: | | Relationship: |
|---|---|---|---|
| Address: | | | |
| Telephone: (    ) | | In whose name is telephone listed? | |
| Other housing issues: | | | |

**Suggested Aftercare Approach Plan:**

Completed By CDC Clinician: _____    Clinician Title: _____   Date: ___/___/___

Clinician Signature: _____    Telephone: (   ) ____-_____   Ext. _____

CCI Name: _____   Telephone: (   ) ____-_____   Ext. _____   C&PR Confirmed by: _____

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM  MH 4  Page: 5 of 5  [3/28/96]  Expand With MH Insert-a-Page  Confidential Client/Patient Information  See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: | First Name: | MI: |
|---|---|---|---|---|
| | | | 278 | |
| | Inpatient | | | |
| | Outpatient | CDC # __-__ __ __ __ | | DOB __/__/__ |

**Mental Health Treatment Plan Part One:**                                     Page 2 of 2

IV. DSM IV Numerical ☑Last MSE 5/15/07 ☐Last TP __/__/__ MH 1☐__/__/__ Last MH 4 ☑ 7/5/05

| Axis I | 311 | Depressive disorder NOS. |
|---|---|---|
| | | |
| | | |

| Axis II | 799.9 | ~~No Diagnosis~~ Diagnosis Deferred on Axis II. |
|---|---|---|

| Axis III | | Chronic Hip Pain. |
|---|---|---|
| Axis IV | | (current) Incarceration |
| Axis V | | GAF = 60  Describe basis. |

**V. Problem / Symptom List**

#1  Depression.

#2

#3

**VI. Inmate's Strength and Weakness, Goals**          Inmate's Treatment Goals, ☐ MH 6 Input

S - Communication skills.

W - Lack of attention

Treatment Readiness: ☒ Amenable ☒ Motivated ☐ Resistant

**VII. Discharge Plan To:** ☒GP ☐CCCMS ☐EOP   ☐MHCB ☐DMH

to return to GP when in full remission of symptoms and medication free for 6 months period.

Signature(s)

_____ Ph.D. _____ PSYCHOLOGIST _____ N. Starn MD _____ Gregory J. Brown

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE  CCCMS  Inpatient  (Outpatient) | Last Name:  First Name:  MI: |
|---|---|---|
| | | BROWN, GREGORY |
| | | CDC # J. 82241  DOB 8/26/65 |

279

| State of California, Department of Corrections:  N / C / S Region, SA = ___ , Institution = _____  ☐Male ☐Female |
|---|
| CONDENSED MENTAL HEALTH ASSESSMENT  & TREATMENT SETTING TRANSFER:     Date 9/24 0 |
| Variety Use Include: Admission Intake, Transfer, Parole, Discharge, MHCB Screen & Assessment.     Page 1 of 5 |
| Current Setting: ☐GP ☐Ad Seg ☐SHU     ☐RC ☐CCCMS ☐ EOP ☐ PSU ☐ MHCB ☐ Other: |

| I/M Ethnicity: *Black* | Non English Language: | Level: I / II / III / IV / AS / SHU |
|---|---|---|
| CDC Arrival date: | CDC Release date: 55-Life | ☐MH 1, MH 4, MH 7  Date:  /  / |
| Inmate interviewed on: 9/24 0 4 | Level of Cooperation: good | DDPS CDDPS ☐Not Noted. |

**I. Purpose for Condensed Mental Health Assessment:**

| A. ☐Condensed Initial Assessment (Intake) Form    (May Replace or Delay MH 1 Assessment / Data Base.) |
|---|
| ☐ MH 1; ☐  MH 7; ☐ Bus Screening;  ☐ Page 2 (Psychiatric History) as ☐ Update or ☐ Initial history |
| B. ☐ Transfer to New Setting     Recommended DDPS Code Change To: _____ - ____ |
| ☐ Return to Custody  ☐GP     ☐OSAP     ☐POC & Complete Page 5. |
| ☐ To Out-patient ☐CCCMS |
| ☐EOP:  Was tele-fax used? yes☐ no☐; Was approval obtained? yes☐ no☐ Conditional☐ |
| ☐PSU |
| ☐ To In-patient      ☐MHCB ☐Infirmary: CTC pre-screening? yes☐ no☐ Details: |
| ☐ DMH  ☐ Criminal History Supplemental Form needed.   DMH Care Level → ☐ Intermediate ☐ Acute |
| Describe referral methods: |
| Describe current symptoms/concerns that indicate a need for Inpatient: |
| |
| Desired Inpatient Treatment outcome: |
| |
| Was Above:  ☐Intra or ☐Inter Institution ☐Other (Outside)_____ ☐No ☐Yes Transfer Chrono by _____ |
| C. ☐ Pre Parole Release   (Complete page 5: MH 4> CCI > C&PR > Form 611> Parole Regional HQ & POC Clinician.) |
| |
| D. ☐ Department of Correction Discharge. No CDC Follow Up.  ☐ Inter State Compact to: _____ (state) |
| ☐ To Other Treatment Source: |
| Name: _____ Telephone: (   ) ___-_____  FAX: (   ) ___-_____ |
| Address: _____ |
| ☐ Consent to Release Specific Records, Coordinate with Health Records. ☐ QA Follow Up Plan Discussed Below. |

**II. Brief Narrative Summary:** ☐ Expanded on Insert-a-Page

*Prior Offense, 2nd Incarceration, Conspiracy to Commit murder, direct involvement + denial. I/m corresponds w/ mo, family all in New Orleans. I/m 1st time involuntary manslaughter for self defense. I/m speaks of mood disorder. SHU Term V BPO*

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM  MH 4  Page: 1 of 5 [3/28/96]  Expand With MH Insert-a-Page  Confidential Client/Patient Information  See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: *Brown*  First Name: *Gregory*   MI: |
|---|---|---|
| | Inpatient | |
| | Outpatient | CDC # 58224 1   DOB 8/29/65 |

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 2 of 5 |
|---|---|

**III. MENTAL HEALTH & HEALTH HISTORY:** ☐ See Unit Health Record _____
   (If an item is normal, check normal or none. If a deviation, elaborate.)

**A. Developmental Problem** ☐ No  ☑ Yes   *Hs grad no dev problems* ☐

**B. Marital:** circle (S) M / D / W   *2 children 21, and 12 (daughter)* ☐

**C. Work History:** ☐None ☐Some ☐Erratic ☑Extensive *auto mechanic* ☐

**D. Mental Health History:** ☐ None known ☐Yes ☐

**E. Issues and Problems** ☐
   1. Psychiatric Hospitalization ☐None ☐Yes *outside*
   2. Psychotropic Medication in the last 2 years ☐None ☑Yes  *was taking Remeron for*
   3. Outpatient Treatment ☐None ☐Yes  *depression*
   4. MH Treatment while incarcerated/paroled ☐None ☐Yes  *erratic compliance*
   5. History of Substance Abuse ☐None ☐Yes *mj/alcohol*
   6. Release of information requested ☐ No Yes

**F. Suicidal Behavior** ☐Denies  History ☐None Found ☐Present ☐
   *Hung self 2 yrs ago - found by others*

**G. Violent Behavior** ☐Denies  History ☐None Found ☐Present ☐

**H. Discuss Significant Medical History (Head Traumas, HIV, Seizures)** ☑ None Found ☐Present ☐
   *Needs 2 hip replacements*
   *Hypertension*

**I. Other or Additional Comments:** ☐
   *I'm back to 3CM 2 mo ago due to ↓ mood.*
   *Chronic SI from 1999*

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 2 of 5 [3/28/96] Expand With MH Insert-a-Page Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE   Inpatient   Outpatient | Last Name: Brown   First Name: Gregory   MI:  281   CDC # J-82241   DOB 8-26-65 |

| Condensed Mental Health Assessment & Treatment Setting Transfer: | Page 3 of 5 |
|---|---|

| IV. Present Mental Status    Date 9/14/0 |
|---|

A) Appearance ☐WNL  6'5" Disabled by hip problem

B) Behavior ☑WNL                                    Speech ☑WNL

C) Mood ☐WNL        Sleep ☐WNL    Appetite ☑WNL    Affect ☐WNL
Depressed, Tearful    Impairment depressed    Tearful

D) Cognition:
   1) Fund of Information ☐WNL
   2) Intellectual Functions ☐WNL
   3) Organization of Thought ☐WNL
   4) Association of Thought ☐WNL
   5) Reality Contact ☑WNL
   6) Thought Quality ☑WNL

E) Perception Disturbances  (Hallucinations) ☑ None

F) Thought Content (Delusions) ☑ None

G) Sensorium  (Orientation, Memory, Attention, Concentration) ☐WNL  impaired

H) Insight & Judgment ☐WNL  Impaired

I) Interview Attitude ☐WNL  Cooperative

J) Current Suicidality ☐None noted or stated. Chronic, past attempts + SI

K) Current Violence Risk ☐None noted or stated. not yet

| V. DSM IV  Numerical  - Transferring / Discharge / Provisional  (Discussion, diagnostic certainty.) |
|---|

| Axis I | R/O | Major Depressive D/O, recurrent |
|---|---|---|
|  | 304.80 | Polysut Abuse (MJ/alcohol) |
| Axis II | 301.7 | ASPD |
| Axis III | Hypertensive, Hip Problems |
| Axis IV | (current) SHU Incarceration |
| Axis V | GAF = 65  (Discuss basis.) |

Discussion and Diagnostic Certainty:

☐ Dual Diagnosis

| CONDENSED MENTAL HEALTH ASSESSMENT & TREATMENT SETTING TRANSFER & PAROLE/DISCHARGE FORM MH 4 Page: 3 of 5  [3/28/96] Expand With MH Insert-a-Page Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE | Last Name: Brown   First Name: gregory   MI: J82 |
|---|---|---|
|  | Inpatient |  |
|  | Outpatient | CDC # J-82241    DOB 8/26/65 |

State of California, Department of Corrections: N / C / S Region, Service Area = _C_, Institution = _CSATF_

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number _____ | | Page 1 of 2 |
|---|---|---|
| ☐Original    ☑Update    ☐Rejustification | | ☐ CCCMS Annual Case Review |

**I. General Information:**
Arrival Date This Treatment Setting: _6 / 9 / 06_
☑ CCCMS ☐ EOP ☐ MHCB/Infirmary
☐ PSU -- ☐ _____ week observation.
Anticipated Date of Transfer to GP: __ / __ / __
Custody Level: I / II / III / IV / AdS / SHU

By: ☑ Team    ☐ Individual Clinician
☐ MH 6 ☑ C File ☐ Health Record
☑ Unit Health Record ☐ MH 1
☐ MH 4 ☑ Prior MH 2 _7 5 06_

Today Date _6 / 22 / 06_
Next Up Date _6 / 29 / 07_

**II. Print Treatment Team Members**

| | Position | Telephone & Extension |
|---|---|---|
| B. Meeker PhD | [T.T.Leader] | 5538 |
| Mr Dean CC1 | | |
| | | |
| | | |

**III. Present Mental Status** Date _6 / 13 / 06_ By _E. Meeker PhD_ Title _Staff Psychologist_

A) Appearance ☑WNL

B) Behavior ☑WNL                                    Speech ☐WNL

C) Mood ☑WNL        Sleep ☐WNL        Appetite ☐WNL        Affect ☑WNL
Depressed            4° - 5°            Poor

D) Cognition:
  1) Fund of Information ☑WNL
  2) Intellectual Functions ☑WNL
  3) Organization of Thought ☑WNL
  4) Association of Thought ☑WNL
  5) Reality Contact ☑WNL
  6) Thought Quality ☑WNL

E) Perception Disturbances (Hallucinations) ☑None

F) Thought Content (Delusions) ☑None

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐WNL
Attention + Memory poor last exam

H) Insight & Judgment ☑WNL

I) Interview Attitude ☑WNL

J) Current Suicidality ☑None noted or stated.

K) Current Violence Risk ☑None noted or stated.

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE

Inpatient

Outpatient | Last Name: First Name: MI: Brown

983

CDC # J 82241  DOB __/__/__ |

| Mental Health Treatment Plan Part One: | Page 2 of 2 |
|---|---|

IV. DSM IV Numerical ☐Last MSE __/__/__ ☐Last TP __/__/__ MH 1☐ __/__/__ Last MH 4 ☐ __/__/__

| Axis I | 3 71 | Depression Disorder NOS |
|---|---|---|
| | | |
| | | |

| Axis II | 799·9 | Deferred |
|---|---|---|
| | | |

| Axis III | | Chronic Nip Pain |
|---|---|---|
| Axis IV | | (current) Incarceration |
| Axis V | | GAF = 60 Describe basis. |

**V. Problem / Symptom List**

#1
Depression

#2

#3

**VI. Inmate's Strength and Weakness, Goals**     Inmate's Treatment Goals, ☐ MH 6 Input

Endurance

Treatment Readiness: ☐ Amenable ☐ Motivated ☒Resistant

**VII. Discharge Plan To:** ☒GP ☐CCCMS ☐EOP     ☐MHCB ☐DMH

If he remains Tox + S/s free x 6 mths.

| Signature(s) | |
|---|---|

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE   Inpatient   Outpatient | Last Name: Brown   First Name:   MI:   CDC # T.822 41 DOB _/_/_  384 |

State of California, Department of Corrections, Institution: CSP, Sacramento

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number: | | Page 1 of 3 |
|---|---|---|
| ☑ Original ☐ Update ☐ Rejustification | | ☐ CCCMS Annual Case Review |

| I. General Information: | By: ☒ Team ☐ Individual Clinician | Today's Date 12/8/06 |
|---|---|---|
| Arrival Date This Treatment Setting: ___ <br><br> ☒ CCCMS ☐ EOP <br> ☐ MHCB/Infirmary ☐ PSU <br> ☐ ___ week observation <br> Anticipated Date of Transfer to GP: ___ | ☐ MH 6 ☐ C File ☐ Health Record <br> ☐ Unit Health Record ☐ MH 1 <br> ☐ MH 4 ☐ Prior MH 2 ___ | Next Up Date 3/8/07 |

Custody Level: I / II / III / IV / AdSeg / SHU

| II.  Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| M. Hillary, PhD | Clinical Psychologist | (916) 985-8610 x8410 |
| M. Moghaddas, MD | Psychiatrist | x6535 |
| J. Brown, PsyD | Clinical Psychologist | x8413 |
| ~~A. Zimmer, LCSW~~ | ~~Licensed Clinical Social Worker~~ | ~~x6159~~ |
| Greer | CCI | x 6061 |

III  Present Mental Status    Date: 12/8/06    By: M. Hillary, PhD.    Title: Clinical Psychologist

| A) Appearance | ☐ WNL  mobility impaired vest, walker |
|---|---|
| B) Behavior | ☐ WNL |
| Speech | ☐ WNL |
| C) Mood | ☐ WNL depressed |
| Sleep | ☐ WNL c/o ↓ sleep |
| Appetite | ☐ WNL c/o no appetite |
| Affect | ☐ WNL |

| D) Cognition: | | |
|---|---|---|
| 1) Fund of Information | ☐ WNL | 8 Dec 06 |
| 2) Intellectual Functions | ☐ WNL | gB |
| 3) Organization of Thought | ☐ WNL | Pres |
| 4) Association of Thought | ☐ WNL | VP  Sct |
| 5) Reality Contact | ☐ WNL | jor |
| 6) Thought Quality | ☐ WNL | |

6 + 3 + 2 = 11
9 – 4 = 5
"world"
"d I row"

| E) Perception Disturbances (Hallucinations) | ☐ None |
|---|---|
| F) Thought Content  (Delusions) | ☐ None |
| G) Sensorium (Orientation, Memory, Attention, Concentration) | ☐ WNL |
| H) Insight & Judgment | ☐ WNL |
| I) Interview Attitude | ☐ WNL |
| J) Current Suicidality | ☐ None noted or stated  none current |
| K) Current violence Risk | ☐ None noted or stated  hx |

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION <br> MH 2 (10/20/99) <br> Part One: General, Team, MSE <br> Diagnosis, Problems, Inmate Strengths <br> Part Two: Problem Pages -- Results <br> Use Insert-a-Page of MH 1 <br> Confidential Client/Patient Information <br> SEE W & I Code, Section 5328 | LEVEL OF CARE <br><br> CCCMS <br> ASU <br> Outpatient | Last Name: Brown <br><br> CDC # J 83241 | First Name: Gregory <br><br> DOB: 285 |

| Mental Health Treatment Plan Part One: | Page 2 of 3 |

IV. DSM IV    Numerical    ☐ Last MSE _____   ☐ Last TP _____   ☐ MH 1 _____   ☐ Last MH 4 _____

Axis I

311 Depressive Disorder NOS

Axis II

301.7 ASPD

Axis III
See UHR

Axis IV   CURRENT INCARCERATION                                    (current) _____

Axis V   BASED ON CURRENT MENTAL STATUS EXAMINATION      GAF = _____ Describe basis
                                                                                          60

V. Problem/Symptom List

#1   faces bilateral hip replacements

#2

#3

VI. Inmate's Strength and Weakness, Goals          Inmate's Treatment Goals, ☐ MH 6 Input
intelligent

PSYCH MEDS:                          Treatment Readiness: ☒ Amenable ☐ Motivated ☐ Resistant
no ‡meds per pt (no UHR, flimsy file)

VII. Discharge Plan To: ☒ GP ☐ CCCMS ☐ EOP ☐ MHCB ☐ DMH

EVENTUAL DISCHARGE TO GENERAL POPULATION.  CONTINUE CCCMS LEVEL OF CARE.

Signature(s)          M. Hillary, PhD  M Hillary, PW

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 (10/20/99) Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information SEE W & I Code, Section 5328 | LEVEL OF CARE  CCCMS ASU Outpatient | Last Name: Brown   First Name: Gregory   CDC # J 82241   DOB: |

286

State of California, Department of Corrections: N /(C) S Region, Service Area = C , Institution = CSATF/SP

| MENTAL HEALTH TREATMENT PLAN: Sequential Part One Identifier Number   0   1   Page 1 of 2 |
|---|

☐ Original   ☐ Update   ☐ Rejustification          ☒ CCCMS Annual Case Review

| I. General Information: | By: ☒ Team   ☒ Individual Clinician | Today Date |
|---|---|---|
| Arrival Date This Treatment Setting: __/__/__ | ☐ MH 6 ☒ C File ☐ Health Record | 05/16/07 |
| ☒ CCCMS ☐ EOP ☐ MHCB/Infirmary | ☒ Unit Health Record ☐ MH 1 | Next Up Date |
| ☐ PSU -- ☐_____ week observation. | ☒ MH 4 ☒ Prior MH 2 6/29/06 | 05/15/08 |
| Anticipated Date of Transfer to GP:   /   / | | |
| Custody Level: I / II / III / (IV) AdS / SHU | | |

| II. Print Treatment Team Members | Position | Telephone & Extension |
|---|---|---|
| E. De Almeida, PhD | Psychologist | (559) 992-7100 ext. 5533 |
| H R Forester, MD | Psychiatrist | "          " |
| I. Gonzalez | CCI | "          " |
| | | "          " |

III. Present Mental Status   Date 5/15/2007   By E. De Almeida, PhD Title Psychologist

A) Appearance ☐ WNL   goatee

B) Behavior ☒ WNL          Speech ☐ WNL

C) Mood ☐ WNL "pluctuation"   Sleep ☐ WNL 3 to 5   Appetite ☐ WNL   Affect ☐ WNL

D) Cognition: euthymic   hours /l   night.
   1) Fund of Information ☒ WNL
   2) Intellectual Functions ☐ WNL
   3) Organization of Thought ☒ WNL
   4) Association of Thought ☐ WNL
   5) Reality Contact ☐ WNL
   6) Thought Quality ☐ WNL

E) Perception Disturbances (Hallucinations) ☐ None

F) Thought Content (Delusions) ☐ None

G) Sensorium (Orientation, Memory, Attention, Concentration) ☐ WNL   mild impairment

H) Insight & Judgment ☐ WNL

I) Interview Attitude ☐ WNL

J) Current Suicidality ☒ None noted or stated.

K) Current Violence Risk ☐ None noted or stated.

| MENTAL HEALTH TREATMENT PLANS, UPDATES, REJUSTIFICATION MH 2 [3/29/96] Part One: General, Team, MSE Diagnosis, Problems, Inmate Strengths Part Two: Problem Pages -- Results Use Insert-a-Page of MH 1 Confidential Client/Patient Information See W & I Code, Section 5328 | LEVEL OF CARE CCCMS. Inpatient Outpatient | Last Name:   First Name:   MI: BROWN, GREGORY CDC # J - 82241   DOB 8/26/65 |
|---|---|---|

587

**MENTAL HEALTH TREATMENT PLAN**

| ☐ Initial | ☐ Update | BiWeekly MHCB Review | ☐ Quarte ☐ Review | ☑ Annual Review |

**I. General Information**

Treatment Setting _(DB) SATF_

Current Level of Care: ☐ NONE ☑ CCCMS
☐ EOP ☐ MHCB ☐ OTHER _____

TODAY'S DATE _4/30/08_

*Arrival Date This Treatment Setting: _6/12005_

Current Housing: ☐ RC ☑ GP ☐ CTC

NEXT UPDATE _4/29/08_

From: _Corcoran_

☐ ASU ☐ PSU ☐ SHU ☐ OTHER:_____

Custody Level: I/ II / III / IV AdSeg / SHU      EPRD: _____

| Date Reviewed: | Initials: | Date: | Initials: | Date: | Initials: |

**II. CLINICAL SUMMARY**

I/m is a 42 year old AA male c a History of major Depression. I/m is not currently on Ψ meds and symptoms seem to be moderate. (depressed mood-daily; anhedonia, ↓energy, ↓concentration, poor sleep & appetite) I/m declined referral to ΨMD.

**III. PROBLEM LIST**

| Number | Problem | Intervention/Clinician | Goal | Progress / Date |
|--------|---------|------------------------|------|-----------------|
| 1 | depression | 1:1 c̄ CM x90days/prn | ↓ Sx of depression from daily to no more than 3x/wk in the next year. | |
| | | 1:1 c̄ ΨMD - as needed. | | |
| | | exercise, per I/m report | a-3x/wk. | |
| | | Group Therapy - I/m on waitlist for depression Gr. | | |

**IV. PSYCHOTROPIC MEDICATION**

| Number | Problem/Target Symptom | Medication | Goal | Progress / Date |
|--------|------------------------|------------|------|-----------------|
| | None | | | |

**V. CURRENT RISK FACTORS/BEHAVIORAL ALERTS:** ☐ Suicidal ☐ Self Injurious ☐ Assaultive ☐ Keyhea

See Form _____ Dated _____ For Detailed Description

Summary: _____

**VI. RECOMMENDED HOUSING:** ☐ Single Cell ☑ Double Cell ☐ No Recommendation

**VII. TRANSFER/DISCHARGE TO:** ☑ Non-MHSDS ☐ CCCMS ☐ EOP ☐ MHCB ☐ APP ☐ ICF ☐ DTP ☐ Parole

When symptoms remit.

INSTITUTION _SATF_      CLINICIAN _C. Buenafe, Psy.D._

INMATE BED NUMBER _104_      DATE _4/30/08_

Name (Last, First, MI), CDC Number, DOB

**MENTAL HEALTH TREATMENT PLAN**
CDCR 7388 (Rev. 06/06)

Confidential Client/Patient Information

Page 1 of 6

Brown, Gregory

288

J82241      8/26/65

STATE OF CALIFORNIA      DEPARTMENT OF CORRECTIONS AND REHABILITATION

1
2
3
4
5
6
7              IN THE UNITED STATES DISTRICT COURT
8          FOR THE NORTHERN DISTRICT OF CALIFORNIA
9

| | | |
|---|---|---|
| GREGORY L. BROWN, | ) | No. C 08-3501 MMC (PR) |
| Petitioner, | ) | **ORDER ADMINISTRATIVELY** |
| | ) | **CLOSING CASE; DIRECTIONS TO** |
| v. | ) | **CLERK** |
| KEN CLARK, Warden, | ) | |
| Respondent. | ) | |
| _____ | ) | |

On July 22, 2008, two habeas corpus actions were opened in this court as the result of filings received from petitioner, a California prisoner proceeding pro se.  The first action, C 08-3502, is a petition for a writ of habeas corpus, in which petitioner alleges that in 1995, in the Superior Court of San Francisco County, he was wrongly convicted of conspiracy to commit murder and attempted murder.  (See Brown v. Clark, C 08-3502 MMC (PR)).  On July 28, 2008, the Court dismissed the petition as a second or successive petition, pursuant to 28 U.S.C. § 2244(b).

The above-titled action is the second action, which is comprised of two documents. The first document is titled "Greg's Declaration and Memorandum in Support of Good Cause to File a Late Petition for Writ of Habeas Corpus Due to Newly Discovered Evidence and a Claim of Actual Innocence" ("Declaration"); the second document consists of exhibits in support of said Declaration.  In his Declaration, petitioner explains that he is seeking leave to file, on grounds of newly discovered evidence, a "late" petition challenging his 1995

1   conviction for conspiracy to commit murder and attempted murder.

2       It is clear from the Declaration that petitioner intended that both the Declaration and

3   supporting exhibits be filed with his petition in Case No. C 08-3502.  Accordingly, as the

4   instant action was opened in error, the Clerk of the Court is hereby DIRECTED to

5   administratively close the case and to file the documents from the instant action in case

6   number C 08-3502.[1]

7       Because the instant action was opened in error, no filing fee is due.

8       IT IS SO ORDERED.

9   DATED: July 30, 2008

10  _____
    MAXINE M. CHESNEY
11  United States District Judge

---

27  [1]Case No. C 08-3502 remains closed.  The filing of the above-referenced documents
    in Case No. C 08-3502 is an administrative matter and has no effect on the Court's dismissal
28  of the petition therein as a second or successive petition.

2